UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LLB CONVENIENCE & GAS, INC.,

        Plaintiff,

v.                                                                              Case No: 6:18-cv-914-Orl-40TBS

SOUTHEAST PETRO DISTRIBUTORS, INC.,

        Defendant.
_____/

**<u>ORDER</u>**

      This cause is before the Court on Plaintiff's, LLB Convenience & Gas, Inc. (hereafter "LLB"), Motion for Emergency Injunction (Doc. 4), by which Plaintiff seeks the entry of a preliminary injunction pursuant to 15 U.S.C. § 2805. Upon due consideration of the pleadings, and with the benefit of oral argument, Plaintiff's motion is granted.

**I.   BACKGROUND**

      On June 11, 2018, LLB commenced this action against Southeast Petro Distributors, Inc. (hereafter "Southeast"). (Doc. 1). In Count One of the Complaint LLB alleges that Southeast violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.* (*Id.*). Count Two asserts a claim for anticipatory repudiation of the franchise agreement entered into between LLB and Southeast. (*Id.*). Plaintiff seeks entry of a preliminary injunction pursuant to 15 U.S.C. § 2805 and pursuant to Fed. R. Civ. P. 65. (*Id.*).

### A.   The Franchise and Wholesale Marketer Agreements

On June 20, 2018, LLB filed its Motion for Emergency Injunction.[1] (Doc. 4). LLB entered into a Dealer Supply Agreement ("DSA") with Southeast on December 12, 2007. (*Id.* at p. 2). The DSA or franchise agreement requires Southeast to supply LLB with motor fuel and allows for the use of the Shell trademark at the service station. (*Id.*). Southeast in turn has entered into a Wholesale Marketer Agreement ("WMA") with Motiva Enterprises LLC (Shell) through which Southeast purchases fuel for distribution to its franchisees, including LLB. (Def. Ex. 2). LLB is not a party to the WMA and Motive is not a party to the DSA. The WMA grants Southeast (the Buyer) permission to use Shell's "Identification" (trademarked logo) in connection with the resale of Shell products at the Buyer's Outlets, meaning that Southeast may use the Shell logo at service stations operated by Southeast's franchisees. (*Id.* at p. 5).

Shell (Motiva) may exercise its sole discretion in approving any requests to brand a proposed retail outlet under the Identification. (*Id.*). Southeast is responsible for ensuring that its franchisees follow "all rules, regulations, standards and guidelines Seller [Motiva/Shell] establishes from time to time relating to the use and display of the Identifications." (*Id.*). In order to protect the Shell brand, Southeast must ensure its outlets "undertake no action of any kind that may harm or degrade the Identifications." (*Id.*). This includes requiring the franchisee/outlets to conduct their business "in a professional,

---

[1]   This action was initially filed in state court, and the circuit judge held a non-evidentiary hearing to address whether injunctive relief should be allowed. (Doc. 4, p. 4). Southeast did not argue during the four-hour evidentiary hearing held before this Court on June 29, 2018, that claim preclusion or collateral estoppel prevents this Court from ruling upon Plaintiff's Motion. This Court agrees with Plaintiff's arguments that LLB's request for injunctive relief is not barred by res judicata or collateral estoppel. (*Id.* at pp. 20–24).

business-like, ethical and moral manner and the public must be provided with prompt, courteous, and efficient service." (*Id.* at ¶ 7(d)). The WMA further provides that "[b]uyer shall promptly and courteously respond to any customer complaints (including written responses when appropriate) and take immediate action to resolve satisfactorily each customer complaint." (*Id.* at ¶ 7(e)).[2] The WMA specifies the grounds for termination of the agreement with Seller (Southeast). (*Id.* at pp. 15–16).

The DSA or franchise agreement entered into between LLB and Southeast provides that the brand of fuel supplied by Southeast may be subject to change:

> 5. **Supply of Products**
>
> …Company shall have the right at any time to change, withdraw, substitute or add brands and grades of petroleum products, TBA, trademarks, identification signs or color schemes. Dealer understands that Company will not be responsible for run-outs caused by Oil Company allocations or acts of God, or any other circumstances out of its control.
>
> 6. **Change of Brand**
>
> At the present time, Company is wholesaler for BPAmaco, Shell (Motiva), Citgo Oil, ExxonMobil and Sunoco and expects to continue such relationship indefinitely. In the event that relationship terminates, or should a brand become unavailable, Company will re-brand Dealer and supply with another brand that Company also wholesales.
>
> If the location is de-branded because of Dealer not keeping up image, cleanliness or any other standards of Oil Company, Dealer shall be responsible for all of the expenses related to de-branding and any penalties from Oil Company as well as all new expenditures incurred for the change of brand.

(Plf. Ex. 1).

---

[2] The WMA lists twelve minimum standards that Southeast's outlets must meet. (Def. Ex. 2, pp. 5–7).

3

Exhibit 1 to the DSA provides that LLB (the Dealer) will be supplied with Shell Oil directly or through Southeast Petro, and LLB shall use "Shell's brands only in accordance with the standards established by Shell from time to time." (Plf. Ex. 1, p. 11).[3] "The privilege of using Shell's brands shall automatically terminate when the franchise relationship between Shell and Southeast Petro Distributors, Inc. is terminated, or on thirty (30) days' written notice, in the event of Dealer's violation of any provision hereof or of any of the aforesaid standards." (*Id.*)

### B.     Termination Notice

On February 14, 2018, Mr. Ryan Firth, the director of business development for Southeast, forwarded to LLB via Email a letter it received from Motiva, dated January 31, 2018, entitled "FAILURE TO MAINTAIN BRAND STANDARDS." (Plf. Ex. 2). Mr. Firth reports that "Shell has again issued notice for you to debrand your facility due to the marketing practices and growing number of complaints files [sic]. Unless otherwise withdrawn by Shell, site must debrand by May 10, 2018." (*Id.* at p. 1). The letter from Motiva (Shell) to Southeast concerns LLB's outlet and states that Buyer's outlet (LLB) has not upheld the Brand Standards of the Company consistent with section 7(a) of the WMA. (*Id.* at p. 3). Motiva contends Southeast's outlet has not promptly and courteously responded to customer complaints. (*Id.*). Motiva further alleges that Southeast's outlet (LLB) failed to comply with sections 7(d) and 9(a) of the WMA, which require the Buyer's outlets to conduct operations a professional, business-like, ethical, and moral manner,

---

[3]     Exhibits were offered and admitted by the respective parties during the evidentiary hearing on June 29, 2018.

and mandate that Buyer's outlets use reasonable efforts to develop and actively promote the sales of Shell products. (*Id.*).

Motiva's allegations center on customer complaints that "overwhelmingly" allege price gouging and deceptive or unfair marketing practices. (*Id.*). The complaints about price gouging are prompted by LLB charging $5.99 for regular gas. Accordingly, Motiva contends that Buyer has failed to uphold the Brand Standards of the Company in resolving satisfactorily each complaint. (*Id.*). In short, Shell/Motiva summarizes LLB's violation of Shell's brand standards as follow:

> The customer complaints have been posted publicly on third party sites, as well as with Company's Customer Service Center. Accordingly, Buyer has failed to uphold the Brand Standards of Company . . . and in turn . . . [s]uch failure and public customer complaints have negatively impacted the Identifications (trademark) when compared to the Orange County average of retail gasoline sales per site per month in that the monthly volume of Buyer's outlet has been well below the Orange County average. For those reasons, Company is revoking permission to use the Identifications at Buyer's outlet and must take all steps necessary to cease the marketing and selling of Products and otherwise using the Identifications at the Buyer's Outlet. **Failure to comply with this notice would result in the rightful termination of the WMA under Section 25.**

(*Id.*).

Motiva concludes its letter to Southeast with this admonition: "In accordance with § 2802 and § 2804 of the . . . [PMPA], Company gives Buyer 100 days from the date of this letter, **May 10, 2018**, to completely debrand Buyer's Outlet in accordance with the specifications listed in Exhibit A." (*Id.*).[4]  Motiva asserts that Buyer is obligated to reimburse them $29,585.23 "[a]s a result of the early termination of Buyer's Outlet." (*Id.*

---

[4]  Exhibit A contains a list of seven items necessary to accomplish debranding.

at p. 5). LLB replied to Motiva's correspondence on March 9, 2018. (Plf. Ex. 3). On May 8, 2018, Southeast wrote LLB's owners and informed them that pursuant to the "notice" provided on February 14, 2018, their service station is scheduled for removal from the Shell Network and must debrand by May 10, 2018. (Plf. Ex. 4). Attached to this correspondence is Motiva's letter of January 31, 2018. (*Id.*).

## II.   THE ISSUE

Setting aside for the moment whether Southeast's termination notice complies with 15 U.S.C. § 2804, LLB contends that consumer complaints and the high-price of its fuel do not support termination of the DSA. Southeast argues that the January 31, 2018 Motiva letter and its letter of May 8, 2018 do not constitute termination of the franchise agreement. Rather, Southeast urges the Court to interpret those letters as merely triggering paragraph 5 and 6 of the DSA, whereby LLB will be rebranded and supplied with another brand-name fuel. Accordingly, the Court must determine whether the letters addressing LLB's alleged failure to maintain brand standards terminate the franchise agreement or only require Southeast to provide an alternative brand for LLB to sell. The Court notes that evidence adduced during the evidentiary hearing establishes that no other brand distributed by Southeast is willing to do business with LLB.[5]

## III.   DISCUSSION

  1.   The PMPA

---

[5] Mr. Firth testified that Citgo was interested in allowing LLB to sell its brand of fuel until it learned the price per gallon charged by LLB. Mr. Firth further testified that all of their branded flags have a clause in their agreements requiring the outlet to maintain competitive pricing under the branded programs. Accordingly, all of the brands serviced by Southeast had elected not to work with LLB under their current pricing method.

6

Congress enacted the PMPA in 1978 to protect motor fuel franchisees from arbitrary or discriminatory termination or nonrenewal of their franchise agreements. *Shukla v. BP Expl. & Oil, Inc.*, 115 F.3d 849 (S.D. Fla. 2008) (quoting *Jones v. Crew Distrib. Co.*, 984 F.2d 405, 407–08 (11th Cir. 1993). The PMPA provides that "[e]xcept as provided in subsection (b) and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may (1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise." 15 U.S.C. § 2802. For a franchisor to terminate a contract prior to its expiration date it must show the following:

> (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure –
>
> (i) Not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant section 2804(a) of this title; or
>
> (ii) Not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

15 U.S.C § 2802(b)(2)(A).[6]

The terms "reasonable" and "material" as used in § 2802(b)(2)(A) are not defined in the Act. However, in *Doebereiner v. Sohio Oil Co.*, 893 F.2d 1275, 1276 (11th Cir. 1990) (per curiam), the Eleventh Circuit Court of Appeals defined these terms as follows:

---

[6]   15 U.S.C. § 2802(b)(2)(C) also provides grounds for termination of a franchise relationship; however, none of the enumerated grounds for termination under this provision are applicable here.

7

> Reasonable is defined as that which is fair, proper, just or moderate. *Black's Law Dictionary* 1138 (5th ed. 1979). Material means 'being of real importance or great consequence.' *Webster's Third New International Dictionary* 1392 (1981). Incorporating these definitions into section 2802(b)(2)(A), we conclude that Congress intended to permit termination or nonrenewal only when the franchisee's failure to comply involves a franchise provision that is both reasonable—that is, fair, proper, just or moderate—and of real importance or great consequence to the franchise relationship.[7]

A franchise relationship consists of three elements: "a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which motor fuel is sold." *Shukla*, 115 F.3d at 852–53 (citation omitted). The Supreme Court in *Mac's Shell Service Inc. v. Shell Oil Products. Co.*, 559 U.S. 175 (2010), held the text of the PMPA prohibits only franchisor conduct that has the effect of ending a franchise agreement. *Id.* at 182. Giving the term "terminate" its ordinary meaning, the Supreme Court held that "the Act is violated only if an agreement for the use of a trademark, purchase of motor fuel, or lease of a premises is 'put [to] and end' or 'annul[ed] or destroy[ed].'" *Id.* at 183. Accordingly, PMPA termination claims must be based upon the breach of one of the three elements of the franchise agreement. *Shukla*, 115 F.3d at 854.

The PMPA provides that a franchisee may bring an action to prevent termination of the franchise agreement if the franchisor has failed to comply with the requirements of § 2802(b)(2)(A). *Doebereiner*, 893 F.2d a6 332–33. Pursuant to § 2805 of the Act, the franchisee may obtain preliminary injunctive relief if he shows that "the franchise of which

---

[7] Whether the franchisee has violated a provision of the franchise agreement that is both reasonable and of material significance to the franchise agreement is judged from the standpoint of a neutral observer. *Shell Oil Co. v. A.Z. Servs., Inc.*, 990 F. Supp. 1406, 1411 (S.D. Fla. 1997).

he is a party has [been terminated or has] not been renewed, and there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation." § 2805. The franchisee "shall have the burden of proving the termination of the franchise . . . . [And,] [t]he franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under § 2802(b) or 2803 of this title." § 2805(c). Assuming the franchisee carries its burden of proof, the Court must determine "that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted." § 2805(b)(2)(B); *see also*, *Doebereiner*, 893 F.2d at 333.

### 2. Termination of the Franchise Agreement

Motiva's letter of January 31, 2018, to Southeast specifically references § 2802 and § 2804 of the PMPA, which provide for the termination or nonrenewal of a franchise agreement. Motiva asserts that Southeast failed to uphold Shell's Brand Standards as evidenced by LLB's failure to promptly and courteously respond to customer complaints and by LLB failing to conduct its business in a professional, business-like, ethical, and moral manner. (Plf. Ex. 2). Motiva's refusal to allow LLB to sell fuel under its brand is motivated by the price per gallon set by LLB. (*Id.*). Motive describes this action as "the early termination of Buyer's Outlet." (*Id.*).

Southeast argues that the termination of the Motiva brand is not synonymous with the termination of the Franchise Agreement, because paragraph 6 of the DSA envisions rebranding and supplying LLB with another brand of fuel when Motiva's brand becomes

unavailable.[8] However, the DSA clearly provides that in the event a brand should become unavailable, "Company **will** re-brand Dealer and supply with another brand that Company also wholesales." (Plf. Ex. 1, p. 3) (emphasis added). Southeast did not contract to attempt to rebrand and supply LLB with a different brand fuel; they contracted to in fact rebrand and supply LLB in the event Shell's fuel became unavailable. As it turns out, no brand distributed by Southeast is willing to do business with LLB, meaning that Southeast is unable to meet its obligation under the DSA. The practical effect is that the refusal of Motiva to allow LLB to operate under their brand and to sell their fuel results in the termination of the Franchise Agreement between Southeast and LLB.

LLB correctly contends that debranding by Southeast coupled with the lack of a replacement brand results in the termination of the Franchise Agreement in that LLB is derived of the "use [of] the refiner's trademark, [and is deprived of] a contract for the supply of motor fuel to be sold under the trademark." *Shukla*, 115 F.3d at 852–53. To be entitled to a preliminary injunction, LLB must show sufficiently serious questions providing a fair ground for litigation; that is, "a reasonable chance for success on the merits," and that the balance of harm tips in their favor. *Doebereiner*, 893 F.2d at 333.

Southeast counters that the high volume of customer complaints driven by the excessive price per gallon charged at this outlet justifies termination of the Franchise Agreement.[9] The DSA and the WMA are both silent on the price per gallon that LLB may

---

[8] The DSA does not define or establish criteria for determining when a brand has become unavailable.

[9] Southeast further argued that LLB was uncooperative when Citgo was considering rebranding the station. However, Citgo ultimately declined to rebrand LLB's station because the price per gallon would damage their brand, and every other brand

10

charge for branded fuel. The DSA does provide, however, that LLB agrees to "use its best efforts to diligently promote the sale of motor fuel." (Plf. Ex. 1, ¶ 7). Similarly, Southeast is responsible under the WMA for ensuring that its franchisees follow "all rules, regulations, standards and guidelines Seller [Motiva/Shell] establishes from time to time relating to the use and display of the Identifications." (Def. Ex. 2, ¶ 5(c)). Southeast "acknowledges that the Identifications represent to the motoring public the manufacture and sale of quality Products [, and] Buyer [Southeast] shall undertake no action of any kind that my harm or degrade the Identification." (*Id.* at ¶ 7). To achieve this objective, the WMA mandates that "operations at Buyer's Outlets must be conducted in a professional, business-like, ethical and moral manner and the public must be provided with prompt, courteous, and efficient service." (*Id.* at ¶ 7(d)).

Southeast avers that these provisions of the DSA and WMA are reasonable and of material importance to the franchise relationship; that is, they are of real importance or great consequence to the franchise relationship such that the failure to comply with these terms supports termination of the Franchise Agreement. *Doebereiner*, 893 F.2d at 1276–77 (reasonableness and materiality are determined from the standpoint of a neutral observer). Mr. Ansari testified that customers who complaint about the price of gas and who leave a contact number are provided a 50% credit on the purchase. He explained that this procedure has been in place since 2015, and Southeast is provided a copy of

---

carried by Southeast similarly declined to accept LLB unless it changed its price point for fuel.

the call logs showing responses to consumer complaints.[10] Mr. Ansari stated that Motiva has never contacted him to suggest he alter the way in which he addresses customer complaints. The defense failed to introduce evidence to contradict Mr. Ansari's testimony on this point.

In order to terminate a franchise agreement due to the franchisee's non-compliance with a term that is of real importance to the agreement, the franchisor must act with diligence. The franchisor must provide notice of such termination "not more than 120 days prior to the date on which notification of termination . . . is given . . ." pursuant to § 2804(a). 15 U.S.C. § 2802(b)(2)(A)(i). Section 2804(a) requires 90 days prior notice of the franchise termination deadline. In the rare circumstance where it is not reasonable for the franchisor to provide 90 days notice, the acts giving rise to the termination must not have been known to the franchisor for more than 60 days. 15 U.S.C. § 2802(b)(2)(A)(ii). LLB offered into evidence at the preliminary injunction hearing customer complaints addressing the high-price set for Motiva's fuel at LLB's station, and the complaints date back to August 4, 2015. (Plf. Ex. 7). Mr. Ansari testified that consumer complaints are received on a dedicated email address and that Southeast and Motiva receive a copy of each complaint. Accordingly, it is beyond dispute that Southeast failed to act with the alacrity required by the PMPA when they terminated the franchise agreement.

## IV. CONCLUSION

---

[10] While Southeast contends Motiva reported hundreds of customer complaints in the months preceding the withdrawal of its brand from use by LLB, the defense failed to produce evidence to support this contention.

The letter sent by Mr. Firth, director of business development for Southeast, to LLB on May 8, 2018,[11] and referring to Southeast's Email of February 14, 2018, which included Motiva's termination letter, ended the franchise agreement. Pursuant to the DSA, Southeast was required to rebrand and supply Plaintiff with another one of its brands once Motiva debranded the outlet. Southeast was unable to rebrand LLB's station on May 10, 2018, when LLB was prohibited for carrying Shell brand fuel, and the Franchise Agreement was terminated.[12] The ability to sell brand fuel and to obtain a supply of that fuel is the heart of a franchise agreement. To the extent the defense argues the refusal by Shell to allow LLB to sell its branded fuel did not terminate the franchise agreement, the Court finds the defense has adopted an artificially narrow view of the PMPA and the specific DSA entered into between the parties. The DSA requires Southeast to rebrand LLB's station and to supply brand name fuel to LLB. The agreement does not contain any exception or qualification to Southeast's obligation, and the inability to rebrand and supply LLB on or before May 10, 2018, results in the cancelation or termination of their Franchise Agreement.[13]

Southeast's contention that LLB's business practices violate provisions of the franchise agreement that are both reasonable and of material significance to the franchise agreement does not preclude the entry of a preliminary injunction in this case. The

---

[11] Plf. Ex. 4.

[12] The Court does not reach the issue of whether Motiva's fuel was "unavailable" or whether the timing or content of the termination notice was adequate.

[13] The evidence presented at the hearing showed that are replacement brand had not been coordinated by Southeast as of February 14, 2018, and certainly not as of May 10, 2018.

provisions of the DSA and WMA relied upon by Southeast provide two general duties: first, prompt and courteous responses to consumer complaints; and, secondly, conducting one's business in a professional, ethical, and moral manner. The defense failed to introduce evidence that LLB failed to respond to consumers promptly and courteously. To the contrary, LLB offered evidence and testimony of a procedure put in place three years ago designed to refund money to dissatisfied consumers. Both Southeast and Motiva had access to the consumer complaint data and neither produced evidence of having objected to the procedure employed by LLB.

Whether the price-per-gallon for regular fuel set by LLB constitutes unethical or immoral conduct is hotly disputed. Mr. Ansari claims he charges what the market will allow, similar to gas stations located in proximity to airports. The DSA and the WMA are silent on how one is to define ethical or immoral conduct, save prohibitions against selling drug paraphernalia and pornography. (Def. Ex. 2, ¶ f(j)). Accordingly, LLB has carried their burden of showing there exists sufficiently serious questions going to the merits of the litigation. The Court further finds that the hardship of being denied Shell brand fuel outweighs the hardship place upon Motiva in supplying fuel to LLB's outlet.[14] While the price charged by LLB may be considered high or even exorbitant, LLB has been charging this price since 2015. More importantly, the DSA and WMA are silent on the maximum price an outlet may charge for fuel. In the absence of Motiva's fuel, LLB will be forced to sell unbranded fuel, and the DSA specifically requires the replacement of one brand with

---

[14] The PMPA sets a standard for preliminary injunctive relief that is more liberal than that which is generally applied outside the PMPA. *Doebereiner*, 893 F.2d at 333 (citations omitted).

another brand. The parties did not debate the fact that unbranded fuel is more difficult to sell.

Finally, the PMPA requires a franchisor who desires to terminate a franchise agreement to act without undue delay. If the facts or conduct giving rise to termination were known to the franchisor more than 120 days prior to initiating the termination notification and the franchisor does not act, he waives his right to commence the termination proceeding. The consumer complaints regarding the price of fuel at LLB's outlet were well known back in 2015. In fact, Southeast states in their Email to LLB on February 14, 2018, "Shell has **again** issued noticed [sic] for you to debrand your facility due to the marketing practices and growing number of complaint files." (Plf. Ex. 2). As a procedural point, Southeast waited too long to seek termination of the franchise agreement.

For the foregoing reasons, LLB's Motion for Emergency (Preliminary) Injunction (Doc. 4) is **GRANTED**. Therefore, it is **ORDERED AND ADJUDGED** that pending the trial of this cause, or until such time as the Court orders otherwise:

1. Defendant, and any other person or entity acting in concert of participation with the Defendant, is hereby enjoined from terminating the franchise between Plaintiff and Defendant, pursuant to which Defendant supplies Plaintiff with Shell-branded motor fuel and licenses the use of the Shell trademark at the Vineland Station.

2. Defendant and any other person or entity acting in concert of participation with the Defendant, shall immediately comply with the terms and conditions

of this Order, by refraining from debranding or forcing Plaintiff to debrand the Vineland Station.

3. Pursuant to 15 U.S.C. § 2805, this Court finds that no bond is required to be posted because Plaintiff will continue to pay Defendant for the motor fuel it delivers to the Vineland Station and because Defendant will benefit from the sale of goods and services at the Vineland Station.

**DONE AND ORDERED** in Orlando, Florida, on July 10, 2018.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties