# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LLB CONVENIENCE & GAS, INC., a Florida
corporation,

     Plaintiff,

vs.                                     CASE NO.:  6:18-cv-914-Orl-40EJK

SOUTHEAST PETRO DISTRIBUTORS, INC.,

     Defendant

_____

SHELL TRADEMARK MANAGEMENT INC.
and MOTIVA ENTERPRISES LLC,

     Intervenor-Plaintiffs

vs.

LLB CONVENIENCE & GAS, INC., a Florida
Corporation,

     Defendant.

_____/

### COMPLAINT OF INTERVENORS, SHELL TRADEMARK MANAGEMENT INC. AND MOTIVA ENTERPRISES LLC AGAINST LLB CONVENIENCE & GAS, INC. (JURY TRIAL REQUESTED)

Intervenor-Plaintiffs, Shell Trademark Management, Inc. ("STMI") and Motiva Enterprises LLC ("Motiva"), by and through undersigned counsel, by way of this Complaint in Intervention against Plaintiff LLB Convenience & Gas, Inc., ("LLB") state and allege as follows:

# EXHIBIT 1

## PARTIES

1.      Intervenor-Plaintiff STMI is a Delaware corporation with its principal place of business in Houston, Texas.

2.      Intervenor-Plaintiff Motiva is a limited liability company organized under the laws of Delaware and headquartered in Houston, Texas.  Motiva is a wholly owned indirect subsidiary of Saudi Aramco.

3.      Defendant Southeast Petro Distributors, Inc., ("Southeast"), is a Florida corporation with its principal place of business in Florida.

4.      Plaintiff LLB is a Florida corporation with its principal place of business located at 8788 Vineland Avenue, Orlando, Florida 32821.

## JURISDICTION AND VENUE

5.      Counts One through Three of this action arise under the trademark laws of the United States, 15 U.S.C. §§ 1114(1)(a) and 1125(c).

6.      Count Four for dilution of trademark arises under Florida Statute § 495.151 is joined with substantial and related claims arising under the trademark laws of the United States.

7.      Count Five for tortious interference with contractual relationship arises from a contract governing the use of the trademarks at issue in this action.

8.      Subject matter jurisdiction is therefore conferred upon this Court pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338 and the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over LLB because it is located in, and transacts and conducts business within this jurisdiction.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the acts giving rise to claims occurred in this district.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

11.     STMI holds licenses from the registered owner of numerous "Shell" trademarks, including SHELL DESIGN PLUS WORDS, SHELL DESIGN and SHELL PUMP DESIGN which have been and continue to be widely used throughout the United States to identify Shell-branded motor fuel and gasoline service stations.   These trademarks, issued by the United States Patent and Trademark Office, are based upon original Shell trademarks.[1]   The trademarks at issue in this matter are U.S. Trademark Registration No. 2,985,351 for the mark consisting of the colors yellow and red and the word "SHELL" used on a canopy, and Registration No. 2,775,435 for the mark consisting of a red and yellow gasoline pump (known collectively as "Shell Trademarks").   These marks have become incontestable pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.   Copies of these Registrations are attached as Exhibits A and B respectively.

12.     STMI is the brand management affiliate of an international energy company with expertise in the exploration, production and marketing of oil and natural gas, and the manufacturing and marketing of chemicals.   An STMI affiliate owns U.S.

---

[1] These trademarks, issued by the United States Patent and Trademark Office, include U.S. Trademark Registration No. 286,178 issued August 18, 1931 for the mark "SHELL," and Registration No. 98,112 issued March 23, 1914 for the mark "SHELL PECTEN DESIGN."   (*See* Composite Exhibit C attached hereto).

Trademark Registration No. 286,178, issued August 18, 1931 for the mark "Shell." STMI is licensed to use and sub-license the trademark "Shell" and various seashell images known as the "Pecten" to identify petroleum products manufactured and distributed in the United States and elsewhere.

13. Motiva is engaged primarily in refining and marketing petroleum products under the "Shell" brand. Motiva owns and operates the Port Arthur Refinery in Port Arthur, Texas, the largest refinery in North America and the fifth largest in the world. The Port Arthur Refinery produces Shell brand gasoline, which Motiva transports to terminals, where wholesalers purchase and take possession of the Shell-branded gasoline for transport and sale to retailers for eventual sale by dealers to consumers. Within its territory, Motiva is an exclusive licensee of the trademarks owned by STMI.[2]

14. Southeast is a wholesale distributor of branded and unbranded motor fuels, including BPAmoco, Shell (Motiva), Citgo Oil, ExxonMobil and Sunoco.

15. Pursuant to a wholesale marketer agreement ("WMA") between Southeast and Motiva, Motiva supplies Southeast with Shell brand fuel, and grants Southeast permission to use the trademarks, trade dress, service marks, and color schemes relating to the Shell brand ("Shell Identifications"). (Exhibit D).

16. The WMA does not grant Southeast any "right," "title," or "interest" in the Shell Identifications. (*Id.*). So, "[t]o use and display, or permit the use and display of, the [Shell] Identifications at any retail outlet," Southeast is required to obtain Motiva's "prior

---

[2] Motiva's licensing agreement is contained within the Brand Licensing Agreement executed by Shell and Motiva. This document is proprietary and confidential. A copy can be provided subject to an appropriate Protective Order.

written authorization." (*Id.* ¶ 5(b)). Motiva may, "in its sole discretion, approve or not approve any requests to [Southeast] to brand a proposed retail outlet under the [Shell] Identifications."

17.     The WMA also requires Southeast to follow, and to cause its franchisee retail outlets ("Retail Outlets") to follow, "all rules, regulations, standards, and guidelines [Motiva] establishes from time to time relating to the use and display of the [Shell] Identifications." (*Id.* ¶¶ 5(c)), 7). For instance, Southeast must ensure that its Retail Outlets "diligently and efficiently merchandise[] and promote[]" the Shell fuel; conduct operations "in a professional, business-like, ethical and moral manner"; provide the public "with prompt, courteous, and efficient service"; and "promptly and courteously respond to any customer complaints (including written responses when appropriate) and take immediate action to resolve satisfactorily each customer complaint." (*Id.* ¶ 7(c)–(e)). If any Southeast Retail Outlet fails to meet Motiva's brand standards, the WMA grants Motiva the power to "revoke its permission to display the [Shell] Identifications at the [Retail Outlet]." (*Id.* ¶¶ 7(b), 24).

18.     LLB owns and operates a gas station located at 8788 Vineland Avenue, Orlando, FL 32821 ("the Vineland Station").

19.      In July 2012, Southeast obtained Motiva's approval to brand the Vineland Station owned by LLB. Thereafter, Southeast and LLB entered into a Dealer Supply Agreement ("DSA"), commencing July 19, 2012, and ending July 19, 2022.  (Exhibit E).

20.     Pursuant to the DSA, Southeast agreed to supply LLB with Shell-branded fuel and to permit LLB to use the Shell Identifications at the Vineland Station.

21.     LLB has operated the Vineland Station as a Shell-branded station, displaying the Shell trademarks and identifications, and continues to do so at the time of the filing of this Intervenors' Complaint.



22.     In executing the DSA, LLB acknowledged and agreed that "[e]ach of Shell's brands . . . [were] . . . owned by [STMI]" and that LLB had "no rights therein except as permitted by [STMI]." (Exhibit E, p. 11). LLB also agreed to "use Shell's brands only in accordance with standards established by [Motiva] from time to time" and that "[t]he privilege of using Shell's brands [would] automatically terminate when the franchise relationship between [Motiva] and [Southeast] [was] terminated, or on thirty (30) days' written notice, in the event of [LLB]'s violation of any provision . . . or any . . . . standards" in the DSA. (*Id.*).

23.     As illustrated in paragraph 3 of the DSA, LLB "understood that [Southeast] was obligated under its agreement with [Motiva] to abide by certain standards of operation and appearance." (*Id.* ¶ 3(a)). LLB also [understood] that "[Southeast] [was] obligated to comply with certain requirements with respect to things such as

---

[3] Photo of the Vineland Station was taken on December 19, 2019.

merchandising, service work, staffing, customer complaints, maintenance, appearance, uniforms, lighting, signs, image, and other matter." (*Id.* ¶ 3(a)). With that understanding, LLB agreed "to comply with all such requirements imposed upon [Southeast]." (*Id.*). The DSA is silent on the price per gallon that LLB could charge for branded fuel. However, "[LLB] acknowledg[ed] the importance of maintaining competitive prices for all [Motiva]'s products" and agreed to "use its best efforts to diligently promote the sale of motor fuel." (*Id.* ¶ 7).

24.     The DSA and Addendum thereto, gave Southeast "the right at any time to change, withdraw, substitute or add brands and grades of petroleum products, TBA, trademarks, identification signs or color schemes." (Exhibit E, ¶ 5). And, in the event that Southeast's relationship with Motiva "terminate[d]" or the Shell "brand bec[ame] unavailable," Southeast agreed to rebrand the Vineland Station with another brand that it wholesales, such as BPAmaco, Citgo Oil, ExxonMobil or Sunoco. (*Id.* ¶ 6 and p. 12).

25.     LLB fixes its own prices for all products at the Vineland Station and has set the prices of its fuel "far above competitive" rates. (Doc. 50[4], ¶ 9; Doc. 74-1, ¶¶ 5, 22). This pricing structure prompted many complaints from customers who "reported receiving false or misleading prices." (Doc. 15-1; Doc. 74-1, ¶¶ 6–7). Many of the complaints are reflected on websites such as Yelp and GasBuddy.  (*See* for example, Exhibit F).  Certain consumer complaints specifically call out that LLB reported, albeit falsely, that the high rates charged by LLB for the Shell-branded fuel were the result of Shell setting such high prices.

---

[4] All citations herein to "Doc. ___" are references to docket entries in the underlying lawsuit.



(Excerpt from Exhibit F).

Other consumer complaints clearly reference that customers were mislead by the use of the Shell trademarks.



(Excerpt from Exhibit F).

### Debranding Demands

26.     On or about January 31, 2018, Motiva mailed Southeast a letter revoking Southeast's authorization to use Shell-branded fuel at the Vineland Station and demanding that Southeast debrand the site. (Exhibit G) ("**Motiva's Letter**"). That letter states, in pertinent part:

> [Motiva] is aware of a high volume of over 400 customer complaints over a short period of time (past few months) that have been lodged against the site located at **8788 Vineland Ave, Orlando, FL 32821-6504 ("[Vineland Station]").** Under Section 7(a) [Southeast] agreed to uphold the Brand Standards of Company, including but not limited to promptly and courteously responding to customer complaints (including written responses when appropriate) and taking immediate action to resolve satisfactorily each customer complaint. Section 7(d) states that the operations at [Southeast's Retail] Outlets must be conducted in a professional, businesslike, ethical, and moral manner. ln addition, [Southeast] has also agreed to under Section 9(a), that it has the obligation to use its reasonable efforts to develop and actively promote the sales of Products.

> [Motiva] has found [Southeast] to be negligent in its responsibilities listed, due in part to the sheer volume of complaints that have been lodged against the above-mentioned site, as well as the content of the complaints that overwhelmingly allege price gouging and deceptive or unfair marketing practices. The customer complaints have been posted publicly on third party sites, as well as with Company's Customer Service Center. Accordingly, [Southeast] has failed to uphold the Brand Standards of Company in resolving satisfactorily each customer complaint and in turn, such customer complaints have impacted promoting the sale and marketing of Products in accordance with the WMA. Such failure and public customer complaints have negatively impacted the [Shell] Identifications when compared to the Orange County average of retail gasoline sales per site per month in that the monthly volume of [Southeast]'s outlet has been well below the Orange County average. For those reasons, [Motiva] is revoking permission to use the [Shell] Identifications at [Southeast]'s outlet and must take all steps necessary to cease the marketing and selling of Products and otherwise using the [Shell] Identifications at the [Southeast]'s Outlet. **Failure to comply with this notice would result in the rightful termination of the WMA under Section 25.**

(*Id.* at 3–5).

27.     On February 14, 2018, Ryan Firth, Director of Business Development for Southeast, forwarded Motiva's Letter to LLB in an email stating: "Shell has again issued notice for you to debrand your facility due to the marketing practices and growing number of complaints files [sic]. (Exhibit H).  Unless otherwise withdrawn by Shell, the [Station] must debrand by May 10, 2018." (*Id.* at 1–2 ("**First Debrand Notice**")).

28.     On or about March 9, 2018, LLB sent Motiva a letter denying any violation of its brand standards. (Doc. 14-3). Meanwhile, Southeast unsuccessfully sought "to persuade Motiva not to remove LLB from [its] approved list." (Doc. 74-1, ¶ 10). Southeast also requested that Motiva extend its May 10th deadline, but Motiva initially refused. (Doc. 15-5, pp. 11–13; Doc. 58, at 44:16–45:4).  Thereafter, Southeast mailed the owners of LLB a letter dated May 8, 2018, stating that "[p]ursuant to the [Debrand]

[N]otice provided on February 14, 2018," the Vineland Station "is scheduled for removal from [Shell's Processing System] and is required to debrand by May 10, 2018." (Doc. 14-4 ("**Second Debrand Notice**")).

29.     On May 9, 2018, Firth emailed LLB-owner Faisal Ansari informing him that Motiva would not grant an extension and that he was searching for another "credit card processor" and an "alternative brand" for the Vineland Station. (Doc. 15-5, p. 19). The following day, Sean Howard, Motiva's territory manager, phoned Shah and advised him that Motiva would extend its deadline to Monday, May 14, 2018. (Doc. 66-5, p. 2). In response, Shah remarked that Southeast was trying to move the Vineland Station "to the Citgo brand" and that he believed Southeast "could have things in place next week." (*Id.*).

30.      On or about May 23, 2018, Motiva sent Southeast a letter admonishing Southeast for "the unauthorized marketing and selling of" Shell-branded fuel at the Vineland Station and cautioning that "[s]uch violations could subject Southeast, as a contributory infringer, to liability for damages, injunctive relief, and attorney fees." (Doc. 15-6).

**Rebranding**

31.     On June 11, 2018, LLB filed the instant action against Southeast, asserting claims for violation of the PMPA and anticipatory repudiation. (Doc. 1). Before receiving service of LLB's complaint, Southeast successfully persuaded Citgo to supply their branded fuels to LLB, and Citgo issued a site number for the Vineland Station. (*Id.* at 99:25-100:5, 104:4-16; Doc. 74-1, ¶ 14; Doc. 5-1 (noting that a copy of the LLB's

complaint was served on Southeast on "the 20th day of June 2018").4 Thereafter, Southeast requested that LLB provide the dimensions of the monument sign at the Vineland Station so that Southeast could cover it with a bag displaying the Citgo logo ("**Citgo Bag**"). (Doc. 58, at 110:9–19, 106:5–22). LLB supplied Southeast with the dimensions of the monument sign on June 13, 2018. (Doc. 15-5, p. 1; Doc. 24, at 31:21–32:7). Then, with LLB's permission, Southeast's agent, Aluminum Plus, removed all Shell Identifications from the Vineland Station and covered the monument sign with the Citgo Bag. (Doc. 58, at 107:12–17, 112:7–113:12, 158:3–18; Doc. 24, at 32:8–10; Doc. 74-1, ¶ 14).





32.     In the brief time that the Vineland Station was rebranded as a Citgo retailer, Citgo received customer complaints regarding the Station's pricing structure and the deceptive conduct of its employees. (Doc. 58, at 100:2–12; Doc. 74-1, ¶ 16; Doc. 49-1, pp. 8–9). Consequently, on June 15, 2018, Citgo revoked its approval to brand the Vineland Station. (Doc. 49-1, pp. 8–9; Doc. 74, ¶ 16; Doc. 58, at 100:2–12). That same day, Ansari removed the Citgo Bag, reinstalled the Shell Identifications, and unilaterally continued selling the Shell-branded fuel provided by Southeast. (Doc. 59, at 68:19–25, 92:20–93:13; Doc. 74-1, ¶ 17).

33.     On June 18, 2018, Southeast sent LLB a letter explaining that "in the absence of a Shell license for use of its trademarks at the [Vineland Station], such use must be discontinued as demanded by Shell." (Doc. 15-2, p. 1). The letter further explained that the "[DSA] and all obligations under it[] remain[ed] in effect" and that Southeast wanted to work with LLB to "put in place a license for another branded fuel." (*Id.* at p. 2).

34.     Southeast approached Valero, who "agreed to allow [Southeast] to supply their branded fuels to LLB." (Doc. 58, 100:12–15; Doc. 74-1, ¶ 18). But that deal also fell through. (Doc. 58, 100:12–15; Doc. 74, ¶ 18). Southeast surmises that the deal fell through "either due to LLB's pricing strategy, small gallonage, customer complaints or alleged unfair competition and behavior or some combination of them." (Doc. 74-1, ¶ 18). Southeast "continues to seek another brand . . . for LLB." (Doc. 49-3, ¶ 16; Doc. 74-1, ¶ 21). However, LLB has since raised its gas prices at the Vineland Station to $6.99 for regular grade, $7.49 for midgrade, and $7.99 for premium grade, thereby making it

difficult for Southeast to secure a replacement brand. (Doc. 74-1, ¶¶ 5, 21; Doc. 66-4; Doc. 59, at 18:25–19:7).

**Underlying Action**

35.     As noted above, LLB initiated this instant action against Southeast on June 11, 2018, and subsequently filed an Emergency Motion for the entry of a preliminary injunction. (Doc. 4). On June 25, 2018, the Court entered a temporary restraining order that (1) enjoined Southeast from "terminating the [DSA] between [LLB] and [Southeast] pursuant to which [Southeast] supplie[d] [LLB] with Shell branded motor fuel and license[d] the use of the Shell trademark at the Vineland Station" and (2) directed Southeast to "refrain[] from debranding or forcing [LLB] debrand the Vineland Station, (Doc. 10, pp. 7–8 ("**Restraining Order**")).

36.     On June 29, 2018, the Court heard oral argument and conducted an evidentiary hearing on LLB's Emergency Motion. (Doc. 13). Following the hearing, the Court entered a preliminary injunction against Southeast. (Doc. 17 ("**Preliminary Injunction**")). Like the Restraining Order, the Preliminary Injunction: (1) enjoined Southeast from "terminating the [DSA] between [LLB] and [Southeast] pursuant to which [Southeast] supplie[d] [LLB] with Shell-branded motor fuel and license[d] the use of the Shell trademark at the Vineland Station" and (2) directed Southeast to "refrain[] from debranding or forcing [LLB] debrand the Vineland Station." (*Id.* at 15–16).

**LLB's Vineland Station**

37.     Before and after Motiva and Southeast's demand that the Vineland Station debrand, LLB has been selling gasoline for prices well above market price, causing

- 13 -

customers to register complaints.  (*See* Exhibit F attached hereto).   Certain complaints included comments specifically addressing "Shell's" responsibility for charging such high prices.  *Id.*  Customers undoubtedly believed the exorbitant prices were attributable to Shell because of LLB's use of the Shell trademarks and Shell Identifiers at the Vineland Station.

38.     Despite demands made to LLB by Motiva and Southeast to debrand, LLB continues to hold itself out as a Shell affiliated and approved Retail Outlet, displaying the Shell trademarks and Shell Identifications, but without authorization to do so.   LLB continues to sell gasoline at prices well above market pricing.



39.     LLB's debranding of the Vineland Station, rebranding as a Citgo Station, and the subsequent but unauthorized "rebranding" as a Shell-branded gas station after its license for the use of the Shell trademarks was revoked, demonstrates LLB's knowledge of the revocation of the license and debranding by Motiva and Southeast.

40.     The Restraining Order and Preliminary Injunction sought and obtained by LLB directly prevent Southeast from complying with the contractual obligations imposed

upon it by the WMA, including Motiva's direction to Southeast to debrand the Vineland Station and to stop distribution of Shell-branded gasoline to LLB.

41.     LLB's requests for a Restraining Order and Preliminary Injunction demonstrate LLB's purposeful intent to ignore the lawful debranding demands for the Vineland Station made by Southeast and Motiva, and its continued and unauthorized use of Shell brands and marks therefore knowingly infringe on STMI's trademarks after the license to use such marks had clearly been revoked.

42.     The Preliminary Injunction granted to LLB and currently in force facilitates LLB's continued infringement of the Shell trademarks.

43.     LLB's conduct was, and continues to be, willful and deliberate.

**COUNT ONE**
**STMI:**
**TRADEMARK INFRINGEMENT PURSUANT TO**
**15 U.S.C. § 1114 OF THE LANHAM ACT**

44.     Paragraphs 1-43 above are repeated and realleged as if fully set forth herein.

45.     LLB's self-rebranding of its Vineland Station as a Shell-branded station, and selling gasoline purportedly as an authorized and approved Retail Dealer of Shell-branded fuel after clear and acknowledged revocation of its license to use the Shall trademarks and Shell Identifications, were willful and constitute trademark infringement in violation of 15 U.S.C. § 1114(1).

46.     STMI has been harmed as a result of LLB's actions.

**COUNT TWO**
**STMI:**
**UNLAWFUL DILUTION BY TARNISHMENT PURSUANT TO**

**15 U.S.C. § 1125(c)(2)(C) OF THE LANHAM ACT**

47.     Paragraphs 1-43 above are repeated and realleged as if fully set forth herein.

48.     The Shell trademarks are famous marks under 15 U.S.C. § 1125(c).

49.     The actions and conduct of LLB, as set forth above, were willfully intended to trade on STMI's reputation or to cause dilution by tarnishment of the Shell trademarks and Shell Identifications.

50.     STMI has been harmed as a result of LLB's actions.

**COUNT THREE**
**STMI:**
**VIOLATION OF § 495.151, FLA. STAT., ANTI-DILUTION**

51.     Paragraphs 1-43 above are repeated and realleged as if fully set forth herein.

52.     The Shell trademarks are famous marks under 15 U.S.C. § 1125(c).

53.     The actions and conduct of LLB, as set forth above, were willfully intended to trade on STMI's reputation or to cause dilution by tarnishment of the Shell trademarks and Shell Identifications.

54.     STMI has been harmed as a result of LLB's actions.

**COUNT FOUR**
**STMI:**
**COMMON LAW TRADEMARK INFRINGEMENT**

55.     Paragraphs 1-43 above are repeated and realleged as if fully set forth herein.

56.     The Shell trademarks are famous and have been come to be associated with Shell-branded products.

57.     LLB's actions constitute common law trademark infringement and have created, and will continue to create, a likelihood of confusion and harm to STMI.

58.     LLB's use of the Shell trademarks demonstrated an intentional and willful intent to trade on the goodwill associated with the Shell trademarks.

59.     STMI has been harmed as a result of LLB's actions.

### COUNT FIVE
### MOTIVA:
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

60.     Paragraphs 1-43 above are repeated and realleged as if fully set forth herein.

61.     As described above, Motiva has a contractual business relationship with Southeast, as evidence by the WMA, under which Motiva has legal rights.

62.     As describe above, LLB was fully aware of Southeast's contractual obligations to Motiva as it related to the branding and debranding of the Vineland Station and the licensing and revocation of the Shell trademarks and Shell Identifications.

63.     LLB's actions described above related in seeking and obtaining the Preliminary Injunction entered in the underlying lawsuit demonstrates intentional and unjustified interference with Southeast's contractual relationship with Motiva.

64.     Motiva has been damaged as a result of such interference.

### PRAYER FOR RELIEF

Pursuant to the claims set forth herein, STMI and Motiva ask this Court to:

(a)      preliminarily enjoin LLB from displaying the Shell trademarks and Shell Identifications;

(b)      award monetary damages and to treble that award;

(c)      require LLB to disgorge all profits from sales while falsely branded as Shell-branded gas station; and

(d)      award punitive damages, attorneys' fees, and costs.

Pursuant to the tortious interference claim, Motiva asks this Court to:

(e)      award monetary damages calculated to reasonably compensate the Plaintiffs for losses and damages incurred as a result of the Defendant's interfering conduct.

## JURY TRIAL DEMAND

STMI and Motiva respectfully demand a trial by jury on all claims and issues so triable.

Date: January 16, 2020

Respectfully submitted,

*/s/ Francis M. McDonald, Jr.*

FRANCIS M. MCDONALD, JR., ESQ.
Florida Bar No. 0327093
SARAH A. LONG, ESQ.
Florida Bar No. 0080543
TIFFANY M. WARD, ESQ.
Florida Bar No. 1019017
MCDONALD TOOLE WIGGINS, P.A.
111 N. Magnolia Avenue, Suite 1200
Orlando, FL 32801
Telephone: (407) 246-1800
Facsimile:  (407) 246-1895
fmcdonald@mtwlegal.com
slong@mtwlegal.co
tward@mtwlegal.com
e.service@mtwlegal.com

*Attorneys for Defendants, Shell Trademark Management Inc. and Motiva Enterprises LLC*

# Exhibit A

Int. Cl.: 35

Prior U.S. Cls.: 100, 101 and 102

United States Patent and Trademark Office

Reg. No. 2,985,351

Registered Aug. 16, 2005

## SERVICE MARK
### PRINCIPAL REGISTER



SHELL TRADEMARK MANAGEMENT BV (NETHERLANDS CORPORATION)
CAREL VAN BYLANDTLAAN 30, 2596 HR
THE HAGUE, NETHERLANDS

FOR: RETAIL STORE SERVICES FEATURING CONVENIENCE STORE ITEMS AND GASOLINE, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 5-31-2000; IN COMMERCE 5-31-2000.

OWNER OF U.S. REG. NO. 2,745,401.

THE COLOR(S) YELLOW AND RED IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE COLORS YELLOW AND RED AND THE WORD SHELL USED ON A CANOPY. THE CANOPY IS YELLOW AND THE STRIPE ALONG THE BOTTOM OF THE CANOPY IS RED. THE WORD "SHELL" IS RED ON THE CANOPY. THE OTHER MATTER SHOWN IN THE DRAWING SHOWS POSITIONING OF THE MARK ONLY AND IS NOT CLAIMED AS A FEATURE OF THE MARK.

SER. NO. 78-425,892, FILED 5-27-2004.

TARAH HARDY, EXAMINING ATTORNEY

# Exhibit B

**Int. Cl.: 4**

**Prior U.S. Cls.: 1, 6 and 15**

**Reg. No. 2,775,435**

## United States Patent and Trademark Office

Registered Oct. 21, 2003

### TRADEMARK
#### PRINCIPAL REGISTER



SHELL PETROLEUM INC. (DELAWARE COR-
PORATION)

910 LOUISIANA

OSP 4794

HOUSTON, TX 77002

FOR: FUEL FOR MOTOR VEHICLES, NAMELY
GASOLINE AND DIESEL FUEL, IN CLASS 4 (U.S.
CLS. 1, 6 AND 15).

FIRST USE 5-31-2000; IN COMMERCE 5-31-2000.

THE DRAWING IS LINED FOR THE COLOR(S)
RED AND YELLOW. THE STIPLING IS FOR SHAD-
ING PURPOSES.

THE MARK CONSISTS OF A RED AND YELLOW
GASOLINE PUMP. THE DOTTED LINES REPRE-
SENT THE POSITION OF THE GAS DISPENSING
UNIT, THE HOSE, AND THE HOSE HANDLE, AND
ARE NOT PART OF THE MARK.

SER. NO. 78-073,412, FILED 7-11-2001.

BRETT J. GOLDEN, EXAMINING ATTORNEY

# Exhibit C

Renewed to
Shell Oil Company, a corporation of California.

# UNITED STATES PATENT OFFICE.

THE ASIATIC PETROLEUM COMPANY, LIMITED, OF LONDON, ENGLAND.

**TRADE-MARK** FOR CERTAIN NAMED BURNING OILS, LUBRICANTS, CANDLES, NIGHT LIGHTS, AND MINERAL WAX.

**98,112.**                                    Registered July 7, 1914.

Application filed March 23, 1914.   Serial No. 76,833.

## STATEMENT.

*To all whom it may concern:*

Be it known that THE ASIATIC PETROLEUM COMPANY, LIMITED, a company incorporated under the companies acts of Great Britain, and located at and doing business at Nos. 24–28 St. Mary Axe, in the city of London, England, has adopted for its use a trademark, shown in the accompanying drawing, for gasolene, (or motor-spirits,) naphtha, benzin, kerosene, (or coal-oil,) lubricating oils and greases, candles, night-lights, and mineral wax for illuminating and heating purposes in Class No. 15, Oils and greases.

used in the business of said company and of its predecessors, since May 6, 1904, and, applicant is at present the owner of U. S. trademark registration No. 74,007, dated June 8, 1909, comprising the representation of a single shell for petroleum spirits for automobiles.

The trademark is applied or affixed to receptacles containing the goods by means of labels of paper or of stamped metal.

THE ASIATIC PETROLEUM
COMPANY, LIMITED,
By JAMES YOUNG KENNEDY.

The trademark has been continuously |                     *Secretary.*



### DECLARATION.

Great Britain, England, London. ss:

JAMES YOUNG KENNEDY, being duly sworn, deposes and says that he is the secretary of the company, the applicant named in the foregoing statement; that he believes the foregoing statement is true; that he believes said company is the owner of the trademark sought to be registered; that no other person, firm, corporation or association, to the best of his knowledge and belief, has the right to use said trademark, either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that said trademark has been registered in England, on the 6th May, 1904, No. 263,277; and on the 1st of December, 1909, No. 318,733; that the drawing presented truly represents the trademark sought to be registered; and that the fac-similes show the trademark as actually used upon the goods.

JAMES YOUNG KENNEDY.

Subscribed and sworn to before me, a notary public, at London, England, this seventeenth day of February, 1914.

[L. S.]

JOHN D. VENN,
*Notary Public.*

Copies of this trade-mark may be obtained for five cents each, by addressing the "Commissioner of Patents, Washington, D. C."

Int. Cl.: 4

Prior U.S. Cl.: 15

**United States Patent and Trademark Office**
Amended

Reg. No. 98,112
Registered July 7, 1914
OG Date Oct. 11, 1994

## TRADEMARK
### PRINCIPAL REGISTER



SHELL OIL COMPANY (DELAWARE CORPORATION)
ONE SHELL PLAZA
HOUSTON, TX 7252, ASSIGNEE OF ASIATIC PETROLEUM COMPANY, LIMITED, THE (GREAT BRITAIN COMPANY) LONDON, ENGLAND

OWNER OF ENGLAND REG. NO. 318733, DATED 12-1-1909.

OWNER OF ENGLAND REG. NO. 263277, DATED 5-6-1904.

OWNER OF U.S. REG. NO. 74,007.

FOR: GASOLENE, (OR MOTOR-SPIRITS),NAPHTHA,BENZIN,KEROSENE, (OR COAL-OIL,) LUBRICATING OILS AND GREASES, CANDLES, NIGHT-LIGHTS, AND MINERAL WAX FOR IL-LUMINATING AND HEATING PUR-POSES, IN CLASS 15 (INT. CL. 4).

FIRST USE 5-6-1904; IN COMMERCE 5-6-1904.

SER. NO. 71-076,833, FILED 3-23-1914.



*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Oct. 11, 1994.*

COMMISSIONER OF PATENTS AND TRADEMARKS

Int. Cl.: 4

Prior U.S. Cl.: 15

**United States Patent and Trademark Office**

10 Year Renewal

Reg. No. 98,112
Registered July 7, 1914
Renewal Term Begins July 7, 1994

## TRADEMARK
## PRINCIPAL REGISTER



SHELL OIL COMPANY (DELAWARE
 CORPORATION)
ONE SHELL PLAZA
HOUSTON, TX 77252

   OWNER OF ENGLAND REG. NO.
318733, DATED 12–1–1909.
   OWNER OF ENGLAND REG. NO.
263277, DATED 5–6–1904.
   OWNER OF U.S. REG. NO. 74,007.

   FOR: GASOLENE, (OR MOTOR-
SPIRITS),NAPHTHA,BENZIN,KEROSENE,
[ (OR COAL-OIL,)] LUBRICATING OILS
AND GREASES, [CANDLES, NIGHT-
LIGHTS,] AND MINERAL WAX FOR IL-
LUMINATING AND HEATING PUR-
POSES, IN CLASS 15 (INT. CL. 4).
   FIRST USE 5–6–1904; IN COMMERCE
5–6–1904.

   SER. NO. 71–076,833, FILED 3–23–1914.





*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Sep. 12, 1995.*

COMMISSIONER OF PATENTS AND TRADEMARKS

Int. Cl.: 4

Prior U.S. Cl.: 15

United States Patent and Trademark Office

10 Year Renewal

Reg. No. 286,178
Registered Aug. 18, 1931
Renewal Term Begins Aug. 18, 1991

## TRADEMARK
## PRINCIPAL REGISTER

## SHELL

SHELL OIL COMPANY (DELAWARE CORPORATION)
50 WEST 50TH STREET
NEW YORK, NY, BY MERGER AND MESNE ASSIGNMENT FROM SHELL OIL COMPANY, THE (CALIFORNIA CORPORATION) SAN FRANCISCO, CA

OWNER OF U.S. REG. NOS. 74,007, 279,462 AND OTHERS.

FOR: GASOLINE, [KEROSENE, GAS OIL,] DIESEL OIL, [FURNACE FUEL OIL,] MOTOR LUBRICATING OILS, AND TRANSMISSION OILS AND LUBRICATING GREASES, IN CLASS 15 (INT. CL. 4).

FIRST USE 9-30-1912; IN COMMERCE 9-30-1912.

SER. NO. 71-312,389, FILED 3-21-1931.

*In testimony whereof I have hereunto set my hand and caused the seal of The Patent and Trademark Office to be affixed on Aug. 6, 1991.*

COMMISSIONER OF PATENTS AND TRADEMARKS

Registered Aug. 18, 1931                    Trade-Mark 286,178

# UNITED STATES PATENT OFFICE

SHELL OIL COMPANY, OF SAN FRANCISCO, CALIFORNIA

ACT OF FEBRUARY 20, 1905

Application filed March 21, 1931.  Serial No. 312,389.

# SHELL

## STATEMENT

*To the Commissioner of Patents:*

The Shell Oil Company, a corporation duly organized and existing under the laws of the State of California, located at San Francisco, and doing business at 100 Bush Street, San Francisco, California, has adopted and used the trade-mark shown in the accompanying drawing, for GASOLINE, KEROSENE, GAS OIL, DIESEL OIL, FURNACE FUEL OIL, MOTOR LUBRICATING OILS, AND TRANSMISSION OILS AND LUBRICATING GREASES, in Class No. 15, Oils and greases, and presents herewith five specimens showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905, as amended.

The trade-mark has been continuously used and applied to said goods in applicant's business since Sept. 30, 1912.

The trade-mark is applied or affixed to the packages containing the goods by means of a printed label on which the mark is shown; by stenciling the same on the containers and in divers other ways.

Applicant is the owner of the following trade-mark registrations: No.74,007, The Asiatic Petroleum Co., Ltd., June 8, 1909; No. 98,112, The Asiatic Petroleum Co., Ltd., July 7, 1914; No. 98,235, The Asiatic Petroleum Co., Ltd., July 7, 1914; No. 98,236, The Asiatic Petroleum Co., Ltd., July 7, 1914; No. 158,809, Shell Company of Calif., Sept. 12, 1922; No. 168,803, Shell Company of Calif., May 29, 1923; No. 279,252, Shell Oil Company, Jan. 13, 1931; No. 279,349, Shell Oil Company, Jan. 13, 1931; No. 279,462, Shell Oil Company, Jan. 13, 1931.

The undersigned hereby appoints Bernard J. Gratama, register No. 12,728, c/o Shell Development Company, San Francisco, it attorney, with full power of substitution and revocation, to prosecute this application, to make alterations and amendments therein, to transact all the business in the Patent Office connected therewith, and to receive the certificate of registration.

SHELL OIL COMPANY,
By A. R. BRADLEY,
*Secretary.*

Exhibit D



<div align="right">Wholesale No.   12314379</div>

## WHOLESALE MARKETER AGREEMENT

**THIS WHOLESALE MARKETER AGREEMENT** is effective **January 01, 2017,** (**"Effective Date"**) between Motiva Enterprises LLC (**"Seller"**) whose address is 910 Louisiana Street, Houston, TX 77002 and SOUTHEAST PETRO DISTRIBUTORS INC (**"Buyer"**) whose address is 402 HIGH POINT DR, COCOA, FL  32926.

1.       **DEFINITIONS AND INTERPRETATION.**

      (a)     As used in this Agreement, the terms below have the following meanings, whether singular or plural:

      **"ADR"** means Alternative Dispute Resolution.

      **"ADR Claim"** has the meaning set forth in Article 30(a).

      **"ADR Notice"** has the meaning set forth in Article 30(b)(1).

      **"Agreement"** means this Wholesale Marketer Agreement together with all amendments, exhibits, and schedules thereto.

      **"Base Volume"** has the meaning set forth in Article 2(a).

      **"Brand Standards"** has the meaning set forth in Article 7(b).

      **"Business Entity"** means any legal entity that is not an individual or sole proprietorship, including a partnership, corporation, limited liability company, limited liability partnership, or association.

      **"Buyer's Marketing Premises"** means Buyer's premises, including Buyer's office and storage, and distribution facilities that Buyer uses in connection with the Products.

      **"Buyer's Outlets"** means those retail outlets, including marinas and truck stops, operated or supplied by Buyer and which Seller has authorized Buyer to display the Identifications in connection with the resale of the Products to consumers.

      **"C.F.R."** – means Code of Federal Regulations.

      **"CPR"** has the meaning set forth in Article 30(b)(1).

      **"Diesel Minimum Quantities"** has the meaning set forth in Article 2(b).

      **"Diesel Maximum Quantities"** has the meaning set forth in Article 2(d).

      **"EFT"** means electronic funds transfer.

<div align="center">- 1 -</div>

"**EPA**" means Environmental Protection Agency.

"**EPOS**" means Electronic Point of Sale.

"**Gasoline Minimum Quantities**" has the meaning set forth in Article 2(a).

"**Gasoline Maximum Quantities**" has the meaning set forth in Article 2(d).

"**Guide**" has the meaning set forth in Article 12(a).

"**Hardware**" means any non-software component of the EPOS and telecommunications systems.

"**Identifications**" means the trademarks, trade dress, service marks, and color schemes relating to the Shell brand which Buyer and Buyer's Outlets are permitted to use under the terms of this Agreement in connection with the marketing and sale of the Products.

"**Indemnified Party**" has the meaning set forth in Article 21(a).

"**Indemnity Claim**" has the meaning set forth in Article 21(a).

"**Image Guidelines**" has the meaning set forth in Article 7(a).

"**Insurance**" has the meaning set forth in Article 22(a).

"**Law**" means any applicable statute, constitution, ordinance, regulation, rule, administrative order, or other requirement of any federal, state, or local government agency or authority in effect at the time of execution, or during the term, of this Agreement.

"**Mediation**" has the meaning set forth in Article 30(a).

"**NOPS Notice**" has the meaning set forth in Article 23(d)(2).

"**Notice of Interest**" has the meaning set forth in Article 23(d)(3).

"**PMPA**" means the Petroleum Marketing Practices Act as may be amended from time to time (15 U.S.C. §2801 et seq.).

"**Product Defect**" has the meaning set forth in Article 16.

"**Products**" means the gasoline, diesel, and alternative/renewable fuel (e.g., E-85, B-20) sold to Buyer by Seller for resale under the Identifications.

"**Regulations**" has the meaning set forth in **Exhibit C**.

"**RVI**" means Retail Visual Identity.

"**Software**" means coded instructions necessary for the operation of the EPOS or telecommunications systems.

"**Taxes**" has the meaning set forth in Article 14.

- 2 -

**"Terminal"** means the distribution plant(s) from which Seller has authorized Buyer to accept deliveries of Products.

**"Transaction Cards"** has the meaning set forth in Article 12(a).

**"Transfer"** has the meaning set forth in Article 23(a).

(b)     In addition, the following apply in interpreting this Agreement:

(1)     The article and section headings are for reference and convenience only and should not be considered in the interpretation of this Agreement.

(2)     All references to dollars are to United States dollars.

(3)     The use of the term "including" is illustrative and not restrictive and means "including, but not limited to."

## 2.     PURCHASE AND SALE OF PRODUCTS.

(a)     Subject to Articles 19 and 20, Seller shall sell and deliver to Buyer, and Buyer shall purchase and accept from Seller, the minimum quantities of Shell-branded gasoline identified on **Exhibit A-1** for each month and year during the term of this Agreement to be resold through Buyer's Outlets (**"Gasoline Minimum Quantities"**).  Buyer acknowledges that the Gasoline Minimum Quantities are necessary and reasonable for, among other reasons, Seller to plan its supply operations and, as such, are of material and reasonable significance to the franchise relationship.  Buyer also acknowledges that Seller has established minimum volume levels of Shell-branded gasoline (**"Base Volume"**) to be resold through Buyer's Outlets for its wholesalers in order to retain a Wholesale Marketer Agreement.  Accordingly, in no event may Buyer's Gasoline Minimum Quantities be less than the following Base Volume:

|  |  |
|---|---|
| January 01, 2017 to December 31, 2017 | 6.75 million gallons |
| January 01, 2018 to December 31, 2018 | 6.75 million gallons |
| January 01, 2019 to December 31, 2019 | 6.75 million gallons |
| January 01, 2020 to December 31, 2020 | 6.75 million gallons |
| January 01, 2021 to December 31, 2021 | 6.75 million gallons |

If Buyer fails to purchase the Base Volume for resale at the Buyer's Outlets, Seller may take such action as Seller deems appropriate, including terminating or not renewing this Agreement.

(b)     Subject to Articles 19 and 20, Seller shall sell and deliver to Buyer, and Buyer shall purchase and accept from Seller, the minimum quantities of Shell-branded diesel identified on **Exhibit A-2** each year during the term of this Agreement to be resold through the Buyer's Outlets (**"Diesel Minimum Quantities"**).  Buyer acknowledges that the Diesel Minimum Quantities are necessary and reasonable for, among other reasons, Seller to plan its supply operations and, as such, are of material and reasonable significance to the franchise relationship.

(c)     Subject to any existing contractual constraint and Articles 19 and 20, Buyer, or any operator of a Buyer's Outlet may, if Buyer or Buyer's operator desires, sell an alternative/renewable fuel at a Buyer's Outlet in lieu of Seller's mid-grade or in addition to all of Seller's grades of gasoline and, if applicable, diesel provided all of the following criteria are met:  (1) Seller has available for sale to Buyer such alternative/renewable fuel to be resold as alternative/renewable fuel Products; (2) Buyer purchases and accepts from Seller sufficient quantities of the alternative/renewable fuel Products to meet the needs and demands of the customers of such Buyer's Outlet; and (3) Buyer sells, or causes to be sold, Seller's premium branded and regular branded gasoline grades, or such two grades as may be otherwise designated by Seller, at the Buyer's Outlet in addition to the alternative/renewable fuel Products.

- 3 -

(d)    Seller may, but will not be obligated to, sell Buyer more than the **"Gasoline Maximum Quantities"** identified on **Exhibit A-1** and **"Diesel Maximum Quantities"** identified on **Exhibit A-2**. Seller's exercise of its right to do so will not obligate Seller to continue to sell Buyer such excess quantities.

(e)    To the extent practicable, Buyer shall take delivery of all Products on a ratable basis.

(f)    If Buyer fails to purchase and accept the Gasoline or Diesel Minimum Quantities in any 12-month period, Seller may unilaterally downward adjust the Gasoline or Diesel Minimum/Maximum Quantities each succeeding 12-month period by the difference between the annual Gasoline or Diesel Minimum Quantities and the amount actually purchased for that 12-month period. In addition, Buyer may request that Seller downward adjust Buyer's Gasoline or Diesel Minimum/Maximum Quantities if the need for the downward adjustment is due to a reason beyond Buyer's reasonable control. If Seller agrees to such an adjustment the parties shall amend **Exhibit A** to reflect such adjustment. Likewise, if Buyer purchases more than the Gasoline or Diesel Minimum Quantities, Buyer may request that Seller upward adjust Buyer's Gasoline or Diesel Minimum/Maximum Quantities. If Seller agrees, the Gasoline or Diesel Minimum/Maximum Quantities in **Exhibit A-1** or **A-2** will be amended accordingly.

(g)    If the term of this Agreement commences at any time after January 1 of any year, Buyer shall purchase and accept the Gasoline and Diesel Minimum Quantities during the remaining months of that 12-month period, but Seller's rights and remedies set forth in Articles 2(a) and (e) above will not commence until the next full 12-month period.

(h)    If Buyer terminates this Agreement prior to expiration of its term or if Seller terminates this Agreement for cause in accordance with the PMPA or applicable Law, Seller will be entitled to all remedies available at law, in equity, or under contract including this Agreement or any incentive agreement pertaining to Buyer's Outlets.

3.    **PRICES AND TERMS OF PAYMENT.**

(a)    The prices Buyer shall pay Seller for the Products are as follows:

(1)    Unless market area pricing is in effect as described below, Buyer shall pay Seller's marketer tank wagon price in effect for the Terminal at the time of Seller's delivery to Buyer.

(2)    If Seller determines, in its sole discretion, that market conditions warrant the use of market area pricing, upon notification to Buyer and for as long as such market conditions exist, Buyer shall pay Seller's marketer price in effect for Buyer's Outlets in the geographic market or trading area established by Seller at the time of Seller's delivery to Buyer. Buyer represents and warrants that the Products purchased at such prices will in fact be delivered only to Buyer's Outlets in the designated market or trade area. If Buyer delivers Products purchased at such prices to locations outside the designated market or trade area: (i) Buyer shall reimburse Seller for the difference between the price paid and Seller's highest applicable marketer price in effect for the area on the date of delivery by Seller to Buyer and (ii) Seller may take such action as Seller deems appropriate, including terminating or not renewing this Agreement.

(b)    Buyer shall pay for the Products in accordance with Seller's payment terms in effect from time to time, any of which may be altered or revoked by Seller with written notification to Buyer. Buyer shall make all payments to Seller without deduction, setoff, discount, allowance, notice or demand, in United States dollars via Seller's EFT system, unless Seller, in its sole discretion, requires Buyer to pay via wire transfer prior to the time of delivery or at such other time and place or by such other method as Seller may designate from time to time. Buyer shall provide any written authorizations required for EFT purposes. If Seller requires Buyer to pay by a method other than EFT, Seller may assess a reasonable administration charge. Buyer agrees that the amount of the transactions payable to Buyer pursuant to Article 12(b) may be used to pay the Product invoices (including applicable taxes, fees, and interest) owed by Buyer to Seller according to the terms and provisions of this Agreement.

(c)    Seller's extension of credit for the purchase of the Products, the terms under which any such credit will be extended or maintained, and the amount of credit extended are subject to the sole discretion of Seller, any of which terms or amount may be altered or revoked with written notification to Buyer. For the purposes of Seller's evaluation of Buyer's financial condition and creditworthiness, upon Seller's request at any time and from time to time during the term of this Agreement, Buyer shall provide

- 4 -

Seller with information and documents relating to Buyer's financial condition and creditworthiness. If Seller elects not to extend Buyer credit, or elects to alter or revoke any extension of credit to Buyer, or Buyer exceeds the credit line, Seller may require Buyer to provide additional credit assurances, including advance cash payment, cash deposit, letter of credit in a form acceptable to .Seller from a financial institution acceptable to Seller, or any other security acceptable to Seller.

(d)    All overdue amounts owed to Seller will bear interest from the date such have become overdue until paid at the rate of 15% per annum, or the maximum lawful rate, whichever is less. If Buyer fails to make timely payment of any amount due Seller, in addition to all other rights or remedies available to Seller, Seller may take such action as Seller deems reasonable under the circumstances. Without limiting the generality of the foregoing, Seller may:  (1) offset, net, or recoup any amounts due Seller by Buyer for Product invoices (including applicable taxes, fees and interest) under this Agreement or any other related agreements against any amounts due Buyer by Seller under this Agreement or any other related agreement; (2) defer further deliveries of the Products until payment of all outstanding amounts is made, or (3) demand advance wire transfer payment for further deliveries. Buyer shall comply with the terms of any reclamation notice issued to Buyer by Seller under applicable Law.

4.    **TERM.**  The term of this Agreement begins on the Effective Date and ends on **December 31, 2021,** subject to Seller's right to terminate this Agreement in accordance with applicable Law. Upon expiration, this Agreement will continue on a month-to-month basis for no longer than 6 months until the parties either execute a new agreement or Seller terminates or does not renew this Agreement in accordance with applicable Law.

5.    **PERMISSION TO USE THE IDENTIFICATIONS.**

(a)    Seller grants to Buyer permission to use the Identifications only in connection with the resale of the Products at the Buyer's Outlets and so long as Buyer complies with the terms of this Agreement. Buyer acknowledges that the Identifications are a valuable and important property right and are essential to the goodwill and reputation of the Products. Buyer further acknowledges Seller's interest in the Identifications, and Buyer shall not claim any right to or title or interest thereto.

(b)    To use and display, or permit the use and display of, the Identifications at any retail outlet Buyer must obtain Seller's prior written authorization. Buyer acknowledges that Seller may, in its sole discretion, approve or not approve any requests to Seller to brand a proposed retail outlet under the Identifications. Those retail outlets approved for the Shell brand and otherwise authorized by Seller to display the Identifications (i.e., Buyer's Outlets) are identified on **Exhibit B,** as may be amended from time to time as retail outlets are added and removed from Buyer's Shell-branded network. The parties acknowledge that as Buyer's Outlets are added or removed from Buyer's network as specified in this article, a formal amendment to **Exhibit B** to this Agreement will not be necessary and this exhibit will be deemed to be amended automatically by the addition or removal of retail outlets as Buyer's Outlets pursuant to this Agreement.

(c)    Buyer shall follow, and cause the operators of Buyer's Outlets to follow, all rules, regulations, standards, and guidelines Seller establishes from time to time relating to the use and display of the Identifications.

(d)    Buyer shall not use, and shall prohibit the use by the operators of Buyer's Outlets of, the word "Shell" as part of Buyer's or the operators' Business Entity name. Buyer shall not use, and shall prohibit the operators of Buyer's Outlets from using, the Identifications or the word "Shell" in Buyer's or the operators' trade style if the use is likely to:  (1) create the impression that the business is owned or operated by Seller or (2) deceive or cause a likelihood of confusion to prospective customers.

(e)    Any transfer of a Buyer's Outlet to another Shell-branded wholesaler requires Seller's prior authorization.

6.    **PRODUCT STEWARDSHIP AND QUALITY.**  Pursuant to Seller's permission granting Buyer use of the Identifications, Buyer shall comply with, and cause the operators of Buyer's Outlets to comply with, the following requirements relating to the marketing, storage, and resale of the Products.

(a)    Buyer shall purchase Products only from Terminal(s) authorized by Seller.

(b)    Buyer shall not resell, nor may any operator of Buyer's Outlets resell, gasoline to be resold as Shell-

- 5 -

branded gasoline at Buyer's Outlets other than gasoline purchased by Buyer from Seller.

(c)     The quality of the Products must be strictly maintained and not adulterated, commingled, or blended with any other products or substances in any manner without Seller's prior written consent.

(d)     All Products must be clearly identified, correctly labeled, and resold under their proper Identifications and grades.

(e)     If Buyer, or any operator of a Buyer's Outlet, purchases, stores, distributes, markets, or sells: (1) gasoline or diesel fuel purchased from any other supplier or (2) unbranded gasoline or diesel fuel from Seller, then adequate facilities must be maintained and correctly identified to keep those products segregated from all of the Products and the fuel must be correctly identified in accordance with Seller's standards.

(f)     All signs and other advertising devices or materials furnished by Seller to Buyer will remain Seller's property, must be used solely in connection with the resale of the Products, and must be returned to Seller immediately upon demand at Buyer's expense.

(g)     Buyer shall obtain Seller's prior written approval before using, or permitting the use of, any promotional materials or advertising that bear any of the Identifications.

7.     **BRAND IDENTIFICATION AND MINIMUM STANDARDS.**  Buyer acknowledges that the Identifications represent to the motoring public the manufacture and sale of quality Products. Buyer shall undertake no action of any kind that may harm or degrade the Identifications.  Buyer further acknowledges that uniform standards of quality and appearance must be maintained at all retail outlets displaying the Identifications in order to properly market and sell the Products, preserve and promote the reputation of Seller, and achieve public acceptance of the Products.  Accordingly, Buyer shall comply with, and cause the operators of Buyer's Outlets to comply with, all standards of operation and appearance established from time to time by Seller, including the following minimum obligations; provided, however, the means and the manner of performance are within the sole discretion of Buyer:

(a)     Buyer shall comply with, and cause the operators of Buyer's Outlets to comply with, Seller's RVI Design Standards and Conversion guidelines or Seller's current image standards pertaining to the image of Buyer's Outlets (**"Image Guidelines"**), as may be amended by Seller from time to time.  If Seller amends the Image Guidelines, Seller shall provide Buyer written notice.  Buyer acknowledges receipt of, or has been informed on how to access, the Image Guidelines through the Seller's online website.  Upon completion of the conversion of each Buyer's Outlet approved for the Shell brand pursuant to Article 5(b), Buyer shall provide Seller with a completed RVI checklist or other required documentation.

(b)     Buyer acknowledges receipt of, or has been informed on how to access through Seller's online website, Seller's brand standards pertaining to Seller's operations, appearance, and cleanliness requirements (**"Brand Standards"**), as may be amended by Seller from time to time.  If Seller amends the Brand Standards, Seller shall provide Buyer notice.  At all times during the term of this Agreement, Buyer shall maintain, and cause the operators of Buyer's Outlets to maintain, Buyer's Outlets in accordance with the Brand Standards.   If any Buyer's Outlet fails to meet the Brand Standards, Seller may revoke its permission to display the Identifications at the Buyer's Outlet in accordance with Article 24.

(c)     The Products must be diligently and efficiently merchandised and promoted at Buyer's Outlets.

(d)     The operations at Buyer's Outlets must be conducted in a professional, business-like, ethical and moral manner and the public must be provided with prompt, courteous, and efficient service.

(e)     Buyer shall promptly and courteously respond to any customer complaints (including written responses when appropriate) and take immediate action to resolve satisfactorily each customer complaint.

- 6 -

(f)      In order to operate Buyer's Outlets in an organized and efficient manner, adequate and competent personnel who are able to converse in English with Seller, customers, government officials, and other persons, considering both the volume and nature of the business activity, must be maintained at Buyer's Outlets.

(g)      The operators and employees at Buyer's Outlets shall wear neat, clean uniforms of a type and style approved by Seller; provided, however, for uniforms with Buyer logos, such approval will not be unreasonably withheld.

(h)      All service work at Buyer's Outlets must be performed in a workmanlike manner utilizing only first-class new materials and parts except when the customer specifically authorizes rebuilt or used materials or parts.

(i)      Buyer's Outlets must be kept in a clean, sanitary, and safe condition and all property and equipment kept in good operating condition and repair.  The driveways, sidewalks, and other landscaped areas must be kept in a neat and orderly appearance free from weeds, debris, snow, ice, and rubbish.

(j)      Buyer's Outlets may not be used for any fraudulent, unlawful, offensive, hazardous, unsightly, or other objectionable purpose, including the sale or display of materials with dominant themes of sex, nudity, prurient interest, or pornography, which are unacceptable to Seller in its reasonable discretion.  Merchandise or paraphernalia, including items that may be used in connection with illegal drugs, that is morally offensive or distasteful to the general public as determined by Seller in its reasonable discretion may not be displayed or offered for sale at the Buyer's Outlets.

(k)      Buyer's Outlets must be kept clear of vehicles, other mobile equipment, and obstructions that restrict traffic flow, endanger customer safety, or detract from appearance.  Buyer's Outlets may not be used to sell, lease, or store motor vehicles, trailers, boats, or other mobile equipment, without Seller's prior written consent.

(l)      Buyer's Outlets must be operated in a secure manner so that criminal activity is adequately deterred from occurring there and so that all persons at Buyer's Outlets are adequately protected from injury, harm, or loss.  Buyer has complete control over and the sole responsibility for security at Buyer's Outlets.

**8.      SELLER'S MARKETING RIGHTS.**    Seller may, from time to time:  (a) add, change, or modify the grade, Product brand name, delivery package, or other distinctive designation of any Product; (b) change or modify the formulations and specifications of any Product; and (c) upon 30 days' prior notice, discontinue at any time the sale of any Product in which event the parties will be relieved of any further obligation with respect to that Product.

**9.      SALES AND MARKETING OBLIGATIONS.**

(a)      Buyer shall use its reasonable efforts to develop and actively promote the sales of Products. Nothing in this Agreement grants Buyer an exclusive territory to market and resell the Products.  Seller reserves the right to market and sell, and authorize others to market and sell, the Products in any manner Seller chooses including through its own retail outlets or through designated wholesalers or other buyers.

(b)      Subject to Articles 19 and 20, Buyer shall keep all Buyer's Outlets supplied on a timely basis with sufficient volumes and quantities of Products to meet the needs and demands of all Buyer's Outlets and their customers.  Buyer shall maintain, or cause to be maintained, a sufficient amount of all grades of Shell-branded gasoline and, if applicable, Shell-branded diesel fuel and Shell-branded renewable fuel at Buyer's Outlets. Notwithstanding the obligation in the previous sentence, if pursuant to the PMPA Buyer, or any operator of a Buyer's Outlet, elects to sell a "renewable fuel" (as defined in the PMPA) in lieu of one grade of Shell-branded gasoline and Seller does not offer for sale such a "renewable fuel," Buyer shall sell, or cause to be sold, Seller's premium branded and regular branded gasoline grades, or such two grades as may be otherwise designated by Seller, at the Buyer's Outlet.

(c)      Buyer shall not sell, deliver, or otherwise supply the Products to retail outlets Seller has not authorized, in writing, Buyer to supply.  Further, Buyer shall not supply the Products to any reseller who Buyer knows or has reason to know will resell the Products under trademarks or brand names other than those of Seller.

- 7 -

10.    **TRAINING.**

(a)    Upon Seller's request, Buyer shall attend, or cause key personnel (chosen by Buyer in Buyer's sole discretion) to attend, Seller approved training courses and courses deemed appropriate by local management of Seller that may be offered by Seller from time to time. Seller shall pay the costs for instructors, training materials, and the facility, if applicable. Buyer shall be solely responsible for assuring that appropriate personnel at Buyer's Outlets are trained in such courses.

(b)    Buyer shall distribute Seller's communications relating to training and Seller's training materials within 90 days after receipt to Buyer's employees and the operators and employees of Buyer's Outlets.

11.    **DELIVERIES.**

(a)    All Products will be delivered by Seller to Buyer at the Terminal(s). Seller may, from time to time, change the Terminal(s) by giving Buyer at least 15 days' prior notice or such shorter notice as may be reasonable under the circumstances.

(b)    Title and risk of loss passes to Buyer when the Products pass from Seller's delivery line into the receiving connection of the transportation equipment supplied by Buyer.

(c)    Buyer shall provide or arrange delivery for all Products. Whether Buyer uses its own transportation equipment to transport the Products, or engages a carrier to do so, Buyer or Buyer's carrier, as the case may be, shall comply with all rules and regulations at the Terminals, shall execute any Seller agreement pertaining to access to the Terminals, and shall provide evidence of Insurance (as defined in Article 22) when requested. If Buyer, or Buyer's carrier, does not provide evidence of Insurance upon request, access to the Terminal may be denied.

(d)    Loading of transportation equipment provided by Buyer or for Buyer's account will be on a first-come, first-served basis. All demurrage shall be for the account of Buyer except to the extent caused by Seller's fault.

12.    **TRANSACTION CARDS.**

(a)    As long as Seller elects to accept specified credit cards, credit identifications, debit cards, pre-paid cards, stored-value cards, or other transaction authorization cards or devices, instruments, codes, account numbers, means or methods, whether tangible or intangible, other than cards that can be used for payment for products or services (collectively "**Transaction Cards**") in the state in which Buyer's Outlets are located, Buyer shall accept, and cause the operators of Buyer's Outlets to accept, all Transaction Cards identified in Seller's Transaction Card guide ("**Guide**") for the purchase of authorized products and services. Buyer shall account for and process, and cause the operators of Buyer's Outlets to account for and process, all such transactions in strict compliance with the terms set forth in the Guide, as may be amended by Seller from time to time. If Seller amends the Guide, Seller shall provide Buyer with notice. Seller may assess Buyer a Transaction Card processing fee (which may include any VSAT/telecommunication related charges) for providing such services.

(b)    Seller shall accept from Buyer all transactions generated as a result of purchases made with authorized Transaction Cards and processed in accordance with the terms in the Guide. In accordance with the timetable and terms set forth in the Guide, as may be amended by Shell from time to time, Shell will process authorized card transactions submitted by Buyer and, if a credit is due, will send a credit to Buyer's bank account through the automated clearing house (ACH) system. At Seller's option, Seller shall pay the amount of the transactions to Buyer, after deducting any processing fee in effect under Seller's then current Guide, by: (1) netting, recouping, or offsetting the amount against Buyer's account with Seller; (2) a credit to Buyer's bank account by EFT; or (3) check to Buyer.

(c)    For each transaction not authorized, disputed by a customer, or otherwise subject to chargeback under the Guide, Seller may either charge the amount to Buyer's account or require Buyer to immediately refund to Seller, including refund by draft or EFT initiated by Seller, without any deduction for any processing fee. Seller may also charge and collect from Buyer any fines or fees referenced in the Guide.

-- 8 --

(d)      In order to provide efficient service to the motoring public, Buyer shall comply, and shall cause the operators of the Buyer's outlets to comply, with Seller's: (1) telecommunications requirements; (2) Software and Hardware standards, established from time to time by Seller, relating to EPOS systems, including Seller approved compatible Hardware, customer activated terminals, integrated and non-integrated EPOS systems, and other requirements necessary to electronically accept and process the Transaction Cards at all times during the term of this Agreement; and (3) requirements for EPOS vendor maintenance and support programs or such alternative maintenance and support programs provided the same has been approved by Seller. Buyer shall upgrade the EPOS and telecommunications systems with any new release of the Software within 6 months, and Hardware within 12 months, after notice from Seller; provided that the respective periods for Hardware and Software upgrades will be extended by Seller for a period not to exceed 120 days where Buyer is unable to complete the upgrades due to circumstances beyond Buyer's reasonable control. Such circumstances include instances in which the Hardware or Software to be installed is not readily available in Buyer's marketing territory or where trained technicians are not readily available to perform the installations.

(e)      Buyer shall execute any applicable Seller agreement relating to the use or access of the EPOS system. In addition, if Seller loans or leases any imprinter, EPOS terminal, or other related equipment to Buyer in connection with acceptance of the Transaction Cards, Buyer shall: (1) comply with the terms of the Guide; (2) execute any applicable Seller agreement relating to the use of such equipment; and (3) reimburse Seller for any charges relating to the use of such equipment (whether third party or internal) incurred by Seller.

(f)      Buyer shall comply with, and shall cause the operators of Buyer's Outlets to comply with, all applicable: (1) industry standard Transaction Cards security or processing procedures, specifically including (i) the Payment Card Data Security Standards (PCI), (ii) the VISA Operating Rules, (iii) the MasterCard Operating Rules, (iv) the American Express Merchant Regulations, and (v) the operating rules of Seller's transaction acquirer(s); and (2) federal, state, and local laws and regulations governing data privacy.

(g)      Without limiting any rights or remedies available to Seller, if Buyer fails to comply, or any operator of Buyer's Outlets fails to comply, with this Article 12 or the Guide, Seller may limit or terminate Buyer's or the operator's right to participate in Seller's program for Transaction Cards; provided, however, if the failure is technical or immaterial, in Seller's sole discretion, Seller may provide Buyer or the operator of Buyer's Outlet, as the case may be, 30 days to correct such failure.

(h)      Seller may terminate its Transaction Card program at any time upon notice to Buyer.

**13.      INSPECTION AND AUDIT.** Buyer grants, and shall cause the operators of the Buyer's Outlets to grant, Seller, its agents, and representatives the right to enter the Buyer's Marketing Premises and the Buyer's Outlets at all reasonable times to inspect the facilities, procedures, and materials being used in connection with the purchase and sale of the Products, to obtain samples of and conduct tests on the Products, to inspect the books and records pertaining to the purchase and sale of the Products, and to audit, observe, and otherwise verify Buyer's compliance with this Agreement.

**14.      TAXES.** Buyer shall pay all federal, state, and local excise taxes, license fees, inspection fees, environmental fees, and other similar assessments or charges, now or hereafter levied or assessed, by any governmental authority that Seller may be required to collect or pay on the importation, manufacture, sale, purchase, transportation, storage, resale, or use of the Products, insofar as the same is not expressly included in the price for the Products ("Taxes"). If Buyer pays directly any such Tax normally remitted by Seller, Buyer shall promptly provide proof of payment of such charges. Further, Seller shall not collect, and Buyer will not be obligated to pay: (a) any such Tax for which Buyer furnishes to Seller a valid exemption certificate or valid fuel license; (b) any charge based on or measured by the net income or net worth of Seller, or (c) any employment-related tax, fee, or charge.

**15.      WARRANTY AND DISCLAIMER.** Seller warrants that all Products sold to Buyer will meet Seller's then current specifications at the time title to the Products transfers to Buyer as specified in Article 11. SELLER MAKES NO OTHER WARRANTIES OF ANY KIND AS TO THE PRODUCTS SOLD TO BUYER, EITHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**16.      LIMITATION OF LIABILITY.**

- 9 -

TO THE EXTENT PERMITTED BY LAW, BUYER'S SOLE AND EXCLUSIVE REMEDY FOR ANY CLAIM ARISING FROM OR IN CONNECTION WITH BREACH OF SELLER'S WARRANTY SPECIFIED IN ARTICLE 15, WHICH CLAIM WAS NOT CAUSED OR CONTRIBUTED BY ANY NEGLIGENCE OR FAULT OF BUYER ("PRODUCT DEFECT"), WHETHER THE CLAIM IS MADE BY BUYER OR AN OPERATOR OF ANY BUYER'S OUTLET FOR BREACH OF CONTRACT OR WARRANTY, OR IS UNDER TORT, STRICT LIABILITY, STATUTE OR OTHERWISE, WILL BE: (a) AT SELLER'S OPTION, REPLACEMENT OF THE FAILED, DEFECTIVE, OR NONCONFORMING PRODUCTS OR REIMBURSEMENT OF THE PURCHASE PRICE THEREOF, AND (b) REIMBURSEMENT OF THE REASONABLE COST OF REPAIR OR REPLACEMENT OF ANY MECHANICAL EQUIPMENT OR PARTS THAT ARE DAMAGED DIRECTLY BY THE USE OF SUCH PRODUCTS. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING UNDER ARTICLE 15 WHETHER UNDER TORT, CONTRACT, STRICT LIABILITY, WARRANTY, STATUTE, OR OTHERWISE.

17.    CLAIMS.

(a)    Seller will not be liable to Buyer for any defect in quality or shortage in quantity of the Products unless: (1) Buyer provides Seller notice within 14 business days after delivery for shortages and within 14 business days after delivery for quality defects (or 14 business days after the day a latent quality defect is discovered) and (2) Buyer provides Seller with a reasonable opportunity to inspect, take samples, and test the Products that are the subject of the claim.

(b)    Except as set forth in Article 21, claims relating to the Products or indebtedness, or as otherwise specified in this Agreement, the parties will not be liable to each other for any other claim arising out of this Agreement unless the claimant provides the other party with written notice of the claim (setting forth fully the facts on which the claim is based) within 180 days after the date on which the claim arose.

18.    COMPLIANCE WITH LAWS.

(a)    Buyer shall comply, and cause the operators of Buyer's Outlets to comply, with all Laws, licenses, and permits relating to its business and the receipt, handling, storage, dispensing, packaging, transportation, labeling, advertising, and sale of the Products at Buyer's Outlets.

(b)    Without limiting the generality of Buyer's obligations in Article 18(a):

(1)    Buyer shall comply, and cause the operators of Buyer's Outlets to comply, with all Laws pertaining to youth access to tobacco products and shall provide Seller with written or electronic notice within 10 business days of any notice received by Buyer of a violation of such tobacco Laws at a Buyer's Outlet; and

(2)    Buyer shall comply, and cause the operators of Buyer's Outlets to comply, with all Laws relating to motor fuel and fuel additives as specified in **Exhibit C**, which Seller may amend from time to time upon written notice to Buyer. Further, if Buyer or any operator of a Buyer's Outlet owns or operates any UST system (as defined in applicable Laws), Buyer shall comply, and cause the operator to comply, with all applicable Laws governing UST systems, including financial responsibility requirements through mechanisms provided for in such Laws such as guarantees, surety bonds, and insurance.

19.    **EXCUSES FOR NON-PERFORMANCE.** Both parties will be excused from their obligations under this Agreement for any circumstance (except for financial obligations): (a) reasonably beyond the parties' control, including flood, ice storm, drought, hurricane, snowstorm, earthquake, other acts of God; or (b) caused by fire or explosion; delay or loss of transportation or delivery equipment; mechanical breakdown; strikes or other labor trouble; Terminal shutdown; riots, terrorism, acts of war, or other civil disturbances; or voluntary or involuntary compliance with any Law or request of any governmental authority.

20.    **ALLOCATION.** If Seller, for any reason, does not have sufficient supplies of the Products to supply its customers, then during any period of short supply Seller may restrict deliveries of the Products to Buyer, without liability, and may allocate Seller's supply of the Products among its customers and classes of customers which in Seller's judgment is fair and reasonable under the circumstances. After cessation of any period of short supply, Buyer and Seller shall promptly resume deliveries

- 10 -

and receipts of the Products but will not be obligated to make up any deliveries or receipts not made because of such period of short supply.

21.    **INDEMNITY.**

(a)    To the extent permitted by Law, Buyer shall indemnify and defend Seller, its members, subsidiaries, affiliates and joint venture partners, and their respective directors, officers, employees, and agents (**"Indemnified Party"**) against all claims, demands, causes of action, suits, damages, judgments, liens, penalties, and expenses, including attorneys' fees and litigation costs, whether incurred for an Indemnified Party's primary defense or for enforcement of its indemnification rights (collectively, **"Indemnity Claim"**) including any Indemnity Claim for harm, injury or death to any person, patent infringement, or damage to property or to the environment, arising out of or in connection with any of the following matters:

(1)    Buyer's performance or nonperformance under this Agreement including Buyer's possession, sale, transportation, storage, handling, blending, and use of the Products;

(2)    Any action or omission of Buyer or Buyer's employees, agents, contractors, assigns, or third parties; and

(3)    Any event or occurrence at or involving the operation of any Buyer's Outlet.

BUYER'S OBLIGATION TO INDEMNIFY AND DEFEND EXTENDS TO ANY INDEMNITY CLAIM CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF AN INDEMNIFIED PARTY.

(b)    Notwithstanding Buyer's obligations in Article 21(a), Buyer shall indemnify and defend the Indemnified Party against all Indemnity Claims arising solely at Terminals owned or operated by Seller but only to the extent of the negligence of Buyer, Buyer's employees, agents, or contractors.

(c)    Within a reasonable time after any occurrence which may result in an Indemnity Claim, Buyer shall report the same to Seller by telephone and shall promptly thereafter confirm the same by written notice, including all circumstances thereof known to Buyer or the operator of Buyer's Outlet or their employees. PROMPTLY AFTER RECEIVING NOTICE OF ANY SUCH OCCURRENCE, AT BUYER'S EXPENSE, BUYER SHALL INVESTIGATE SAID OCCURRENCE AND RESPOND TO AND DEFEND ANY INDEMNITY CLAIM ASSERTED AGAINST ANY INDEMNIFIED PARTY, INCLUDING ANY INDEMNITY CLAIM ALLEGING THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE. The Indemnified Party may participate in the defense and settlement of any Indemnity Claim or litigation with attorneys of the Indemnified Party's selection without relieving Buyer of any obligations under this article; provided, however, the Indemnified Party will be responsible for its own attorney's fees. Seller shall reimburse Buyer for the amount of any judgment and reasonable defense costs paid by Buyer which represents the total liability found by final nonappealable judgment to have been caused by: (1) the Indemnified Party's sole negligence; (2) Product Defect as defined in Article 16; or (3) the amount of liability attributable to the negligence of Seller, its employees, agents or contractors as specified in Article 21(b).

(d)    The Insurance requirements of Article 22 do not limit or restrict in any way Buyer's obligations under this article.

(e)    Buyer's obligations under this article survive termination or nonrenewal of this Agreement.

22.    **INSURANCE.**

(a)    Buyer shall maintain, at all times under the term of this Agreement, the following insurance coverage satisfactory to Seller with limits not less than those limits required below (the **"Insurance"**). If Buyer does not own or operate Buyer's Outlet, upon renewal, or when entering into new agreements with its operators, Buyer shall require that those operators maintain adequate insurance that is consistent with the following requirements.

- 11 -

(1)     Commercial General Liability Insurance unamended or Comprehensive General Liability Insurance with Broad Form CGL endorsement with limits of $2,000,000 each occurrence and $2,000,000 general aggregate for Buyers owning, operating, or supplying up to and including 5 Buyer's Outlets. Buyers owning, operating, or supplying 6 or more Buyer's Outlets shall amend their policy aggregate to $5,000,000.  Limits in excess of $1,000,000 may be provided by Excess Liability or Umbrella Liability coverage.  As applicable, Buyer shall maintain the following:

(i)     Liquor Liability Insurance if Buyer owns and operates the Buyer's Outlet and alcoholic beverages are sold at the location, utilizing endorsement CG 24 08, CG 00 33, or an equivalent;

(ii)     Marine Terminal or Wharfingers Liability Insurance if Buyer owns and operates a Buyer's Outlet which is a marine facility.  If Buyer supplies the marine facility via watercraft the watercraft exclusion must be deleted or equivalent coverage purchased; and

(iii)     Garagekeepers Legal Liability if Buyer owns and operates a Buyer's Outlet with service bays or car washes, with limits of not less than $60,000 per occurrence.

(2)     Business Automobile Liability Insurance covering all vehicles used in the operations of the Buyer with limits of liability of $1,000,000 each accident, such policy to be endorsed with:

(i)     MCS-90 when hazardous material transportation is involved;

(ii)     Liability coverage for employees test driving customers' automobiles if Buyer has service bays; and

(iii)     Garagekeepers coverage if Buyer has service bays or car washes.

(3)     Workers' Compensation Insurance and Longshoremens' and Harborworkers' Compensation Insurance as required by Laws applicable to and covering Buyer's employees.  Such Insurance must include a waiver of subrogation in favor of Seller where permissible by Law.

(4)     Employers' Liability Insurance protecting Buyer against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a limit of $1,000,000 Each Accident, $1,000,000 Disease-Policy Limit;  $1,000,000 Disease-Each Employee. Such Insurance must include a waiver of subrogation in favor of Seller where permissible by Law.

(b)     Buyer shall assure that the Insurance policies allow for the separation of insureds, and provide for written notice of cancellation or material change.  Notice of cancellation or change will not affect the Insurance until 30 days after written notice is received by Seller.  Any deductible or retention of insurable risks will be for the Buyer's account.

(c)     Buyer shall assure that the Insurance required in this article and evidence of the Insurance issued to Buyer names Seller and its members, subsidiaries, affiliates and joint venture partners, to the extent of their interest, as additional insureds, without regard to the allocation of liability provisions contained in this Agreement, to the extent of any claim, loss or liability within the scope of the required Insurance.  The parties intend that, to the extent of their interest, the status of Seller and its members, subsidiaries, affiliates and joint venture partners as additional insureds will not be limited by the indemnity obligations under this Agreement or otherwise.  Buyer shall secure from its insurance companies and provide to Seller, for all required Insurance, an additional insured endorsement without restrictions.

(d)     At the time of execution of this Agreement and upon request during the term of this Agreement, Buyer shall provide Seller with evidence of Insurance that Buyer is in compliance with Seller's Insurance requirements.  Buyer's failure to provide certificates evidencing the Insurance requirements or to purchase Insurance coverage in compliance with this article will not relieve Buyer of its obligations in this article.

23.  **ASSIGNMENTS.**

(a)  <u>Assignment by Buyer</u>.  This Agreement is personal to Buyer.  Buyer may not sell, transfer, assign, or encumber any of its interest under this Agreement, or assign any claim against Seller arising directly or indirectly out of or in connection with this Agreement, in whole or in part, whether voluntarily, involuntarily, or by operation of Law (collectively, **"Transfer"**) without the prior written consent of Seller, which consent will not be unreasonably withheld.  Seller will have 30 days (or any lesser period specified by Law) after receipt of Buyer's request for Seller's consent and all qualification information reasonably required by Seller to provide Buyer with written notice of its decision to grant or withhold consent.  Seller's consent to any Transfer is not a waiver of the provisions of this article as to any future transaction.  Any Transfer by Buyer without Seller's prior written consent is void.

(b)  <u>Successor in Interest</u>.  Notwithstanding the foregoing, if Buyer or the person currently in "control" of the ownership interest of Buyer ("control" being the authority to direct the operations of Buyer and to have or exercise management responsibility) dies or suffers severe physical or mental disability of at least 3 months which renders Buyer unable to perform all of its obligations under this Agreement, or if Buyer seeks to Transfer any of its interest in this Agreement, Seller will consent to the Transfer of this Agreement, in whole or in part, to a qualified member of the individual's immediate family.  For the purposes of this article a "qualified member" includes the individual's spouse, adult child, parent, brother and sister who is acceptable to Seller at the time of the Transfer under Seller's current Transfer guidelines.

(c)  <u>Transfer Events</u>.  Without limiting the foregoing, the following events constitute a Transfer:

(1)  Subject to Article 23(b), if Buyer is an individual and Buyer dies and Buyer's interest in this Agreement is transferred, whether by will or operation of Law;

(2)  Buyer becomes bankrupt or insolvent, Buyer makes an assignment for the benefit of creditors, or a proceeding is instituted under the Bankruptcy Code and, if it is an involuntary proceeding, Buyer or other affected party has not had it dismissed within 60 days;

(3)  A writ of attachment or execution is levied on this Agreement and is not removed by Buyer within 30 days;

(4)  A receiver is appointed with authority to take over Buyer's interest in this Agreement and is not removed within 60 days in any proceeding or action to which Buyer is a party;

(5)  If Buyer is a partnership or a limited liability partnership, a withdrawal or any change of interest (voluntary, involuntary or by operation of Law) of any partner or the dissolution of the partnership; provided, however, a Transfer of interests between existing partner is not a Transfer requiring Seller's consent;

(6)  If Buyer is a limited liability company or a corporation, any dissolution, merger, consolidation or other reorganization, or other arrangement having similar effect, or the Transfer by Buyer or any member or shareholder with a controlling interest or more of the voting shares of the capital stock of Buyer or of any lesser interest which cumulatively vests a controlling interest of such voting shares in the transferee; provided, however, if Buyer Transfers more than 25% of the interest in any one year or more than 49% of the interest over the term of this Agreement, Buyer must obtain Seller's consent in accordance with Article 23(a); and

(7)  If Buyer is composed of more than one person, any change of interest (voluntary, involuntary or by operation of Law) of any such person.

(d)  <u>Notice of Pending Sale</u>.

- 13 -

(1)     Potential Sale.  If Buyer formalizes a plan to sell 3 or more Buyer's Outlets or Buyer receives a proposal or offer to purchase 3 or more Buyer's Outlets from a third party, Buyer shall provide Seller with the opportunity to make an offer to purchase such Buyer's Outlets in accordance with the terms of this Article 23(d).

(2)     Notice.  In each such case, Buyer shall provide written notice to Seller identifying the Buyer's Outlets to be sold, any equipment, fixtures or other related assets to be included in the sale, and any special terms and conditions that would apply to the sale and whether a minimum asking price is required ("NOPS Notice").  Buyer will not be required to provide Seller with any confidential, proprietary or competitively sensitive business information, including sales volumes, profit and loss or other financial statements, or information concerning prices, margins, and cost of goods unless Seller agrees in writing not to disclose such information to any third-party and enters a confidentiality and non-disclosure agreement satisfactory to Buyer.  Notwithstanding the foregoing obligation, if Seller assigns its rights pursuant to Article 23(d)(4) to a competitor of Buyer, Seller shall not disclose any proprietary or competitively sensitive information it received in connection with the NOPS Notice to its designee and Buyer shall not be obligated to provide Seller's designee any such proprietary or competitively sensitive information.

(3)     Seller's Response.  Seller will have 30 days from receipt of the NOPS Notice in which to make Buyer an offer to purchase the Buyer's Outlets; provided, however, Seller shall make a reasonable effort to respond to Buyer in less time.  Buyer shall consider, but will not be obligated to accept, any purchase offer made by Seller.

(4)     Assignment.  Seller may assign its rights under this Article 23(d) to a designee in which case Seller's designee will have the same rights and obligations as Seller.

(e)     Assignment by Seller.  Seller may transfer its interest, in whole or in part, in this Agreement.

**24.     DE-IDENTIFICATION OF BUYER'S OUTLETS.**

(a)     If any action is taken at any Buyer's Outlet that is prohibited by this Agreement, any action is not taken at a Buyer's Outlet that is required or contemplated by this Agreement, or the operations at a Buyer's Outlet are otherwise not conducted in accordance with this Agreement, Seller may revoke the permission Seller granted to use the Identifications at that Buyer's Outlet by giving sufficient advance written notice to Buyer to enable Buyer to comply with the PMPA.  Without limiting the generality of the foregoing, if a Buyer's Outlet is abandoned, not operated, is no longer supplied by Buyer, or if a sufficient amount of all grades of Shell-branded gasoline and, if applicable, branded diesel fuel is not maintained at a Buyer's Outlet for 7 consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time, Buyer must: (1) notify Seller of any such event; (2) if applicable, take immediate action to terminate the operator's franchise in accordance with the PMPA; (3) de-identify the outlet promptly after Buyer has the lawful right to do so; and (4) provide a second notice to Seller once the de-identification is complete. Notwithstanding the foregoing, in the event the Buyer's Outlet is owned or leased by Buyer, Buyer will have 90 days from the date of Seller's notice to replace the operator without having to de-identify the outlet.  If the operator has not been replaced within this time period, Buyer shall promptly de-identify the outlet and notify Seller once the de-identification is complete.

(b)     Promptly after receiving notice from Seller revoking permission to use the Identifications at a Buyer's Outlet as specified in Article 24(a) above, Buyer shall take, or shall cause the operator of Buyer's Outlet to take, all steps necessary and appropriate to cease the marketing and selling of Products, and otherwise using the Identifications, at the Buyer's Outlet.  Without limiting the generality of the foregoing, at Buyer's expense, Buyer shall, or shall cause the operator of Buyer's Outlet to: (1) remove, and if requested by Seller return, all signs or materials bearing any of the Identifications including, if applicable, the Lazy S canopy fascia, illuminated light bar, and the building portico unless Buyer has received prior approval from Seller to relocate the same to another Buyer's Outlet; (2) remove and destroy, or permanently paint over, all advertising displays, color schemes and other materials and items bearing any of the Identifications (whether used on buildings, equipment, tanks, trucks, automobiles or stationery); (3) return any equipment loaned or leased to Buyer for use at Buyer's Outlet to a place designated by Seller; and (4) if requested by Seller, return the primary Identification sign including the poles and modules to a place designated by Seller if Seller provided any funds towards the purchase of such signage.

- 14 -

(c)      If a Buyer's Outlet is temporarily closed with Seller's prior consent, Buyer shall cover or remove the primary Identifications at the Buyer's Outlet, including the canopy, street, and high rise signs, and shall keep, or cause the operator of the Buyer's Outlet to keep, the Buyer's Outlet cleaned and maintained.

**25.      TERMINATION OR NONRENEWAL.**

(a)      <u>Termination by Seller.</u>  Subject to any limitations imposed by Law, Seller may terminate this Agreement for any of the following grounds.

(1)      Buyer's failure to comply with any provision of this Agreement, which provision is both reasonable and of material significance to the relationship under this Agreement;

(2)      Buyer's failure to exert good faith efforts to carry out the provisions of this Agreement;

(3)      The occurrence of an event which is relevant to the relationship under this Agreement and as a result of which termination of this Agreement is reasonable, including the following events:

(i)      Buyer's fraud or criminal misconduct relevant to the operation of Buyer's business, Buyer's Marketing Premises, or Buyer's Outlets;

(ii)      Buyer's declaration of bankruptcy or judicial determination of insolvency of Buyer;

(iii)      Buyer's continuing severe physical or mental disability if Buyer is an individual, or if Buyer is a Business Entity, the disability of any individual who is currently in "control" of the ownership interest ("control" being the authority to direct the operations of Buyer and to have or exercise management responsibility) of at least 3 months that renders Buyer unable to provide for the continued proper operation of Buyer's Marketing Premises or Buyer's Outlets;

(iv)      Loss of Seller's right to grant the right to use the Identifications, which are the subject of the franchise;

(v)      Buyer's failure to pay to Seller in a timely manner when due all sums to which Seller is legally entitled;

(vi)      Buyer's failure to operate Buyer's Marketing Premises for 7 consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(vii)      Buyer's willful adulteration, mislabeling, or misbranding of motor fuels or other trademark violations;

(viii)      Buyer's knowing failure to comply with the Laws relevant to the operation of Buyer's business, Buyer's Marketing Premises, or Buyer's Outlets;

(ix)      Buyer's conviction of any felony involving moral turpitude;

(x)      Subject to Article 23(b), Buyer's death if Buyer is an individual, or if Buyer is a Business Entity, the death of any individual who is currently in "control" of the ownership interest of Buyer ("control" being the authority to direct the operations of Buyer and to have or exercise management responsibility); and

(xi)      Buyer's failure to comply with Buyer's obligations relating to Insurance set forth in Article 22.

- 15 -

(4)     A determination is made by Seller in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which Buyer's Outlets are located;

(5)     Termination by Seller for cause of any other branded Wholesaler Marketer Agreement between Buyer and Seller; or

(6)     Any other ground for which termination is provided for in this Agreement or is otherwise allowed by the PMPA or other applicable Law.

(b)     <u>Termination After Execution</u>.  If after execution of this Agreement, but prior to the Effective Date, Seller has grounds to terminate or not renew any then existing Wholesale Marketer Agreement between the parties, or to terminate this Agreement as if it were then in its term, Seller may terminate this Agreement, as well as any existing Wholesale Marketer Agreement, based on those grounds.

(c)     <u>Nonrenewal by Seller.</u>  Subject to any limitations imposed by Law, Seller may not renew this Agreement for any of the grounds specified in Article 25(a) or any other ground for which nonrenewal is provided for in this Agreement or is otherwise allowed by the PMPA or other applicable Law.

(d)     <u>Mutual Termination.</u>  The parties may terminate or not renew this Agreement by mutual written agreement in the form and manner permitted by the PMPA.

(e)     <u>Acts Attributable to Buyer</u>.  In determining whether a ground for termination or nonrenewal exists under this article, the acts or omissions of Buyer's employees, agents, and contractors are the acts or omissions of Buyer.  If Buyer is comprised of more than one person, the acts or omissions of each such person are the acts or omissions of Buyer.  If Buyer is a Business Entity, in addition to those individuals mentioned above, the acts or omissions of each partner, shareholder or member, as the case may be, are the acts or omissions of Buyer.

26.     **RIGHTS AND DUTIES UPON TERMINATION OR NONRENEWAL.**

(a)     Upon termination or nonrenewal of this Agreement, Buyer shall immediately cease, and cause the operators of Buyer's Outlets to immediately cease, marketing and selling the Products and otherwise using the Identifications or any marks confusingly similar thereto.  Without limiting the generality of the foregoing, at Buyer's expense, Buyer shall, or shall cause the operator of Buyer's Outlets to:  (1) remove, and if requested by Seller return, all signs or materials bearing any of the Identifications including, if applicable, the Lazy S canopy fascia, illuminated light bar, and the building portico; (2) remove and destroy, or permanently paint over, all other advertising displays, color schemes and other materials and items bearing any of the Identifications (whether used on buildings, equipment, tanks, trucks, automobiles or stationery); (3) return any equipment loaned or leased by Seller to Buyer for use at Buyer's Outlets to a place designated by Seller; and (4) if requested by Seller, return the primary Identification signs including the poles and modules to a place designated by Seller if Seller provided any funds towards the purchase of such signage.

(b)     If Buyer fails for any reason to cease marketing and selling the Products or otherwise using any of the Identifications immediately upon the effective date of termination or nonrenewal, then Seller may enter Buyer's Marketing Premises and the Buyer's Outlets operated by Buyer to carry out Buyer's obligations under Article 26(a), at Buyer's expense.  Buyer shall not interfere, and will not permit any of its employees, agents or representatives to interfere, with Seller's rights under this article.  Seller's exercise of its right of entry will not constitute a trespass or other tort.

(c)     If Buyer fails for any reason to cause any operator of a Buyer's Outlet supplied by Buyer to cease marketing and selling Products or otherwise using any of the Identifications immediately upon the effective date of termination or nonrenewal, then Seller may take all necessary and appropriate action, in Buyer's name and at Buyer's expense, to cause the operator of that Buyer's Outlet to cease that activity.

(d)     Seller will be entitled to injunctive and equitable relief for any violation of this article and Buyer shall pay all costs and expenses, including reasonable attorneys' fees and other legal costs Seller incurs, in enforcing this article.

4/20/14 revn. (W201)
Wholesale Marketer Agreement

**27.   INDEPENDENT CONTRACTOR.**   Buyer is an independent contractor, and nothing in this Agreement may be construed as reserving to Seller any right to exercise any control over, or to direct in any respect the conduct or management of, Buyer's business or operations conducted pursuant to this Agreement, but the entire control and direction of such business and operations are and will remain in Buyer, subject only to Buyer's performance of the obligations of this Agreement. Neither Buyer nor any person performing any duties or engaged in any work at the Buyer's Outlets will be deemed an employee or agent of Seller, and none of them is authorized to impose on Seller any obligations or liability whatsoever.

**28.   BUSINESS ENTITY OR JOINT BUYER.**

(a)   If Buyer is comprised of more than one person, the obligations imposed under this Agreement are joint and several as to each person and all of the terms apply to each person with the same effect as though that person were the sole Buyer.

(b)   If Buyer is a Business Entity, all obligations and provisions of this Agreement of a personal nature apply as if the Business Entity were an individual and, insofar as is legally possible and reasonably practicable, to those individuals who have or exercise management responsibility for the Business Entity, including officers, directors or agents of corporations and partners of partnerships. The Business Entity must manage its affairs with respect to the personal obligations and provisions in a manner so as to give full force and effect to the same.

**29.   ATTORNEY'S FEES.** Except as provided under Article 30, Seller or Buyer, as the case may be, will be entitled to recover from the other party reasonable attorney's fees and other legal costs the prevailing party incurs in order to secure or protect the rights inuring to the prevailing party under this Agreement, or to enforce the terms thereof.

**30.   ALTERNATIVE DISPUTE RESOLUTION.**

(a)   Any and all claims, counterclaims, demands, causes of action, disputes, controversies and other matters arising out of or relating to this Agreement or the relationship established by this Agreement, any provision of this Agreement, the alleged breach of this Agreement, or in any way relating to the subject matter of this Agreement involving the parties or their respective representatives (**"ADR Claim"**), whether such Claims are in contract, tort, or otherwise, at law or in equity, whether provided by statute or the common law, for damages or any other relief, if not capable of resolution through negotiation by the parties, must be submitted to non-binding mediation (**"Mediation"**) as described below. Excepted from Mediation is: (1) Seller's determination to terminate or nonrenew this Agreement and the franchise relationship thereunder pursuant to the PMPA; (2) Seller's collection of indebtedness arising out of or relating to this Agreement; (3) Seller's decision to require the de-identification of any Buyer's Outlet; and (4) any ADR Claim with a monetary value of less than $20,000.00.

(b)   The Mediation process will be conducted according to the following procedure:

(1)   Seller and Buyer shall submit a notice of an ADR Claim (**"ADR Notice"**) to the other party and to the office of the CPR Institute for Dispute Resolution (**"CPR"**), whose address is 366 Madison Avenue, New York, NY 10017-3122, which sets forth the details of the ADR Claim.

(2)   The ADR Claim must be submitted to Mediation in accordance with: (i) the then current CPR Rules for Non-Administered Mediation of Business Disputes; and (ii) the provisions of this Agreement.

(3)   The Mediation proceeding will be conducted on a confidential basis.

(4)   The Mediation will be conducted in the county in which Seller's region office is located or in a mutually agreed city, such agreement being made within 10 days of the filing of the ADR Notice.

- 17 -

(5)     There will be one mediator. The CPR will furnish a Panels List of 5 potential mediators to the parties within 15 days of the ADR Notice. Within 10 days from receipt of the Panels List, each party shall designate up to 3 members of the Panels List in order of preference and return their selections to the CPR. The CPR will have 10 days to notify the parties of an agreed upon mediator based upon the selections furnished by the parties. If the parties are unable or fail to agree upon a mediator, the CPR will select one within 30 days from the filing of the ADR Notice. The mediator must not have any actual or perceived conflict of interest with any party to the Agreement, any affiliate or subsidiary of a party or their respective counsel.

(6)     The mediator will order the parties to promptly exchange copies of all exhibits and, if requested by a party, to produce other relevant documents, to answer up to 20 interrogatories (which total includes any subparts), and to respond to up to 10 requests for admissions (which will be deemed admitted if not denied within 30 days). Any additional discovery will only occur by agreement of the parties or as ordered by the mediator upon a finding of good cause. All discovery must be completed 15 days prior to the commencement of the hearing process. If any dispute or disagreement arises with respect to the discovery contemplated herein, the mediator will hear the nature of the dispute and make any rulings needed to resolve it. The hearing process will be postponed until all such disputes are resolved, so that there will be a 15 day period between the end of discovery and the commencement of the hearing process.

(7)     The mediator will schedule one or more meetings, all of which will be conducted within 90 days from the filing of the ADR Notice.

(c)     Seller and Buyer will each be responsible for their own personal expenses, and Seller and Buyer shall each pay 50% of the fees and costs for the engagement of the CPR and the mediator. If advance payment or a deposit is required of any party prior to commencement of the Mediation, each party represents and warrants that it will timely pay and deposit this amount. The failure to timely pay any amounts requested by the mediator or the CPR (whether at commencement of the Mediation or otherwise) will constitute an immediate and material event of default of this Agreement. If these amounts are not timely paid within 10 business days following the defaulting party's receipt of a written notice and demand to pay (issued by the mediator or the non-defaulting party with a copy to the mediator), the non-defaulting party may seek to compel payment of such fees and costs by initiation of a court proceeding.

(d)     All statutes of limitations and defenses based upon passage of time applicable to any ADR Claim (including any counterclaim or setoff) will be tolled while the Mediation is pending.

(e)     In order to prevent irreparable harm, a party may, notwithstanding any other provision of this Agreement, seek temporary injunctive relief from any court of competent jurisdiction; provided that the party seeking such relief (if Mediation has not already been commenced) simultaneously commences Mediation.

(f)     The provisions of this article survive any expiration or termination of this Agreement.

(g)     **BY EXECUTING THIS AGREEMENT, EACH PARTY IS AGREEING TO HAVE ANY APPLICABLE ADR CLAIM SUBMITTED TO MEDIATION AS SET FORTH HEREIN, AND EACH PARTY ACKNOWLEDGES AND AGREES TO COMPLY WITH THIS REQUIREMENT PRIOR TO INITIATING LITIGATION OR OTHER COURT PROCEEDING. IF ANY PARTY REFUSES TO SUBMIT TO THE MEDIATION PROCESS AFTER AGREEING TO THIS PROVISION, SUCH PARTY MAY BE COMPELLED TO SUBMIT TO THE MEDIATION PROCESS. BUYER CERTIFIES THAT IT HAS READ AND UNDERSTANDS THE FOREGOING AND AGREES TO SUBMIT ALL APPLICABLE ADR CLAIMS TO THE MEDIATION PROCESS.**

31.    **NOTICES.**

(a)     Except as otherwise specified in this Agreement, all notices must be in writing, addressed to the parties as specified below and in compliance with the PMPA and other applicable Law. Subject to any requirements of Law, any notice (including price notifications) may be given to Buyer by personal service or by electronic mail or to either party by certified mail, regular mail, facsimile, or overnight or local courier. Notice will be deemed given when: (1) deposited in the U.S. Mail, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the

- 18 -

party upon written notice to the other if given by certified mail or regular mail; (2) deposited with the dispatching agency, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to the other if given by overnight or local courier; (3) confirmation is received by the sending party if given by facsimile; or (4) Seller is electronically notified by its electronic mail provider or program of delivery to Buyer if given by electronic mail.

      (b)    All notices must be addressed to the parties as follows:

| If to Buyer: | If to Seller: |
|---|---|
| *Southeast Petro* | Shell Oil Products US |
| *402 High Point Dr.* | 910 Louisiana Street |
| *Cocoa, FL 32926* | Houston, Texas 77002 |
| Attn.: *Summit Shah* | Attn.: Retail Administration |
| FAX: *321-633-0467* | FAX: _____ |
| E-MAIL: *summit@southeastpetro.com* | |

      (c)    If Buyer is a Business Entity, Seller may give notice to: (1) any officer or director of a corporation or limited liability company; (2) any partner of a partnership or limited liability partnership; or (3) any personal representative, agent, or employee of Buyer, as may be designated by Buyer from time to time.

      (d)    To enable Seller to send notices and communications to Buyer by electronic mail: (1) Buyer must have access to a computer that meets Seller's specifications in effect from time to time; (2) Buyer must have access to the internet; and (3) Buyer shall have at all times during the term of this Agreement an active E-mail address and Buyer shall promptly advise Seller of such address and of any change thereto.

**32.    GENERAL PROVISIONS.**

      (a)    This Agreement as of the Effective Date hereof cancels and supersedes all prior and contemporaneous representations, inducements, agreements, commitments, and undertakings with respect to the subject matter of this Agreement, except those written agreements relating to any indemnification, reimbursement, indebtedness, or debt security obligations (including any security interest, security agreement, guaranty, mortgage, deed of trust, promissory note, or UCC filing).

      (b)    Except as expressly provided under this Agreement, all amendments and supplements to this Agreement must be in writing and signed by both parties.

      (c)    Any waiver of any provision of this Agreement must be in writing signed by the parties. Either party's delay or failure to enforce any provision of this Agreement or any course of dealing or trade custom or usage will not operate as a waiver of compliance with that provision or a waiver or estoppel of the party's right to enforce any other provision of this Agreement.

      (d)    The provisions of this Agreement are severable. If any provision of this Agreement is, for any reason, invalid or unenforceable, the remaining provisions of this Agreement are valid and enforceable if the basic intent of the parties is still capable of being achieved.

      (e)    This Agreement is binding upon and enforceable against the parties' respective successors, permitted assignees, legal representatives, executors, administrators, heirs, and legatees.

      (f)    Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement is binding unless a duly authorized representative of the parties signs the Agreement, amendment, or supplement.

      (g)    For the purpose of Articles 32(b), (c) and (f), signatures and writings in an electronic form do not constitute

- 19 -

or create a writing signed by a party.  For the purposes of this Article 32(g) "electronic" means via email or involving any technology having electrical, digital, magnetic, wireless, optical, electromagnetic or similar capabilities.

(h)    Except to the extent that the PMPA requires the mandatory application of the Law of another jurisdiction, this Agreement is subject to and governed by the Law of the State of Texas, without giving effect to principles of conflicts of Law that would result in the application of the Laws of another jurisdiction.

(i)    By entering into this Agreement Buyer is not releasing or waiving any right as a condition of entering into this Agreement by the provisions of Section 2805(f) of the PMPA that: (1) Seller is prohibited from requiring Buyer to release or waive; or (2) that Buyer cannot lawfully waive under state law.

Executed on the date shown below.

**SOUTHEAST PETRO DISTRIBUTORS INC**

**Buyer**

By: _____

Title: _____V . P . _____

Date: _____11|6|16_____

Motiva Enterprises LLC
**Seller**

By: _____

Title:    Thelma E Johnson
FSM Contracts & Sales Support Manager

Date: _____11|16|16_____

- 20 -

## EXHIBIT A-1

### GASOLINE MINIMUM/MAXIMUM QUANTITIES

Unless otherwise indicated below, the approximate monthly quantities of the Products will be 1/12th of the annual Gasoline Minimum and Maximum Quantities.

YEAR 1:                    Total annual Minimum:46,511,000 gallons
                           Total annual Maximum:72,673,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '17 | 3,876,000 | 6,056,000 | July '17 | 3,876,000 | 6,056,000 |
| February '17 | 3,876,000 | 6,056,000 | August '17 | 3,876,000 | 6,056,000 |
| March '17 | 3,876,000 | 6,056,000 | September '17 | 3,876,000 | 6,056,000 |
| April '17 | 3,876,000 | 6,056,000 | October '17 | 3,876,000 | 6,056,000 |
| May '17 | 3,876,000 | 6,056,000 | November '17 | 3,876,000 | 6,056,000 |
| June '17 | 3,876,000 | 6,056,000 | December '17 | 3,875,000 | 6,057,000 |

YEAR 2:                    Total annual Minimum:46,511,000 gallons
                           Total annual Maximum:72,673,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '18 | 3,876,000 | 6,056,000 | July '18 | 3,876,000 | 6,056,000 |
| February '18 | 3,876,000 | 6,056,000 | August '18 | 3,876,000 | 6,056,000 |
| March '18 | 3,876,000 | 6,056,000 | September '18 | 3,876,000 | 6,056,000 |
| April '18 | 3,876,000 | 6,056,000 | October '18 | 3,876,000 | 6,056,000 |
| May '18 | 3,876,000 | 6,056,000 | November '18 | 3,876,000 | 6,056,000 |
| June '18 | 3,876,000 | 6,056,000 | December '18 | 3,875,000 | 6,057,000 |

4/20/14 revn. (W201)
Wholesale Marketer Agreement

## EXHIBIT A-1

### GASOLINE MINIMUM/MAXIMUM QUANTITIES
(Continued)

YEAR 3:                          Total annual Minimum:46,511,000 gallons
                                 Total annual Maximum:72,673,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '19 | 3,876,000 | 6,056,000 | July '19 | 3,876,000 | 6,056,000 |
| February '19 | 3,876,000 | 6,056,000 | August '19 | 3,876,000 | 6,056,000 |
| March '19 | 3,876,000 | 6,056,000 | September '19 | 3,876,000 | 6,056,000 |
| April '19 | 3,876,000 | 6,056,000 | October '19 | 3,876,000 | 6,056,000 |
| May '19 | 3,876,000 | 6,056,000 | November '19 | 3,876,000 | 6,056,000 |
| June '19 | 3,876,000 | 6,056,000 | December '19 | 3,875,000 | 6,057,000 |

### EXHIBIT A-1

### GASOLINE MINIMUM/MAXIMUM QUANTITIES
(Continued)

YEAR 4:                          Total annual Minimum:46,511,000 gallons
                                 Total annual Maximum:72,673,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '20 | 3,876,000 | 6,056,000 | July '20 | 3,876,000 | 6,056,000 |
| February '20 | 3,876,000 | 6,056,000 | August '20 | 3,876,000 | 6,056,000 |
| March '20 | 3,876,000 | 6,056,000 | September '20 | 3,876,000 | 6,056,000 |
| April '20 | 3,876,000 | 6,056,000 | October '20 | 3,876,000 | 6,056,000 |
| May '20 | 3,876,000 | 6,056,000 | November '20 | 3,876,000 | 6,056,000 |
| June '20 | 3,876,000 | 6,056,000 | December '20 | 3,875,000 | 6,057,000 |

- 22 -

### EXHIBIT A-1

### GASOLINE MINIMUM/MAXIMUM QUANTITIES
(Continued)

YEAR 5:                         Total annual Minimum: 0 gallons
                                Total annual Maximum: 0 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '21 | 3,876,000 | 6,056,000 | July '21 | 3,876,000 | 6,056,000 |
| February '21 | 3,876,000 | 6,056,000 | August '21 | 3,876,000 | 6,056,000 |
| March '21 | 3,876,000 | 6,056,000 | September '21 | 3,876,000 | 6,056,000 |
| April '21 | 3,876,000 | 6,056,000 | October '21 | 3,876,000 | 6,056,000 |
| May '21 | 3,876,000 | 6,056,000 | November '21 | 3,876,000 | 6,056,000 |
| June '21 | 3,876,000 | 6,056,000 | December '21 | 3,875,000 | 6,057,000 |

4/20/14 revn. (W201)
Wholesale Marketer Agreement

## EXHIBIT A-2

### DIESEL MINIMUM/MAXIMUM QUANTITIES

YEAR 1:        Total annual Minimum: 4,524,000 gallons
                         Total annual Maximum: 7,069,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '17 | 377,000 | 589,000 | July '17 | 377,000 | 589,000 |
| February '17 | 377,000 | 589,000 | August '17 | 377,000 | 589,000 |
| March '17 | 377,000 | 589,000 | September '17 | 377,000 | 589,000 |
| April '17 | 377,000 | 589,000 | October '17 | 377,000 | 589,000 |
| May '17 | 377,000 | 589,000 | November '17 | 377,000 | 589,000 |
| June '17 | 377,000 | 589,000 | December '17 | 377,000 | 590,000 |

YEAR 2:        Total annual Minimum: 4,524,000 gallons
                         Total annual Maximum: 7,069,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '18 | 377,000 | 589,000 | July '18 | 377,000 | 589,000 |
| February '18 | 377,000 | 589,000 | August '18 | 377,000 | 589,000 |
| March '18 | 377,000 | 589,000 | September '18 | 377,000 | 589,000 |
| April '18 | 377,000 | 589,000 | October '18 | 377,000 | 589,000 |
| May '18 | 377,000 | 589,000 | November '18 | 377,000 | 589,000 |
| June '18 | 377,000 | 589,000 | December '18 | 377,000 | 590,000 |

4/20/14 revn. (W201)
Wholesale Marketer Agreement

EXHIBIT A-2

DIESEL MINIMUM/MAXIMUM QUANTITIES
(Continued)

YEAR 3:                        Total annual Minimum: 4,524,000 gallons
                               Total annual Maximum: 7,069,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '19 | 377,000 | 589,000 | July '19 | 377,000 | 589,000 |
| February '19 | 377,000 | 589,000 | August '19 | 377,000 | 589,000 |
| March '19 | 377,000 | 589,000 | September '19 | 377,000 | 589,000 |
| April '19 | 377,000 | 589,000 | October '19 | 377,000 | 589,000 |
| May '19 | 377,000 | 589,000 | November '19 | 377,000 | 589,000 |
| June '19 | 377,000 | 589,000 | December '19 | 377,000 | 590,000 |

YEAR 4:                        Total annual Minimum: 4,524,000 gallons
                               Total annual Maximum: 7,069,000 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '20 | 377,000 | 589,000 | July '20 | 377,000 | 589,000 |
| February '20 | 377,000 | 589,000 | August '20 | 377,000 | 589,000 |
| March '20 | 377,000 | 589,000 | September '20 | 377,000 | 589,000 |
| April '20 | 377,000 | 589,000 | October '20 | 377,000 | 589,000 |
| May '20 | 377,000 | 589,000 | November '20 | 377,000 | 589,000 |
| June '20 | 377,000 | 589,000 | December '20 | 377,000 | 590,000 |

4/20/14 revn. (W201)
Wholesale Marketer Agreement

EXHIBIT A-2

DIESEL MINIMUM/MAXIMUM QUANTITIES
(Continued)

YEAR 5:                    Total annual Minimum: 0 gallons
                          Total annual Maximum: 0 gallons

Monthly Quantities (gallons)

| Month/Year | Minimum | Maximum | Month/Year | Minimum | Maximum |
|---|---|---|---|---|---|
| January '21 | 377,000 | 589,000 | July '21 | 377,000 | 589,000 |
| February '21 | 377,000 | 589,000 | August '21 | 377,000 | 589,000 |
| March '21 | 377,000 | 589,000 | September '21 | 377,000 | 589,000 |
| April '21 | 377,000 | 589,000 | October '21 | 377,000 | 589,000 |
| May '21 | 377,000 | 589,000 | November '21 | 377,000 | 589,000 |
| June '21 | 377,000 | 589,000 | December '21 | 377,000 | 590,000 |

- 26 -

EXHIBIT B

BUYER'S OUTLETS

| SAP Account No. Ship to: | SAP Account No. Sold to: | BUYER'S OUTLET ADDRESS |
|---|---|---|
| 10013526 | 12314379 | 4900 STATE ROAD 524, COCOA, FL 32926-2527 |
| 10013527 | 12314379 | 3590 CHENEY HIGHWAY, TITUSVILLE, FL 32780-2503 |
| 10013529 | 12314379 | 3995 N US HIGHWAY 1, COCOA, FL 32926-5934 |
| 10013530 | 12314379 | 5600 NORTH HARBOR CITY BOULEVARD, MELBOURNE, FL 32940-7224 |
| 10013533 | 12314379 | 305 COUNTRY CLUB DRIVE, TITUSVILLE, FL 32780-8601 |
| 10013535 | 12314379 | 7490 GRISSOM PKWY, COCOA, FL 32927-3214 |
| 10014308 | 12314379 | 3820 FAY BLVD, COCOA, FL 32927-8445 |
| 10014307 | 12314379 | 6807 NE HWY 301, GAINESVILLE, FL 32605-0000 |
| 10014309 | 12314379 | 3928 E SILVER SPRINGS BLVD, OCALA, FL 34470-5006 |
| 10014752 | 12314379 | 2557 MOODY BLVD, FLAGLER BEACH, FL 32136-4410 |
| 10013371 | 12314379 | 4600 W KING ST, COCOA, FL 32926-3222 |
| 10014915 | 12314379 | 5050 MINTON RD NW, PALM BAY, FL 32907-1109 |
| 10014986 | 12314379 | 3120 N COURTENAY PKWY, MERRITT ISLAND, FL 32953-8308 |
| 10014987 | 12314379 | 13725 S APOPKA VINELAND RD, ORLANDO, FL 32821-6380 |
| 10001102 | 12314379 | 4680 S ORANGE BLOSSOM TRL, ORLANDO, FL 32839-1706 |
| 10015122 | 12314379 | 1919 MCCOY RD, ORLANDO, FL 32809-7819 |
| 10002705 | 12314379 | 2924 CORRINE DR, ORLANDO, FL 32803-2236 |
| 10000715 | 12314379 | 5355 E IRLO BRONSON MEMORIAL HWY, SAINT CLOUD, FL 34771-8732 |
| 10000769 | 12314379 | 1417 S 14TH ST, LEESBURG, FL 34748-6646 |
| 10000709 | 12314379 | 6203 OLD WINTER GARDEN RD, ORLANDO, FL 32835-1343 |
| 10000701 | 12314379 | 3200 S CONWAY RD, ORLANDO, FL 32812-7333 |
| 10000757 | 12314379 | 1412 MEMORIAL DR, AVON PARK, FL 33825-4221 |
| 10000759 | 12314379 | 629 NORTH RIDGEWOOD DRIVE, SEBRING, FL 33870-7214 |
| 10000712 | 12314379 | 20250 US HIGHWAY 27, CLERMONT, FL 34715-8793 |
| 10000705 | 12314379 | 2017 NEPTUNE RD, KISSIMMEE, FL 34744-4942 |
| 10000711 | 12314379 | 1045 E BROADWAY ST, OVIEDO, FL 32765-7819 |
| 10015436 | 12314379 | 1200 MALABAR RD SE, PALM BAY, FL 32907-2527 |
| 10010781 | 12314379 | 1402 NE 25TH AVE, OCALA, FL 34470-4861 |
| 10010695 | 12314379 | 2901 E GULF TO LAKE HWY, INVERNESS, FL 34453-3219 |
| 10010783 | 12314379 | 3130 SE 36TH AVE, OCALA, FL 34471-6232 |
| 10010782 | 12314379 | 3801 NW BLITCHTON RD, OCALA, FL 34475-6761 |
| 10010660 | 12314379 | 122 E NOBLE AVE, BUSHNELL, FL 33513-5525 |
| 10047684 | 12314379 | 601 N JOHN YOUNG PKWY, ORLANDO, FL 32805-1111 |
| 10047751 | 12314379 | 3096 CURRY FORD RD, ORLANDO, FL 32806-3376 |
| 10048680 | 12314379 | 2410 W OAK RIDGE RD, ORLANDO, FL 32809-3718 |
| 10015809 | 12314379 | 3495 W ANTHONY RD, OCALA, FL 34475-2674 |
| 10013738 | 12314379 | 3676 N WICKHAM RD, MELBOURNE, FL 32935-2323 |
| 10051131 | 12314379 | 8788 VINELAND AVE, ORLANDO, FL 32821-6504 |
| 10005312 | 12314379 | 7000 NORTHEAST JACKSONVILLE ROAD, OCALA, FL 34479-1334 |

| SAP Account No. Ship to: | SAP Account No. Sold to: | BUYER'S OUTLET ADDRESS |
|---|---|---|
| 10005317 | 12314379 | 14725 S US HIGHWAY 441, SUMMERFIELD, FL 34491-3473 |
| 10005330 | 12314379 | 8955 SOUTHWEST HIGHWAY 200, OCALA, FL 34481-7704 |
| 10052184 | 12314379 | 2201 W COLUMBIA AVE, KISSIMMEE, FL 34741-3429 |
| 10053706 | 12314379 | 5004 OLD WINTER GARDEN RD, ORLANDO, FL 32811-1636 |
| 10056949 | 12314379 | 2645 S ORANGE AVE, ORLANDO, FL 32806-4558 |
| 10010696 | 12314379 | 2612 HIGHWAY 44 W, INVERNESS, FL 34453-3726 |
| 10010686 | 12314379 | 2300 N FLORIDA AVE, HERNANDO, FL 34442-5601 |
| 10056455 | 12314379 | 5922 TURKEY LAKE RD, ORLANDO, FL 32819-4217 |
| 10010654 | 12314379 | 3502 N LECANTO HWY, BEVERLY HILLS, FL 34465-3512 |
| 10013267 | 12314379 | 6164 N SUNCOAST BLVD, CRYSTAL RIVER, FL 34428-6742 |
| 10010694 | 12314379 | 19 HIGHWAY 19 S, INGLIS, FL 34449-9681 |
| 10013272 | 12314379 | 704 W MAIN ST, INVERNESS, FL 34450-4620 |
| 10010834 | 12314379 | 3006 STATE ROAD 540 W, WINTER HAVEN, FL 33880-1135 |
| 10004894 | 12314379 | 4445 PGA BLVD, PALM BEACH GARDENS, FL 33410-6525 |
| 10000671 | 12314379 | 6812 W INDIANTOWN RD, JUPITER, FL 33458-3978 |
| 10061026 | 12314379 | 1865 STATE ROAD 70 W, OKEECHOBEE, FL 34972-2835 |
| 10010679 | 12314379 | 401 MIRACLE STRIP PKWY SW, FORT WALTON BEACH, FL 32548-4501 |
| 10014440 | 12314379 | 6114 COVINGTON HWY, DECATUR, GA 30035-3803 |
| 10002616 | 12314379 | 2360 NORTH FEDERAL HIGHWAY, BOYNTON BEACH, FL 33435-2446 |
| 10002623 | 12314379 | 5675 S US HIGHWAY 1, FORT PIERCE, FL 34982-7373 |
| 10002628 | 12314379 | 3905 NORTHLAKE BLVD, LAKE PARK, FL 33403-1504 |
| 10002631 | 12314379 | 837 NW FEDERAL HWY, STUART, FL 34994-1025 |
| 10013501 | 12314379 | 9595 W ATLANTIC AVE, DELRAY BEACH, FL 33446-9738 |
| 10048392 | 12314379 | 242 S CONGRESS AVE, WEST PALM BEACH, FL 33406-3023 |
| 10014450 | 12314379 | 11720 ALPHARETTA HWY, ROSWELL, GA 30076-3807 |
| 10000766 | 12314379 | 17218 US HIGHWAY 19 N, CLEARWATER, FL 33764-7523 |
| 10000698 | 12314379 | 3498 E SEMORAN BLVD, APOPKA, FL 32703-6055 |
| 10000730 | 12314379 | 455 W OAK RIDGE RD, ORLANDO, FL 32809-4018 |
| 10000771 | 12314379 | 2400 E BAY DR, LARGO, FL 33771-2404 |
| 10083023 | 12314379 | 4730 SR 46, SANFORD, FL 32771-9220 |
| 10083071 | 12314379 | 1998 N US HIGHWAY 1, FORT PIERCE, FL 34946-1439 |
| 10001103 | 12314379 | 100 DOG TRACK RD, LONGWOOD, FL 32750-6404 |
| 10089572 | 12314379 | 100 S SPRING GARDEN AVE, DELAND, FL 32720-5138 |
| 10047184 | 12314379 | 14745 SOUTHERN BLVD, LOXAHATCHEE, FL 33470-9224 |
| 10014817 | 12314379 | 175 INTERNATIONAL PKWY, LAKE MARY, FL 32746-5007 |
| 10010683 | 12314379 | 410 S ORANGE AVE, GREEN COVE SPRINGS, FL 32043-4134 |
| 12403143 | 12314379 | 356 NW 16 STREET, BELE GLADE, FL 33430-0000 |
| 12406304 | 12314379 | 500 S ORLANDO AVE, MAITLAND, FL 32751-5610 |
| 12406303 | 12314379 | 26520 JONES LOOP ROAD, PUNTA GORDA, FL 33950-4708 |
| 12406302 | 12314379 | 793 CENTRAL AVE, UMATILLA, FL 32784-9504 |

- 28 -

| SAP Account No. Ship to: | SAP Account No. Sold to: | BUYER'S OUTLET ADDRESS |
|---|---|---|
| 12406300 | 12314379 | 603 W INDIAN RIVER BLVD, EDGEWATER, FL 32132-3598 |
| 12414910 | 12314379 | 8195 20TH ST, VERO BEACH, FL 32966-1322 |
| 12414909 | 12314379 | 430 US HIGHWAY 1, VERO BEACH, FL 32962-1601 |
| 12414914 | 12314379 | 9660 STATE ROAD 82, FORT MYERS, FL 33905-5401 |
| 12414912 | 12314379 | 9497 108TH AVE, VERO BEACH, FL 32967-3154 |
| 12419296 | 12314379 | 6700 S US HIGHWAY 1, BUNNELL, FL 32110-6816 |
| 12450171 | 12314379 | 463943 STATE ROAD 200, YULEE, FL 32097-6342 |
| 12450111 | 12314379 | 2135 SADLER RD, FERNANDINA BEACH, FL 32034-4452 |
| 12484971 | 12314379 | 717 S BROAD ST, BROOKSVILLE, FL 34601-3219 |

- 29 -

## EXHIBIT C

## REGULATION OF FUELS AND FUEL ADDITIVES

Buyer shall strictly comply, and cause the operators of Buyer's Outlets to strictly comply, with all applicable federal, state, and local Laws, including the regulations of the EPA promulgated as Part 80 - REGULATION OF FUELS AND FUEL ADDITIVES, of Chapter I, Title 40, Code of Federal Regulations ("C.F.R."), as amended from time to time, and with any applicable state regulations and local ordinances covering the Products, as amended from time to time (the **"Regulations"**), including those obligations set forth below; provided that, should there be any conflict between those obligations set forth below and the Regulations, the Regulations control.  With respect to the Buyers' Outlets, Seller and Buyer agree as follows:

(a)      Seller's Rights and Responsibilities.

(1)      Continuing for the period as Seller, Seller may take periodic samples from the Product dispenser(s) at Buyer's Outlets or from other buyers supplied from the same Terminal and test such samples to determine whether the Products are in compliance with the Regulations.  Any such sampling and testing will not relieve Buyer of any obligation Buyer has under the Agreement or by Law to sell, dispense, and offer for sale only Products complying with the Regulations.

(2)      If the Laws relating to UST systems or those set forth in this exhibit are not complied with by Buyer or any operator of a Buyer's Outlet, based upon evidence satisfactory to Seller, Seller may, in addition to other rights or remedies available to Seller, suspend deliveries of the affected Products to Buyer and enter Buyer's Outlet to take such appropriate action, in Seller's sole judgment (including padlocking the pump dispensers), to avoid any violation of this Agreement or the Regulations.

(3)      Seller shall provide prompt notice to Buyer if any test performed under (1) above, or through other circumstances known to Seller, indicates that the Product inventory at a Buyer's Outlet is not in compliance with the Regulations.  Seller shall cooperate with Buyer in any further action taken that is necessary (including pumping out the applicable tanks) to restore the availability of complying Products.  The costs of any such further action, including further sampling and testing, will be at Buyer's expense if the cause of contamination was within Buyer's control.

(b)      Buyer's Responsibilities.

(1)      Buyer shall ensure that no gasoline Product is mixed with any gasoline containing lead anti-knock agents.  Gasoline Product may not be sold if it is mixed with lead anti-knock agents.

(2)      Buyer shall ensure that no leaded gasoline (i.e., gasoline containing unlawful amounts of lead or phosphorus) is sold or offered for sale at a Buyer's Outlet.

(3)      Buyer shall ensure that gasoline Product is not sold, offered for sale, supplied, dispensed, offered for supply, transported, or caused to be transported, in which the Reid Vapor Pressure exceeds the legally applicable standard or where the oxygen content is below the legally applicable standard.  Buyer shall not sell, offer for sale, dispense, supply, offer for supply, or transport reformulated gasoline Product which does not comply with the legally applicable standard under the Law for the geographical area and time period in which such gasoline Product is intended to be dispensed to motor vehicles.

(4)      Buyer shall ensure that diesel Product for on road use in motor vehicles is not sold, offered for sale, supplied, dispensed, offered for supply, transported, or caused to be transported, unless the diesel Product (i) has a sulfur content, no greater than 15 parts per million (ppm); (ii) has a cetane index of at least 40, or a maximum aromatic content of 35 volume percent; (iii) is free of visible evidence of the yellow solvent 124; and (iv) is free of visible evidence of the dye solvent red 164 unless it is used in a manner that is tax-exempt as defined under section 4082 of the Internal Revenue Code.

(5)      Gasoline Product may not be sold or offered for sale at Buyer's Outlets unless such gasoline Product is additized in accordance with the requirements of 40 C.F.R. section 80.161, as may be amended from time to time.

- 30 -

(6)    Buyer shall use 10-micron particulate only filters for alcohol-blended fuels and use 10-micron particulate only or 10-micron particulate and hydrosorb type filters for non-alcohol blended fuels. A water management procedure must be implemented to prevent the presence of water for tanks storing alcohol blended fuels. In some states, tank water bottoms must be maintained below ¼" to ¾" and it is Buyer's responsibility to ensure compliance with applicable state Regulations for water management procedures for tanks.

(7)    Buyer shall establish and enforce an oversight compliance program to assure that Buyer and the operators of Buyer's Outlets, and their respective employees and agents, and third parties (including the employees, agents and contractors of Buyer) will not cause, allow, or permit the Products to not be in compliance with the Regulations or become contaminated with any other gasoline or diesel fuel product or foreign substance, at any time, after delivery by or for Seller to Buyer. The oversight program must include periodic sampling and testing of the Product inventory; securing the manhole covers, fill line caps and dispensers to avoid authorized entry or use; and supervising and instructing those employees and others having access to the Products fuel system regarding proper procedures to prevent the Products from becoming non-compliant with the Regulations and to prevent contamination of the Products.

(8)    Buyer shall give prompt notice and descriptive details to Seller of: (i) the EPA's or state agency's taking a sample of any Product at any Buyer's Outlet to test for compliance with the Regulations and (ii) the verbal or written receipt of any test results from any such sampling.

(9)    Buyer shall give prompt notice and descriptive details to Seller (by telephone to Seller's Region office, followed by written notice) of any circumstance or occurrence at a Buyer's Outlet which reasonably could cause the Products or dispensing equipment to not be in compliance with the Regulations. Upon discovery of any such condition the Products may not be sold, dispensed, or offered for sale until Seller and Buyer can mutually determine by sampling, testing, or other means whether the Product is in compliance and, if found not to be in compliance, take such further action as is necessary (including pumping out the applicable tanks) to restore the availability of a complying Product. The sampling, testing, or further action will be at Buyer's expense if the cause of contamination was within the control of Buyer or the operator of Buyer's Outlet.

(10)    Buyer shall obtain, properly affix, and maintain all Product labels required by Law to be affixed at Buyer's Outlet, including gasoline and diesel fuel pump island and dispenser labels.

(11)    Buyer certifies that Buyer has read, understands, and is fully informed of the relevant Regulations pertaining to the Products, and Buyer shall, and shall cause the operators of Buyer's Outlets to, fully comply with the provisions thereof whether or not such other obligations are referred to or restated in this Agreement.

- 31 -

# Exhibit E

# SOUTHEAST PETRO DISTRIBUTORS, INC.

## DEALER SUPPLY AGREEMENT

Dealer's Name: <u>LLB Convenience & Gas, Inc.</u>

Date: ~~November 20, 2007~~ December 12, 2007

Dealer's Fed ID. No. <u>20-0233265</u>   Site No.: N/A

Home Address: ___N/A___

Facility Address: <u>8788 Vineland Rd. Orlando, FL 32821</u>

Business Address: <u>4484 34th Street SW. Orlando, FL 32811</u>

THIS DEALER SUPPLY AGREEMENT made this <u>20th</u> day of November, 2007 between SOUTHEAST PETRO DISTRIBUTORS, INC., a Florida corporation, (hereinafter "Company") and <u>LLB Convenience & Gas, Inc.,</u> (hereinafter "Dealer") operating a petroleum products business at <u>8788 Vineland Rd. Orlando, FL 32821</u>, (hereinafter "Facility").

WHEREAS, Company has a reputation as a marketer of high quality petroleum products; and

WHEREAS, Dealer desires to operate the Facility as a branded outlet offering Company's petroleum products and the highest quality service to the motoring public;

NOW, THEREFORE, in consideration of the mutual undertakings herein contained, Company and Dealer agree as follows:

1.    **Term.**

The initial term of this Agreement is for ten (10) years and commences on July 19, 2012 ~~2008,~~ and ends on <u>July 19, 2022</u> ~~2018.~~ Dates to be inserted once site is approved for incentive by Oil Company

2.    **Equipment.**

      (a) Company hereby provides to Dealer the Equipment shown on the "Equipment Schedule" attached hereto and made a part hereof as Exhibit 1, now installed or to be delivered and installed by Company at the Facility.  Such Equipment and any additions, replacements, or substitutions hereafter made  will be collectively referred to as the "Equipment".  Dealer agrees that the Equipment shall remain the property of Company and shall not be encumbered, changed, modified, relocated or removed without the consent of Company.  Company reserves the right at any time to remove from the Facility without replacement any item of Equipment not deemed by Company essential to the operation thereof.

      (b) Dealer will at Dealer's own expense make all repairs and provide all maintenance required to keep the Equipment in good operating condition.  Upon termination of the Agreement Dealer agrees to surrender and return the Equipment to Company in as good order and condition as when supplied to Dealer hereunder, ordinary wear and tear excepted.

LLB Conv & Gas DSA

- 1 -

3.    **Standards of Operation.**

(a)  Dealer understands that Company is obligated under its agreement with Oil Company to abide by certain standards of operation and appearance which have been developed by Oil Company.  Dealer also understands that those standards may be modified or changed by Oil Company from time to time and Company is obligated to comply with certain requirements with respect to such things as merchandising, service work, staffing, customer complaints, maintenance, appearance, uniforms, lighting, signs, image, and other matters.  Dealer hereby agrees to comply with all such requirements imposed upon Company.

(b)  Minimum Operating Hours.  The Facility will be kept open for operation, properly lighted and staffed for at least the hours shown below:

<u>Minimum Open Hours</u>

| <u>Day</u> | <u>From:</u> | <u>To:</u> | <u>24 Hrs.*</u> | <u>No. of Hours</u> |
|---|---|---|---|---|
| Monday - Sunday | 6 A.M. | 11 P.M. | _____ | _____ |

*Place an X if applicable                Total Weekly Hours:       _____

4.    **Compliance with Environmental Laws and Regulations.**

Dealer expressly acknowledges that it is the sole operator of the motor fuel facility located at the Station, and further acknowledges that Company has no ownership or operational interest in the underground motor fuel storage tanks, piping system or aboveground dispensing equipment.  Further, Company has no right of control over the use, inspection or maintenance of such storage tanks, piping system or aboveground dispensing equipment.  Without limiting or detracting from the indemnity provisions herein, Dealer shall comply with the Environmental Protection Act, with special attention to the regulations governing the storage, dispensing and sale of unleaded gasoline, and all other Federal, State and local laws and ordinances relating to the environment, and with rules, orders and regulations issued and promulgated there under, and shall defend, indemnify and hold Company harmless from and against any and all penalties, interest, costs, expenses, claims, judgments and orders with respect to such laws, ordinances, rules, orders and regulations.

5.    **Supply of Products.**

Company agrees to sell to Dealer and Dealer agrees to buy and diligently to promote the sale of such quantities of Company's petroleum and other products as may be necessary to meet the customer demand for Company products at the Facility.  Dealer agrees to buy 100% of Dealer's motor fuel requirements from Company.  Company shall have the right at any time to change, withdraw, substitute or add brands and grades of petroleum products, TBA, trademarks, identification signs or color schemes. Dealer understands that Company will not be responsible for run-outs caused by Oil Company allocations or acts of God, or any other circumstances out of its control.  All fuel deliveries shall be made in full transport truckload quantities or in such other minimum quantities per delivery as specified by Company from time to time.  If Dealer requests delivery of less than Company's established minimum volumes, compensatory delivery charges will be imposed.  In no circumstances is Company obligated to make deliveries into a tank that is suspected of leaking.  Under this Agreement, Company is obligated to supply product to only the Facility specified above.

LLB Conv & Gas DSA

- 2 -

6.      **Change of Brand**

At the present time, Company is a wholesaler for BPAmoco, Shell (Motiva), Citgo Oil, ExxonMobil and Sunoco and expects to continue such relationship indefinitely. In the event that relationship terminates, or should a brand become unavailable, Company will re-brand Dealer and supply with another brand that Company also wholesales.

If the location is de-branded because of Dealer not keeping up image, cleanliness or any other standards of Oil Company, Dealer shall be responsible for all of the expenses related to de-branding and any penalties from Oil Company as well as all new expenditures incurred for the change of brand.

7.      **Best Efforts, Access and Information**

Dealer shall use it best efforts to diligently promote the sale of motor fuel, and to purchase from Company the monthly minimum amounts set forth herein. In so doing, Dealer acknowledges the importance of maintaining competitive prices for all Oil Company's products. Dealer also shall keep records reflecting motor fuel purchases and sales made at the Dealer's place of business. Upon written request, Dealer agrees to make such records available to Company, as may reasonably be required or necessary for audits or compliance with environmental laws or rules.

8.      **Minimum Volumes.**

Dealer agrees to purchase from Company and resell through the Facility each contract year a quantity of motor fuel at least equal to 100,000 gallons per month. "Contract year" shall mean each successive 365-day period this Agreement is in effect. Failure to purchase minimum volumes shall be grounds for termination of this Agreement and repayment of any amortized balances that may exist as described in the Amortization Agreement, if applicable. If, at 12 million minimum total gallonage has not been purchased, contract end date shall be extended until the contract minimum has been purchased from Company.

9.      **Title to Motor Fuel and Stock Losses.**

Title to, and risk of loss of, motor fuel delivered by Company passes to Dealer at the time the motor fuel enters the motor fuel storage tanks at the Station. Dealer waives any claims against Company as to quantity and quality of motor fuel delivered under the Agreement unless such claim is presented to delivering common carrier at the time of delivery and notification in writing within two (2) business days after delivery to Company. Company agrees to assist dealer in all claims against the common carrier.

10.     **Price of Products.**

The price for gasoline and diesel fuel shall be 1 cents over the posted rack price for such fuel plus all applicable Federal, State, and county taxes and assessments, plus the Company's applicable posted common carrier freight rate. In addition, Dealer is obligated to pay any tax, duty, fee or charge levied on any of the products, or on Company, or required to be paid or collected by Company upon the sale, delivery, transportation, storage, ownership or use of any of the products.

11.     **Terms of Payment.**

(a) Motor fuel sales shall be net cash at time of delivery (C. O. D.) unless otherwise expressly agreed by Company and Dealer as detailed below in section (b). If Company should agree to extend credit to Dealer for any products purchased hereunder, Company may demand security, and, in default thereof, Company may elect to discontinue credit deliveries.

LLB Conv & Gas DSA

(b) Dealer agrees to establish an account with a financial institution that provides electronic fund transfer ("EFT") services and to authorize transfers of funds between that account and designated accounts of Company. Dealer shall provide Company with the information and authorization necessary to debit and credit Dealer's account through EFT transactions. With terms for fuel being 7 days.

## 12.  Credit Card Sales.

Dealer is authorized to use the credit card programs currently being offered by Oil Company or Oil Company's primary supplier. Dealer may make sales of products and services at the station to persons presenting a valid credit card listed and approved by Oil Company. If Dealer elects to make credit sales to customers presenting an acceptable credit card, Dealer shall comply with the instructions, policies, and restrictions set forth in the credit card program guidelines as amended from time to time. Dealer understands that his failure to comply with the instructions, policies or restrictions set forth in the guidelines may result in refusal of the Oil Company or its primary suppliers of card services to accept credit card invoices or to charge back to Dealer any such credit card invoices. To process credit card sales Dealer must have an appropriate POS terminal compatible with Oil Company networks. Dealer expressly agrees that it is responsible for all fixed and variable charges imposed by Oil Company in the process of offering credit card sales.

## 13.  Trademarks and Names.

It is understood and agreed by Dealer that Company neither owns nor controls the signs, brands, trademarks or trade names of Oil Company. Dealer is authorized to use and display these at Dealer's place of business subject to the requirements for such use imposed by Oil Company and Company. Dealer agrees to maintain such signs in good condition and to otherwise use the signs, brands and trademarks in a lawful manner. Further Dealer agrees to maintain the integrity of the branded product quality by not adulterating or otherwise mixing foreign substances with such products or passing on NON OIL COMPANY FUEL products under the OIL COMPANY Brand.

## 14.  Indemnity.

Dealer agrees to indemnify, protect, defend and hold Company and its employees harmless from and against all losses, claims, liens, demands and causes of action of every kind, including the amount of any judgments, penalties, interest, court costs and legal expenses (i.e. attorney's fees and costs of legal assistance) incurred by Company in defense of same, arising in favor of any party on account of claims, liens, debts, personal injury, death or damages to property and all other claims or demands of every character occurring or in any way incident to, in connection with or arising out of the conduct of Dealer's business. Dealer shall be solely responsible for the defense of any and all claims, demands, or suits and agrees to bear all other costs related thereto. Dealer's obligations hereunder expressly extend to all pollution cleanups and response costs claims and demands by any party, including governmental agencies, arising out of any underground storage tank leaks or groundwater contamination. As used herein, "pollution cleanup and response costs" include, but are not limited to, costs of testing, costs of site rehabilitation and other costs for the cleanup of discharge of petroleum products.

## 15.  Insurance.

Dealer agrees to purchase and maintain comprehensive general liability insurance covering Dealer's Facility and operation thereof. Such insurance shall be in an amount of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence. Dealer should assess his/her own needs and determine if more insurance is necessary. Dealer must carry storage tank third party liabilities, corrective action and clean up insurance. All insurance policies shall be written by companies satisfactory to Company and shall contain a clause that the insurance carried by Dealer is primary to any

LLB Conv & Gas DSA

- 4 -

liability insurance carried by Company and shall include Company as an additional insured. Dealer or Dealer's insurance carrier shall furnish Company with a certificate of insurance certifying the existence of the above coverage and clauses and stating that Company will receive at least 10 days written notice prior to cancellation or material change. Dealer agrees to increase the amount of any of the insurance described herein upon receiving the written request of Company to do so. In addition, Company reserves the right to require additional types of coverage's such as, for example, environmental impairment liability insurance to satisfy governmental requirements for financial responsibility, and promptly upon notice of such an additional requirement Dealer agrees to obtain the necessary coverage.

### 16.   Independent Contractor Status of Dealer

Nothing in this Agreement shall be construed as reserving or granting to Company any right to exercise control over or to direct the day-to-day conduct or management of Dealer's business. Dealer is an independent contractor for all purposes, subject to the obligations set forth herein. Dealer shall have no authority to make any contracts or representations whatsoever in the name of or on behalf of Company. Dealer shall not be deemed an employee of Company in any manner.

### 17.   Security Interest and Deposit.

In order to secure payment of all Dealer's present and future indebtedness owed by Dealer to Company at any time during the term of this Agreement or upon its termination or expiration, Dealer hereby grants to Company a security interest in (a) all of Dealer's inventory of petroleum products purchased from Company, (b) all accounts receivable owing to Dealer regardless of when or how incurred, Dealer agrees to sign all financing statements and renewals as necessary to provide public record of this security interest.

### 18.   Assignment - Subleasing.

This agreement is not assignable by Dealer or by operation of law without the prior written consent of Company, which consent shall not be unreasonably withheld, but otherwise shall be binding upon and shall insure to the benefit of the parties, and their respective representatives, successors, and assigns. Furthermore, Company may assign this agreement without the consent of Dealer.

### 19.   Technology and Image Upgrades.

Dealer understands that from time to time the Oil Company may require technology upgrades of software and/or equipment or image changes and mandate that such upgrades are a requirement to maintain the Oil Company Brand. Dealer agrees to make such upgrades as are required by the Oil Company.

### 20.   Termination; Default..

    (a)    In the event this Agreement is subject to and governed by Title 1 of the Petroleum Marketing Practices Act, 15 U.S.C. 2801, et. seq. ("PMPA"), the same is made a part of this Agreement. To the extent any provision of this Agreement conflicts with the PMPA, that provision shall be deemed modified so as to comply with PMPA. In the event this Agreement is subject to and governed by the PMPA, notice of termination or non-renewal of this Agreement by Company shall be provided in the manner prescribed by PMPA.

    (b)    In the event this Agreement is subject to and governed by the PMPA, grounds for termination or non-renewal of this Agreement are as set forth herein and in Section 2802 of PMPA. In the event this Agreement is subject to and governed by the PMPA, a copy of a summary of Title 1 of PMPA is attached to this Agreement as Exhibit B.

LLB Conv & Gas DSA

(c)  If the Dealer (a) fails to make any payment of money required under this Agreement, or (b) breaches any other obligation imposed by this Agreement and fails to cure same within ten (10) days after written demand,  Southeast may immediately declare a default hereunder. Any default in any Supplemental Agreement, and/or and default in any mortgage or other document securing this Agreement, is and shall be a default hereunder.

(d)  In the event of default, the Company shall have the right to any and all of the following cumulative remedies:

(1)  Accelerate the payment of all sums due under this and/or any Loan Document  or other related instruments without notice or demand;

(2)  Pursue any remedies available in any or all of the Loan Documents, including the Note, Mortgage, Security Agreement, Supplemental Agreement or other related instruments;

(3)  Terminate this agreement; and

(4)  Seek any other remedies available at law or in equity.

(e)  The Parties stipulate that, in the event of breach or early termination of this contract, there will be damages, including liquidated damages, due to Company, including loss of income, recapture of incentives due to Oil Company, and any branding costs or cash advances; all of which will be due by Dealer to Company.  The Parties further agree that, in the event of breach hereof by Dealer or in the event Dealer shall terminate this contract, or in the event Oil Company shall terminate supplying brand for any reason related to Dealer, then in any of those events, Dealer shall immediately pay all damages including but not limited to loss of income (calculated by multiplying the remaining contract volume by the Company markup over rack), repay all incentives due, and reimburse all branding costs or monies.

## 21.  Right of First Negotiation

If Dealer shall desire to sell the real property upon which the Facility is located (the "Property"), Dealer shall notil' the Company in. writing, specifying the price and terms upon which the Dealer desires to sell the Property. If the Company is interested in purchasing the Property it shall advise the Dealer in writing of its intention within seven (7) days after receipt of notice from the Dealer. If the price and terms are acceptable to the Company, the Company shall so advise the Dealer in its notice. If the price and / or terms shall not be acceptable to the Company, the Company shall so advise the Dealer, and shall advise the Dealer of the price and terms which, would be acceptable to the Company in its notice. If the Company shall fail to provide notice of its intention to buy the Property within the time set forth above, the Company's rights under this Paragraph shall lapse and expire, and shall be of no thrther force or effect, If the Company shall prov:ide notice of alternative price and tenns, 'then Dealer and the Company shall attempt to negotiate mutually acceptable price and 'terms for the sale and purchase of the Property. If the Company and the Dealer shall be unable to agree upon acceptable price and terms within fifteen (15) days after th.e provision of the notice of alternative price and terms from the Company to the Dealer, then the parties shall be deemed to have reached an impasse, and the Dealer shall have no further obligation to negotiate with the Company for the sale of the Property, and Dealer shall 'be free to sell the Property to any person it desires, upon such terms as it desires, without regards to the terms of this Paragraph, and the Company's rights under this Paragraph shall lapse and expire, and shall be of no further force or effect.

## 22.  Waiver.

LLB Conv & Gas DSA

The waiver of any default or breach by Dealer hereunder, forbearance, or failure to insist upon strict performance of any of the terms or provisions hereof or prior course of dealing on the part of Company shall not be taken to be a waiver of any continuing or subsequent default or breach of the same or any other covenant, condition or provision hereof or affect the rights or remedies of Company with respect thereto.

23.    **Severability.**

Should any of the provisions contained in this Agreement now or hereafter become illegal or unenforceable by statue or otherwise, such provisions shall be void and the remaining provisions shall continue to be of full force and effect. If subsequent to the date of this Agreement valid state or federal laws or regulations governing the relationship between Dealer and Company take effect, this Agreement shall be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provision of this Agreement in conflict therewith shall during such period be void.

24.    **Entirety - Release.**

This Agreement constitutes the entire agreement and understanding between Company and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express or implied between Company and Dealer. All prior agreements between Company and Dealer concerning the subject matter hereof are hereby terminated and ALL CLAIMS WHICH COMPANY AND DEALER RESPECTIVELY MAY HAVE OR ASSERT, EACH AGAINST THE OTHER, DIRECTLY OR INDIRECTLY RESULTING FROM OR CONNECTED WITH ANY SUCH PRIOR AGREEMENTS BEFORE THE EFFECTIVE DATE OF THIS AGREEMENT, EXCEPTING ONLY LIQUIDATED INDEBTEDNESS DUE FROM EITHER PARTY TO THE OTHER, CLAIMS RELATING TO EQUIPMENT OR CLAIMS SPECIFICALLY RESERVED IN WRITING, ARE HEREBY FOREVER RELEASED AND DISCHARGED. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Company or Dealer unless in writing, duly executed by Dealer and Company.

25.    **Notices**

Any notice provided for herein shall be given in writing and shall be considered properly given when personally delivered or sent by U.S. Mail, Certified, Return Receipt Requested, addressed by either party to the other at such party's address shown below or at any changed address of which notice is duly given, as of the date received.

Southeast Petro Distributors, Inc.
402 High Point Drive Suite 101
Cocoa, FL 32926
(321) 631-0245   FAX (321) 633-0467

LLB Convenience & Gas, Inc.
Tahir Ansari
4484 34th Street
Orlando, FL 32811
(407) 407-426-7009        Cell (321) 695-6911

26.    **Authority to Sign Agreement.**

Dealer is aware that this Agreement may be signed on behalf of Company only by an officer of Company and acknowledges that this Agreement is not effective until so signed. Dealer

LLB Conv & Gas DSA

- 7 -

expressly acknowledges that no agent or employee of Company below the level of officer may alter or modify the written terms of this Agreement or in any way bind Company to obligations not set forth in writing in this Agreement. Dealer must provide warranty deed showing proof of ownership for recording this agreement or if property is leased by dealer, dealer must provide copy of the lease and have consent of its landlord. Dealer specifically acknowledges and has represented to Southeast Petro that it has not or will not enter into any other supply agreements that conflict with agreement. EXECUTION OF THIS AGREEMENT BY DEALER IS AN ACKNOWLEDGMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE TO OR RELIED UPON BY DEALER.

**27.    Attorneys Fees and Costs.**

In the event of litigation between the parties regarding the provisions of this Agreement or other related agreements governing the supply of fuel or the obligations of the parties hereunder, the prevailing party shall be entitled to recover from the other party its attorneys fees, legal fees, and costs in maintaining the litigation.

**28.    Institutional Lender.**

Company acknowledges that this Agreement shall in all events be subordinate to any first mortgage executed in favor of any financial institution, encumbering the Facility. The Company thrther agrees that in the event of default by the Dealer hereunder, it will provide written notice thereof to any such institutional lender which shall have provided written notice to the Company of its name and address simultaneously with. the notice to be provided to Dealer hereunder, and shall permit such institutional lender to perform the obligations of the Dealer hereunder, and it agrees that it will not terminate this Agreement unless and until such institutional lender shall have been given the opportunity to cure the default by the Dealer hereunder. The terms of this section shall be self-operative, but upon written request by the Dealer the Company shall execute any agreement required by an existing or proposed institutional lender providing first mortgage financing with respect to the Facility confirming the agreements contained in this section in such form as shall be reasonably required by such institutional lender.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed, as of the date first written above.

In the presence of:                                   SOUTHEAST PETRO DIST, INC.
                                                      "Company"


_____              By _____
(As to Company)                        Mahesh R. Shah
                                       It's President


                                       LLB CONVENIENCE & GAS, INC.
                                       "Dealer"

_____              By _____
(As to Dealer)                         Tahir Ansari
                                       It's President


LLB Conv & Gas DSA

- 8 -

Dealer acknowledges receipt of the following
Exhibits to this Agreement by initialing below:
Addendum 1 - Equipment Schedule    _____
Standards of Operation             _____
Personal Guarantee     _____

LLB Conv & Gas DSA

## PERSONAL GUARANTY

FOR GOOD AND VALUABLE CONSIDERATION as an inducement for Southeast Petro Distributors, Inc. (hereinafter "Payee"), to accept credit from:

LLB Convenience & Gas, Inc. (hereinafter "Promisor"),

the undersigned unconditionally guarantee all the obligations of the Promisor under the Dealer Supply Agreement as they relate to fuel invoices, incentives received, charge backs and in the case of premature termination (with future gas use) the liquidated damages per the Dealer Supply Agreement dated _____, and any modification, amendment, or extension thereof, and guarantees to Payee the prompt and full payment of all sums now or hereinafter due Payee from Promisor, including costs of collection and attorneys' fees, if any.

And the undersigned agree to remain fully bound on this guaranty notwithstanding any extension, forbearance, or waiver, or release, discharge or substitution of any collateral or security for the debt. In the event of default, the Payee may seek payment directly from the undersigned individuals, jointly or separately without need to proceed first against Promisor. In any action to enforce this guaranty, the prevailing party shall be entitled to recover attorney's fees and costs.

This guaranty shall be binding upon and inure to the benefit of the parties, their successors, assigns and personal representatives.

Signed under seal this _12_ day of _Dec._, 2007.

Guarantor(s)

_____

Tahir Ansari, individually
SS#_____

_____
, individually
SS#_____

LLB Conv & Gas DSA

- 10 -

## EXHIBIT 1 TO DEALER SUPPLY AGREEMENT

DEALER EQUIPMENT RECEIPT

Dealer has been and/or will be supplied with products of Shell Oil directly or through Southeast Petro Distributors, Inc., its branded reseller, in order to enjoy the privilege of using Shell's brands (i.e., trademarks, trade names, etc.) In connection with advertising and resale of Shell products, and Dealer acknowledges and agrees as follows:

Each of Shell's brands used by Dealer is good and valid and owned by Shell Dealer acknowledges that it has no rights therein except as permitted by Shell. Dealer shall use Shell's brands only in accordance with standards established by Shell from time to time. Dealer agrees not to change or alter by any means whatsoever the nature, quality, or appearance of any of Shell's branded products and to merchandise such products under Shell brands use at the time. The privilege of using Shell's brands shall automatically terminate when the franchise relationship between Shell and Southeast Petro Distributors, Inc. is terminated, or on thirty (30) days' written notice, in the event of Dealer's violation of any provision hereof or of any of the aforesaid standards.

All signs, poles, and other identification items and equipment ("EQUIPMENT") furnished by Southeast Petro and now or hereafter displayed at the Premises are, and shall remain, property of Southeast Petro, and Shell or its authorized representatives shall be entitled to enter upon said Premises and remove the EQUIPMENT therefrom at any time and for any reason, without any liability. Dealer further agrees to indemnify and hold Supplier, Shell and their agents harmless from and against any and all claims, costs, damages, fines, actions, and suits arising out of the installation, use, repair, maintenance, or removal of the EQUIPMENT. Dealer agrees not to deface, obscure, or in any other way alter any EQUIPMENT furnished by Southeast Petro, and not to attach other fixtures, including, but not limited to, lights, or other signs, to any of Shell's EQUIPMENT except as directed by Shell or Southeast Petro Distributors, Inc.

### COMPLETE LIST OF ALL EQUIPMENT

| ITEM | DESCRIPTION | SERIAL NO. |
|------|-------------|------------|
| Manual Imprinter | | |
| Any Shell Logo Items. | | |

As provided from time to time.

Date:_____

Witness:_____   By:_____

Addendum to Dealer Supply Agreement
Between Southeast Petro Dist., Inc. and LLB Convenience & Gas, Inc.
Dated ~~November 20, 2007~~
December 12, 2007

1.      Section 6 is hereby modified to add that should Company notify Dealer that the Oil Company has decided to withdraw from the market and that its brand is no longer available, then in that case Dealer shall have the right, in its sole discretion, to terminate the Dealer Supply Agreement with 15 days written notice from date of notification.

2.      Company agrees it will not provide gasoline and diesel fuel to any other Shell brand station located within five (5) mile radius of the Facility for a price lower than the price at which it is provided to Dealer.

3.      The Dealer Supply Agreement is hereby amended to amend the liquidated damages provision to reflect the following:  In the event that the Dealer sells the property for a non-gas use prior to the expiration of the Dealer Supply Agreement, the Dealer will not be assessed liquidated damages.  Dealer agrees that for the liquidated damages to be waived by Shell and Company, the Dealer must deed-restrict the property against gasoline use upon the sale and repay all incentives received by Shell or Oil Company.

4.      Section 21, Right of First Negotiation, is not valid if Dealer sells the Property for non-gas use. The Company does not have Right of First Negotiation if the Property is sold by the Dealer for non-gas use.

LLB Conv & Gas DSA

Exhibit F

**Check prices faster. Save more on gas.
Download our app today!**



⭐⭐⭐⭐⯨
380,000+ reviews



⭐⭐⭐⭐⯨
745,000+ reviews

---



### Shell

⭐⯨☆☆☆ (470)

8788 Vineland Ave
Lake Buena Vista, FL

407-938-9645

♡

---

| Regular | Midgrade | Premium | Diesel |
|---------|----------|---------|--------|
| - - - | - - - | - - - | - - - |

---

**LOG IN TO REPORT PRICES**

---

## Features


C-Store


Pay At
Pump


Restrooms


Payphone

## Reviews

**1.4**
Overall Rating





LOG IN TO WRITE A REVIEW


**rofro05**
Dec 13 2019



Extreme price inflation!!! Don't use this tourist trap!!!


**JerseySaltLife**
Dec 11 2019



Price Gouging on Gas... Absolutely Ridiculous!


**Buddy_cggnh798**
Dec 11 2019



Rob run !!!


**wmpmarshall**
Dec 10 2019



The price is $6.99 per gallon. The owner wanted a convenient store but was forced to sell gas. So he

priced it so high he didn't have to sell any but people still do.

 **lrodfiretec**
Dec 02 2019



Double the price than any other gas station in the area!! We just drove away when we saw the price.
....

 **Buddy_qzdc9nyz**
Dec 01 2019



Huge price

 **wdwepcot**
Nov 27 2019



Price of gas is ridiculous. Buyer beware

 **jcpatriots**
Nov 23 2019



Gas gouging. Notoriously high gas prices.

 **Redbonez01**
Oct 20 2019



Regular 6.99 Mid 7.99 Premium 8.99 Diesel 6.99 I took pictures because I thought it was a joke!🙈
🙈🙈 Where the capital H double hockey sticks do they do this at? And get atu with it? Someone
was actually dumb enough to pay $84 for like 12 gallons! 📷📷! No denying. I took pictures!
Shameful!



**rcurlee**
Oct 20 2019



the Shell gas prices are outrageous at $6.99 for regular unleaded and higher for premium and diesel. I've been staying at the Marriot Spring Hill across the street for over 7 years for spring and fall business meetings. This Shell gas station has had similar overpriced gas for the entire time ranging from $5.99 to $6.99 a gallon for unleaded gas. I can buy it currently for $2.35 - $2.45 at several gas stations within a mile of this one.



**Buddy_bm2rhja2**
Oct 20 2019



Price gouging POS!



**CaptainSheo**
Oct 15 2019



We need to keep reporting these prices as they are, because this gas station is taking advantage of people who are using possibly the last of their gas to get to the station that promises cheap gas and they at that point have no other option. This is manipulative and needs to be reported to whoever the most relevant party is to report to. This is false advertisement, and is, therefore, criminal.



**datkanwel**
Oct 14 2019



Prices this morning are $6.99, $7.59, $7.99 for unleaded to premium. Everyone else in the area is around $2.30 or so. How is this even legal? Just after I jumped out of the car, another patron came running over and told me not to get gas because she just spent $80 on 10 gallons. I couldn't believe my eyes when I saw the prices, so I took a picture. UNBELIEVABLE!!!



**Buddy_xc3wxmf3**
Sep 27 2019



PRICE GOUGING!!!! We didn't realize gas was 6.99 a gallon until after we had pulled out (our bad, but still...)!



**Buddy_8n77hq80**
Sep 08 2019



What the heck is with the 6.99 price still like that 9/8/19



**Dnlaly4**
Sep 06 2019



Price gouging! Buyer beware. I didn't notice until after I filled to $75. That's what I get for not looking. My debit card was declined, so I used my credit card. It was a warning.



**Buddy_eetdc9kk**
Sep 01 2019



I think they are price gauging. during a hurricane. not right



**dnaglich**
Aug 30 2019



Price gouging before Dorian 2019



**barryesq**
Aug 28 2019



Gas station is selling over priced gas and won't do anything about it



**dan3gators**
Aug 26 2019



Price Gouging at it's best



**danimassey**
Aug 23 2019



Ridiculous!!!!



**wolfpac**
Aug 23 2019



Their price is routinely $3-$4 per gallon higher than other stores around. Must be the store owner reporting these false prices



**dwdw2**
Aug 10 2019



Extremely high price since outlet mall nearby and cheating tourists



**Jasmine154**
Aug 06 2019



$6.99 for gas!!! No one go here!!!!



**Buddy_9334q4hx**
Aug 01 2019



Didn't notice the price until it was too late. 5.99 per gallon for regular was flat out theft!



**Dbdaly**
Jul 28 2019



They are price gauges their price is 6.99 a gallon for diesel. But they don't have a sign that says that will you are at the pump and you notice . Every other gas station have the price at 2.86,3.02 that is ridiculous for them to allow to do that to consumers. I went in and asked and was told the manager Carlos can do what ever he wants. Guys don't go there at all if they want to hurt us we can hurt

them. That's so abusive someone needs to put a stop to this. People go to Orlando to vacation and some with a budget to have an abuser like this owner to make your vacation go over your budget . He is taking advantage cause it's the closes gas station nearest to a lot of hotels and people stop there one they check out of the hotel.

 **purple5daddy**
Jul 27 2019 

Ridiculous price

 **E85isNotE0**
Jul 25 2019 

The new-normal for this place is up another dollar to 6.99,7.49,7.99 (6.99 diesel). For some reason, out-of-down folks always report insanely lower prices, here. Unfortunately, if you report the accurate prices, GasBuddy won't believe you, and block your price reports from showing.

 **miltonclark490**
Jul 03 2019 

price gouging at this gas station do not come here

 **imlaker2488**
Jul 01 2019 

Price for Regular 6.99 Mid was 7.99 Premium 9.19 This is Crazy for prices like this

 **logowears**
Jun 28 2019 

$6.99/gallon. $2.50 everywhere else. Price gouging at its finest!



**katekate23**
Jun 25 2019



6.99 for gas ?! Crooks



**spatty5600**
Jun 22 2019



ridiculous price gouging!



**randog**
Jun 21 2019



I suppose they hope someone is dumb enough to not notice that gas is $6 a gallon, after the owner posts a fake lowest price on this site.



**DrPremium**
Jun 16 2019



PRICE GAUGING!!!! Beware and avoid!!!!!!



**Buddy_1pnkkfky**
Jun 15 2019



$6.99 per gallon for regular gas. I didn't notice the sign, so that was my fault, but I just assumed it would be similar to other gas stations in the area. Ridiculous price gouging. I paid $70 to fill up 10 gallons. My fault for not paying attention, but their fault for such ridiculous price gouging



**yaya0ncloud9**
Jun 15 2019



$6.99/gallon for Regular while nearby places are averaging $2.45/gallon! Price gouging definitely at its best; they are definitely taking advantage of tourists and some locals. Perhaps this place needs to go viral!

 **Buddy_zw3wmvg0**
Jun 14 2019


PRICE GOUGING AVOID AT ALL COATS

 **Lori724**
Jun 14 2019


This place should not be in business and should be reported to the Better Business Bureau. $7 a gallon for gasoline is a crime. Thanks for ripping off people as they come and go to the happiest place on earth. Do you believe in karma??

 **sweetrapsody57**
Jun 04 2019


Prices are double anywhere else!!!

 **honestijm**
May 31 2019


5.99 price!

 **mrshinko**
May 28 2019


Price gouging

 **navylife78**
May 13 2019


Case 6:18-cv-00914-PGB-EJK    Document 89-1   Filed 01/16/20   Page 88 of 138 PageID 2063

price gouging!! Completely illegal.

---

 **krayon7979**
May 11 2019



gas is outrageously expensive

---

 **crizznaig**
May 11 2019



I wish I knew to report this station for it's pricing. I also feel sorry for people in desperation looking for gas to land at this place. avg local price was around 2.50/g. this place was 5.99/g... WHAT? SHUT THIS PLACE DOWN. I'm all for making a few extra bucks ok tourists, but lol at this place

---

 **Sonwise**
May 09 2019



At least they post their gas price on a large enough sign. Regular price there shows as 5.99

---

 **LeAnn258**
Apr 27 2019



$5.99 for regular?! Are you kidding me?! Highway robbery

---

 **djs75**
Apr 23 2019



Expensive prices. Recommend going for more affordable gas. (A recent newspaper article states this isn't price gouging, as this station did mirror local prices during a recent hurricane, and then raised them after the "price gouging window" was closed)

---



**danlittle777**
Apr 19 2019



These people are thieves. They rip off the tourists by charging gas that is $2.50 above area prices. They manipulate this app to hide prices. Crooks!!!



**JasonGvl**
Apr 18 2019



Charging over 3x normal gas prices for the area.



**Mercker**
Apr 08 2019



stopped and saw the price 599 thought it was a mistake then I looked at the pumps pulled out one somewhere else



**santymunoz**
Mar 30 2019



The gas per gallon it's extremely high. I do not recommend this gas station.



**sofi0518**
Mar 26 2019



This is price gouging. 6.99 for premium - other stations in the area are $3.14. Highway robbery!!!



**Jaredpaul2019**
Mar 13 2019



Price gouging



**needmysims**
Mar 07 2019



gas prices unreasonably priced



**dknog96**
Mar 03 2019



PEOPLE STAY AWAY!!!! Extremely high prices!



**salo83**
Feb 24 2019



Price gouge maybe???



**jmjclden**
Feb 23 2019



Gas was 5.99 a gallon price gouging. All other places under3.00



**mpbrennan1**
Feb 21 2019



Nice looking station with sky high prices.



**jack44b**
Feb 09 2019



Price more than double than everywhere!! Do not go



**rdhuckmedi64168**

Jan 26 2019



Coming off busy Vineland Ave. so didn't notice the poster price. $5.99/gallon for regular! Other stations nearby we around $2.20 or so! I'm glad that I caught the RIP OFF before I filled up!



**bobbyferna66710**

Jan 21 2019



Yes, you read this correct. I was here today 01/21/19. I didn't notice the price until it was to late. 5.99 for reg!! that 3.80 more then everywhere else. I called Shell and made a complaint as they are using their trademark and fuel to screw people over!! They are unapologetic about it to. I walked around and pointed the price out to everyone pumping, and none of them realized that they were going to work most of the day to pay for the fuel that they were pumping. They were all very upset and stopped pumping. They haven't heard the last of me on this. Disgusting!



**Yari91**

Jan 20 2019



Rode by going to the outlets and I saw the sign said $5.99 for regular unleaded. I figured it was a mistake since I had just filled up on Irlo Bronson for $2.18. But pulled in just to see. Indeed. $5.99 per gallon for regular! Blew my mind. And people were pumping! Stay away people. I promise it's cheaper. Way cheaper, everywhere else.



**gforce8887**

Jan 15 2019



Price gouging at its finest!!



**mccd**

Jan 14 2019



Omg. Price gouging! Do NOT use this gas station. Premium cost $6.999. Total rip-off. I reported to Shell Corporate HQ.



**LaurenKM12321**
Jan 13 2019



Okay. The gas station itself may be fine but they've inflated the gas prices to as much as 6 dollars while everywhere else is around 2 dollars! Don't go here!



**jorgedelaporte**
Jan 09 2019



Overpriced. DO NOT GO to this place.



**3littletykes**
Jan 07 2019



Price gouging to the extreme! $5.99 a gallon when everyone else is $1.99.



**odie3236**
Jan 06 2019



This place is a rip off stay away!!!!!



**Johns1935**
Jan 06 2019



extremely overpriced , gouging customers



**meganbevan**
Jan 04 2019



Not an actual shell?? Also very expensive





**justshena**
Jan 03 2019



Gas is $2 everywhere else and he's charging $6/gallon

---

**ctulumalo**
Jan 01 2019



Stay away from this station. They are charging 5.99 a gallon for regular.

---

**64chevy69er**
Dec 31 2018



always too high priced. when visiting I have never seen it change

---

**Air_Assualt**
Dec 30 2018



Do not stop here. They just got me for gas at 5.99. Horrible place!

---

**bwilson0925**
Nov 25 2018



Pulled in just before 8am on Saturday 11/24/18 and they were charging $5.99 for regular unleaded. Needless to say, didn't buy a drop from these crooks.

---

**Charitas**
Nov 25 2018



Prices are double other locations








**simplycrissy**

Nov 24 2018



Price gouging! The owner should be ashamed! I hope this place shuts down for cheating on their customers!



**cpmjr1**

Nov 04 2018



Price gouging, stay away



**jbeave**

Oct 01 2018



Extreme price gouging. Double the price of all surrounding gas stations due to the proximity to the rental cars



**billyham527**

Sep 03 2018



charging $5.99 for regular gas on labor day weekend 2018, you're app will not allow me to post price, why?



**breadstk11**

Aug 30 2018



$5.99/gal Regular Need I say more?



**proserpina**

Jul 24 2018



5.99 fuel....since everywhere else is 2.66 we asked if it was a mistake. Clerk said it's always 5.99 so I don't know who is reporting it as less.



**Jgomizzle**

Jul 24 2018



gas buddy asked me if the price is correct cause it seems a little high. A little high? These people who figured this price Must be sniffing gas Or . hahaha these people must be HIGH?gas prices at 5.99 a gallon for reg 6.99 for premium. this is insane, I can't even write , i must be High for being here.....



**TruckingNana**

Jul 23 2018



Price Gouging!!!!



**Xade**

Jul 23 2018



prices reported are never accurate, someone working at this gas station must use the app to report incorrect prices in the hopes that when you get here you buy gas anyway. This is the 3rd time I have come here for the reported "lowest price" around only for it to be a lie!!



**keimini**

Jul 23 2018



$5.99 per gallon is not right. Catching tourists not paying attention. someone on Gasbuddy app constantly lowing the price on the app but doesn't reflect the real price. I almost fell for it when it showed up cheap on gas buddy. can't believe people actually fill up here. at that price you have to wonder how old the gas is and if it is too old or not.



**ccvidor**

Jul 22 2018



This station has prices much way higher than any other gas stations on the vicinity..


**Myhemi528**
Jul 18 2018



these people are rubbing the tourists silly... this nothing but price gouging and they should shut down. .


**dvela713**
Jul 18 2018



Yes!!! Prices were almost double than every where else. $5.99 for regular


**Sammy30152**
Jul 18 2018



$5.99 gas


**kolekate22**
Jul 16 2018



Please take this down this place is scamming people please contact me so we can take this down


**murphyslaw16**
Jul 16 2018



false gas reporting constantly..should be taken off this site


**blueorangeny31**
Jul 15 2018



it's insane how this station has priced their gas



**doryisabel**
Jul 15 2018



$5.99 for REGULAR?!?

---



**Manuel Lope**
Jul 15 2018



This gas price is never under 5.99/gal. Someone keeps reporting false lower prices so it can be shown on the local news as the lowest price. Very deceitful.

---



**BernLogan**
Jul 14 2018



Price gouging at double the price. Someone is updating gas prices here with a much lower price to get you to go to this station and then it is double.

---



**PandaLoGuercio**
Jul 12 2018



Wow!!!!!! I've never seen any station gouge prices so bad!

---



**AggieGal92**
Jul 11 2018



price is double what the rest of Orlando is. gas buddy showed wrong price and still shows wrong price even after correct reporting. please check pump price before you buy.

---



**zee4speed**
Jul 10 2018



This owner lies and changes his gas price to 2.49 every day to fool people into thinking he is cheap and fool them not to read his small sign!



**storpappa**
Jul 08 2018



This is a gas trap station. Beware whoever is posting those fake cheap price reviews



**orquy**
Jul 08 2018



Prices have been high for 7 years according to the employees!!! We need to report them!!!



**JalapenoJoe**
Jul 06 2018



Someone is monitoring the pricing of this station on gas buddy and changing it to a low or the lowest price when it's actually 3x higher than anywhere else in town. Clearly Gas Buddy needs to keep an eye on this station.



**bonil5**
Jul 06 2018



Fraud! This place has high prices and as soon as you pay with your cards your bank starts texting you fraud alert at this location. Stay away from it!



**himes101**
Jul 05 2018



Needs work



**fridayy**
Jul 05 2018



This place says they have been charging 5.99 for regular for years..buyer be ware! Curious who

reported previous prices

 **ccavrn**
Jul 05 2018


Yes He is price gouging but it is legal. Avoid buying gas here and he will go out of business.

 **ghilsman**
Jul 03 2018


WOW. This is price gouging. Almost DOUBLE everything in the entire Orlando area. Stay away!!!!

 **Fenrir2012**
Jun 30 2018


5.99 per gallon. I stopped by thinking it was 2.57 because it was reported as such a couple hours ago. I have my suspicions.

 **dantusing**
Jun 24 2018


Station was down; cannot accept cash, debit or credit card. Cannot purchase gasoline

 **xxheathermarie**
Jun 23 2018


Way too overpriced. Disney cast members get discounts though. That's when you know it's a scam.

 **on3jump**
Jun 15 2018


Shell/Citgo at 8788 Vineland Avenue Orlando Florida. Unfortunately we weren't looking at the pumps and the lowest gas price was $5.99 a gallon. After realizing it we talked to the attendant who tried to tell us that the gas station as of 6/14/2018 defranchised which allows them to set the prices to whatever they like. But as of today's date (6/15/2018) it looks like a shell gas station entirely branded as Citgo. BEWARE! Not to mention the surrounding gas stations average price per gallon is $2.60.

 **alecarrillo3**
May 28 2018



Suuuuuuper expensive gas $$$$

 **JMBoykinII**
May 26 2018



don't stop here

 **rainpro**
May 23 2018



Pure 100% price gouging. Avoid at all costs. Stations with half the price less than 2 miles away.

 **beaucl**
May 20 2018



price gouging

 **robketterer**
May 17 2018



Crazy high gas prices!



**jamesdusoleil**
May 10 2018



This station in particular is the highest prices station in all of central Florida. Maybe all of Florida. It's been $5.99 a gallon for years for all grades.



**bdj604**
May 05 2018



Regular price here is ALWAYS $5.99/gal. Unfortunately, the price sign is low, not digital and at the far end of the station, so most people don't notice until it is too late. For some reason, every time we report the price here, it is removed. Please help consumers stay away from this ripoff pricing! It has been $5.99/gal for years! If you need photo proof, let me know.



**dthree3**
Apr 26 2018



PRICE GOUGING!! STAY AWAY! $5.99 PER GALLON!!!!



**dmdrewitt**
Apr 23 2018



$5.99per gallon. Why?



**lnorm2016**
Apr 22 2018



GAS PRICE FOR REGULAR IS 5.99!!!!!!!!



**DCCXVII**
Apr 21 2018



Horrific! I'm from Beverly Hills, California and we don't even pay that at out most expensive station- a 76 at the corner of Little Santa Monica Blvd and N. Crescent! And it's Full-service at ours!



**andys63**
Apr 14 2018



Gas price gouging.



**asanpedr**
Apr 14 2018



Absolutely terrible. The owner "doesn't want to sell gas, but wanted a convenience store". Do not go here



**hawaii2018**
Apr 05 2018



These guys price hike. BS. They are selling gas at Almost $6.00. Stay away should be fined



**mpeery**
Apr 05 2018



Gas is overpriced on purpose.



**TooTall314**
Mar 27 2018



Price gouging All stations around them are 2.59



**fdjmexx**
Mar 17 2018



Gas Price gouging.. ridiculous price ...5.99. They should be reported. Don't go there.

 **sinister1080**
Mar 08 2018 

This is by far one of the worst stations to get Gas from. They purposely take advantage of tourist by charging high prices for gas. $5.99 per gal Reg

 **skraz**
Mar 04 2018 

$5.99 when the market is $2.49? Ridiculous.

 **lastminutegc**
Mar 04 2018 

Thieves gauging tourist !

 **1MGD**
Feb 20 2018 

They have gas. But want to screw customers with high prices

 **jend15**
Feb 19 2018 

They charged 5.99 a gallon for regular gas when no other gas stations were above $3.00.

 **lydia6968**
Feb 09 2018 

prices way higher than surrounding stations

 **richman48**
Jan 23 2018



Price gauging here for sure!!!!! Needs to be addressed!

 **saure**
Jan 02 2018



Prices are insane compared to anywhere else in the area

 **Trincadog38**
Jan 02 2018



Way too expensive for no reason. Never putting gas here

 **Denia4093**
Dec 22 2017



Severe price gouging

 **damaris043093**
Dec 22 2017



way over priced gas!

 **GAGPestControl**
Dec 04 2017



Do not buy gas or diesel at this location it is a rip off

 **wahumphrey**
Dec 03 2017



Price gouging!!!!

 **ctmartens**
Nov 21 2017



Posted price is 5.99 per gallon. Have never seen anyone filling up there, only seen people using the restaurant.

 **gregh954**
Nov 18 2017



This is a privately owned gas station therefore they charge customers whatever they want in this case over double what the regular rate of gas in the area avoid it all costs.!!! I do not know how people like this sleep at night!

 **ecastillos**
Nov 17 2017



they are highway robbery.

 **JAYKAY89**
Nov 15 2017



Gas price is wayyyy too high $5.99/ gal???? I'm SOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOOO glad I glanced at the price before I pumped because I would've been hot!!! NEVER getting gas from this place. Ridiculous.

 **cordipi**
Nov 13 2017



rip off



**hubaby721**
Nov 11 2017



Crazy expensive. Don't waste your time here!



**mattsenfamily**
Nov 06 2017



price gouging for who knows what reason



**anajarrell**
Oct 29 2017



So expensive! Someone should sue them! Can't believe they are pricing their gas that high. $5.99 where everywhere else is around $2.20. Incredible!



**toocoolballz**
Oct 23 2017



Price gauging, this is a robbery. I didn't even notice until I was 6 gallons that I had already been charged $42. Not even during Hurricane Irma did I pay $5.99 a gallon.



**linairs**
Oct 19 2017



Clerk claims prices set by Shell. Then why are other Shell stations prices in line with everyone else?. Giant ripoff.



**chrispearl01**
Oct 15 2017



Price gouging.us . MERICAAAAAAH.

 **AlbertAlgood**
Oct 02 2017 

Don't waste your time stopping here! Extremely HIGH PRICES!

 **katcreese**
Sep 24 2017 

Don't get gas here. Plenty of gas stations around with normal gas prices!!

 **maxflier**
Sep 19 2017 

High gas prices

 **Renegade451**
Sep 15 2017 

Price gouged during Irma, 5.99/Gallon.

 **SidekickAmigo**
Sep 14 2017 

Gas is price gouge. One gallon of regular gas should not coast $5.99 in a crisis.

 **gamiley**
Sep 12 2017 

The price is ridiculous



**litlelowi**
Sep 09 2017

Price gouging $5.99 a gallon!!?!

**robcor16**
Sep 09 2017

This place should be shut down. Rip Off.5.99 gallon of diesel...

**kimjump**
Sep 09 2017

this place is price gouging!!!should be shut down and fined heavely!!!

**kwatta**
Sep 08 2017

what a rip-off! charging 5.99 for regular gas. that's horrible.

**elrankw1**
Sep 08 2017

6$ gallon

**TxnLonghorn**
Sep 07 2017

NEVER BUY GAS HERE!!!!!!!!!





**dsmonaco**
Sep 07 2017



Charged 5.99 per gallon during Irma



**pdarata**
Sep 05 2017



will never stop there again. Total rip off on gas.



**Jules472**
Sep 04 2017



Price is always ridiculous. Never less than $6 a gallon



**Phoenixg**
Sep 04 2017



The price is always at 5.99



**Dash27**
Sep 03 2017



Gas way over priced



**cherniausky**
Sep 02 2017



$5.99 for fuel and they don't accept the Shell Rewards card, even though they have the signs posted everywhere…. Seriously?!?



**BJ244**
Aug 10 2017



don't pay his inflated gas prices! plenty around the corner



**ilevers**
Aug 10 2017



5.99 a gallon lol



**Gunner1355**
Aug 01 2017



Down the street gas was 2.99 i asked the guy HE DIDNT WANT TO TALK ABOUT IT!!!! STAY AWAY



**lesmack73**
Aug 01 2017



gas prices at this station are outrageous 5.99 per gallon. prices are 2.99 at others stations in the area



**AldenVini**
Jul 21 2017



Stupidly Expensive



**issues_tissues**
Jul 16 2017



$5.99 per gallon? Will this gasoline turn my car into a supersonic jet of some kind? 😂



**TheTanColombian**
Jul 15 2017



this place is a ripe off, the get the tourists to pay $4 more a gallon just for being close to Disney world. it's a Shame. don't go here



**utopian7**
Jul 13 2017



Price for gas was more than 3x as much as everywhere else.



**debbi2011**
Jul 10 2017



It's DISNEY gas for tourist and desperate people. Double plus charged!



**dieselwhore**
Jun 30 2017



The most expensive opportunistic rip off artist around! $4gallon more than anyone else. Only a cretin would fill up here😵



**Mumeister**
Jun 19 2017



low cash price but they soak credit users



**Meow78**
Jun 18 2017



ridiculously over priced!



**rambler5**
Jun 16 2017



5.99 per gallon is outrageous would never patronize this store



**gaswoolf**
Jun 14 2017



PRICE GOUGING!!!



**cheap59**
Jun 10 2017



Reported prices out of wack.



**adaone**
Jun 07 2017



HORRIBLE—PRICE GOUGING, AVOID AT ALL COSTS



**g8rpack**
Jun 02 2017



Still gouging.



**tiana44**
May 31 2017



RIDICULOUS PRICING!!!! $5.99 a gallon!!!!! Everyone nearby is $2 plus!!!!!! An employee told me "prices have always been that way here" RIDICULOUS!!!!!!



**PeteP79**
May 28 2017



Ok any place that charges $5.99 per gallon is insane. Stopped in to get gas and noticed it said that price, I went in and asked if it was a mistake and they just said nope. One mile away you can find normal priced fuel. No wonder the place was empty.



**bguenth**
May 26 2017



expensive



**redheadrick**
May 25 2017



Horrible store



**jdmonks**
May 14 2017



ripping off the poor tourists with the HIGHEST GAS PRICES IN TOWN



**Kullainne**
May 13 2017



this place sucks it over charges for gas at 599 and I don't know how they get away with it



**choeffel**
May 08 2017



Way too expensive, rip off. Stay away.

 **Finegaz**
Apr 29 2017 

price gouging at its very best. drivers beware.

 **Bright_Scouter**
Apr 27 2017 

Always price gouging.

 **artvader**
Apr 27 2017 

Price gouging gas station

 **Shay508**
Apr 22 2017 

outrageous gas prices ... use GasBuddy find cheaper price gas.

 **rablelyte**
Apr 22 2017 

Literally always at $5.99.

 **Ronin813**
Apr 21 2017 

This station is priced 2 to 3 times as much as other stations. There should be a law against this.



**Claudinchen**
Apr 21 2017



It is a ripoff.



**helenhenderson**
Apr 16 2017



They over charge you for everything.



**searsbob**
Apr 14 2017



owner is ripping people off preying on unsuspecting tourist. pulled in and seen the $6 gas. most people don't pay attention and just slide their card and start the pump. owner should go to jail for what he is doing.



**PHDcuda**
Apr 09 2017



Ridiculously overpriced



**danikatt21**
Apr 07 2017



price gougers



**krtzone**
Apr 01 2017



don't go to this station under any circumstances!!! these scam artists charge $6 a gallon for no reason at all!! the owners should be in prison!!



**hotair60**
Mar 22 2017



not good



**erhrph**
Mar 21 2017



He rips people off by charging almost 3x the price as his competitors. 12 gallons of gas costs almost $72!!! He is definitely a predator.



**timmy5619**
Mar 16 2017



Ripping off unsuspecting tourists. The Gas prices here are almost THREE TIMES higher than average in area - REALLY ??



**atpgary**
Mar 04 2017



Check prices BEFORE you pump! These people are $1 - $2 MORE per gallon than other stations in the area. Avoid!!!



**NancyandLen**
Mar 04 2017



They sure does want to sell any gas .



**f1at1ger**
Mar 03 2017



rip-off and the staff are jerks!



**MDAtlanta**
Mar 02 2017



Third world criminals a. Pakistani terrorist group picing



**cmv517**
Feb 17 2017



entirely toooo expensive at 5.99 when other Shells .5 mile away are 2.



**#12#_purecountry**
Feb 12 2017



Highway robbery!!! 



**mlgl**
Feb 03 2017



Overpriced.



**Gmama58**
Jan 26 2017



There price $5.99 everyone else in the $2.20 range. Need I say more!



**Buffalo847**
Jan 26 2017



Rip off



**Miken118**
Jan 09 2017



Very high prices they gouge tourists.



**Timshroyer**
Jan 01 2017



Price gouging!!! Absolutely horrible.



**jygasfinder**
Dec 21 2016



THIS PLACE SHOULD BE SHUT DOWN!!!! THE OWNER IS PRICE GOUGING!!! I HOPE THEY HAVE TO CLOSE SOON BECAUSE OF NO BUSINESS.



**seabassofgas**
Dec 19 2016



You have to be REALLY DESPERATE



**Iamawingmut**
Dec 15 2016



Thieves!!



**407carlos**
Dec 14 2016



Price gouging for gas



**dreamtrip2015**
Dec 09 2016



5.99 for regular fuel???? everyone else is 2.09. can we say price gouging????



**myoung398**
Dec 04 2016



Biggest rip off ever!! Over priced gas! Price gouging! Less then a mile down the road it is $2.11



**michelson**
Nov 28 2016



they charge so much for gas because they know Disney guests will pay it.



**wojo88**
Nov 23 2016



$5.99? Everyone should go pump 10 cents worth and pay with a credit card. Nail this idiot with credit card fees.



**lauerbr**
Nov 13 2016



They need better prices and need to cleanup the place



**gators66**
Nov 10 2016



Sickness



**metalcorpse66**
Oct 31 2016



Price gouging! $5.99/ gallon when avg is $2.10



**devo442**
Oct 28 2016



prices way too high



**Passaro**
Oct 23 2016



they have NERVE! GAS GOUGING and they should be fined! They are greedy and should keep their prices competitive wuthering others. they might get more business.



**jguzmaja**
Oct 14 2016



This place is a rip off. Who gives them the right to charge 3 times more than the average price in the area? They should be jailed!



**kipsvet**
Oct 06 2016



  



**Debbybap**
Oct 04 2016



Holy crap! They jacked up their gas prices because of Matthew???!!!



**oz6269**
Oct 03 2016



Price gouging here

---



**ppurington23**
Sep 25 2016



Ridiculous

---



**outthere2**
Sep 21 2016



This station gouges customers because they are tourists. please stay away. I complained to Shell, they don't care.

---



**gassylola**
Sep 17 2016



This gas station is over priced to take advantage of foreign customers.

---



**bradakacoolguy**
Sep 14 2016



What's with the gas prices???

---



**biggytupac**
Sep 11 2016



Price gouging. 6 dollars a gallon. Should be illegal.

---



**yogilynn02**
Aug 20 2016



$5.99 a gallon. What a rip off not necessary.



**cobrasvt94**
Aug 15 2016



Stay away from this place. He's a known price gouger that takes advantage of tourists

These reviews are the subjective opinion of a GasBuddy member and not of GasBuddy LLC

# Want to write a review?
Download the GasBuddy App




## Nearby Stations



**Chevron**
⭐⭐ 42
13480 S Apopka Vineland Rd
Orlando, FL

**$2.99**
👤 xfireRED
18 minutes ago
CASH



## Top Spotters

| | | |
|---|---|---|
| 1 | Spanky132 | 7 |
| 2 | mzonew | 1 |
| 3 | Buddy_ve8up9jm | 1 |
| 4 | 64chevy69er | 1 |
| 5 | tltddamico | 1 |

**FEATURES**

**COMPANY**

**WORK WITH GASBUDDY**

**MEDIA**

**SUPPORT**

Download on the App Store

GET IT ON Google Play

Terms of Use     Privacy Policy

v 6.15.4 © 2019 GasBuddy/OpenStore LLC

99 Chauncy Street
Boston, MA 02111





Restaurants ▾    Home Services ▾    Auto Services ▾    More ▾



# Vineland Shell    ⊘ Unclaimed

★☆☆☆☆    181 reviews    📊 Details

Gas Stations    Edit

★ Write a Review    📷 Add Photo    ↗ Share    🔖 Save

---

## Photos and Videos



See All 88

See All 88

---

## You Might Also Consider    Sponsored  ⓘ

**Sam's Club**    ⋯
★★★☆☆  18 reviews    📍 **4.1 miles** away from Vineland Shell

Brett H. said "As expected this place was packed, after all, we did choose to come on a Saturday. LOL. It seems that everyone else in the area also wanted to go to Sam's. No issues while we were here. The only person we interacted with was the…"  **read more**
in Tires

**Fields BMW of South Orlando**    ⋯
★★★☆☆  81 reviews    📍 **6.3 miles** away from Vineland Shell

Michelle D. said "It only gets 4 stars as the first two times I came in, I had a horrible experience. Also the Wait times are horrendous. They were charging me for things I shouldn't be charged for and really just disregarded me. I argued a lot and…"  **read more**
in Auto Repair, Car Dealers

---

## Location & Hours



📝 Add business hours

**8788 Vineland Ave**
**Orlando, FL 32821**
International Drive / I-Drive

Get directions



## Amenities

💳 Accepts Credit Cards **Yes**          ⚥ Gender Neutral Restrooms **Yes**

## Ask the Community

Yelp users haven't asked any questions yet about **Vineland Shell**.

[ Ask a Question ]

## Recommended Reviews

🔴 **Your trust is our top concern,** so businesses can't pay to alter or remove their reviews. Learn more.                                                    ✕

| Search within reviews 🔍 |

Sort by **Newest First** ▾          Language **English (177)** ▾

Start your review of **Vineland Shell**.

---

**Genny A.**
Manhattan, NY
👥 0 friends
📋 11 reviews
📷 3 photos

⭐☆☆☆☆ 12/18/2019

DO NOT BUY GAS from these criminals! The worst they are committing a crime and extortion. I plan to report them to Shell HeadOffice.
They charge 6.99 a Gallon but you don't realize til you are at then pump, if filled it up with the automatic lever action when it stopped it usually full. The charge was $75 I normally pay $65 to fill my tank but wait for it $75 was only a half tank at this criminal gas station!
You will be ripped off a violation. DO NOT BUY GAS FROM HERE

[ 👍 Useful ]  [ 😊 Funny ]  [ 😎 Cool ]

---

**Sandra P.**
Evanston, IL
👥 0 friends
📋 15 reviews

⭐☆☆☆☆ 12/15/2019

RIPOFF AVOID AT ALL COST! I just got suckered into paying 6.99 a gallon for gas at this place! REALLY. We pulled into this place and didn't notice the price for gas until it was too late. It's been reported so many times and yet nothing is done. Its my last night here and that's how I'm going to remember Orlando, by a $100 charge for 14 gallons of gas. I hope they get closed down. WHAT A RIPOFF

[ 👍 Useful ]  [ 😊 Funny ]  [ 😎 Cool ]

---

**Carol O.**
Coral Gables, FL
👥 105 friends
📋 5 reviews

⭐☆☆☆☆ 12/15/2019

PRICE IS $6.99 P/G please avoid this Gas station. We trusted the Shell logo and it's reputation, we are from Miami and we do browse for gas prices but we never encountered such a problem. If you are a turist please make sure to double check before paying. The biggest red flag is that if you are paying by credit card, you will get a fraud alert. Because if you have a business and get lots of charge backs, merchant services will not allow you to get payment unless is  y debit. PLEASE BE AWARE!

[ 👍 Useful ]  [ 😊 Funny ]  [ 😎 Cool ]

---

↗ shell.us

📞 (407) 938-9645

◆ Get Directions

---

✕

**Is this your business?**

Claim your business to immediately update business information, respond to reviews, and more!

[ Claim This Business ]

**You Might Also Consider**   Sponsored ⓘ

**Beast Coast Towing**
Stephanie P. said "Would highly recommend Beast Coast Towing to anyone in the Orlando area needing…" read more

**A1 Speed Auto Glass Inc**
⭐⭐⭐⭐⭐ 1 review
📍 13.0 miles
Yefry G. said "Installed my windshield good and professional job very nice and best price i was…" read more



**Deborah A.**
Ridgeland, SC
3 friends
2 reviews

★☆☆☆☆ 12/13/2019

BUYER BEWARE!! They charge $6.99 a gallon. I reported them to the gas gouge hotline, only to be told that in Florida it is inly illegal if they gouge in a state of emergency.
Sadly, some people in a hurry won't notice until it's too late. I hope they are proud to be so immoral and unethical.

☺ Useful   😀 Funny   😎 Cool

**Mike B.**
Cave Creek, AZ
133 friends
226 reviews
60 photos
**Elite '2019**

★☆☆☆☆ 12/5/2019

Talking about taking advantage of a location, this is the worst I've ever seen. NO prices Posted on a sign anywhere. We stopped for a quick bite and was distracted helping someone from another country on how to use the Pay at the Pump. Had started refueling and did not notice the price per gallon until we had half a tank, $60!!! Predatory practices!!!

☺ Useful 1   😀 Funny   😎 Cool

**Lynn B.**
Tallahassee, FL
0 friends
1 review

★☆☆☆☆ 11/21/2019

Exorbitant price for gas. $6.99/gallon!! Taking advantage of people who are not familiar with the place. Beware if you are staying at Marriott Villages, there are other gas places nearby. Don't go there.

☺ Useful 1   😀 Funny   😎 Cool

**Don H.**
Clearwater, FL
0 friends
4 reviews

★☆☆☆☆ 11/9/2019

Beware of this gas station. Regular gas is $6.99 per gallon. That's right $6.99. Just because they are in the Orlando area, they think they can overcharge. I can Understand Gas being higher here than other places but $7 a gallon is outrageous.

☺ Useful 1   😀 Funny   😎 Cool

**John B.**
Arlington, MA
0 friends
8 reviews

★☆☆☆☆ 10/17/2019

Total ripoff. My son stopped here after visiting Disney and luckily he stopped just shy of ten bucks for JUST OVER A GALLON!!! What a joke - preying on unsuspecting visitors to Disney. Disney should be ashamed and shut this place down.

☺ Useful   😀 Funny   😎 Cool

**Philip F.**
Fort Lauderdale, FL
82 friends
5 reviews
1 photo

★☆☆☆☆ 10/16/2019

Gouging Gas Price at Shell Station 87788 Vineland ORLANDO
Reports of exorbitant gas prices at this Shell station go back 3 or more years. On 10/11/2019 I was getting gas across from my hotel and STOPPED when I realized it was at a rate of $6.99. Half a tank came to $71.44

☺ Useful 1   😀 Funny   😎 Cool

**Susan W.**
Tavernier, FL
0 friends
14 reviews
12 photos

★☆☆☆☆ 10/13/2019

Unbelievable price gouging because they're near a hotel. Price all over town $2.32 for regular grade. This place is charging $6.99 for regular gas. If there was a hurricane coming they would be breaking a law

☺ Useful 1   😀 Funny   😎 Cool





 **Molly F.**
Land O' Lakes, FL
313 friends
18 reviews
1 photo

10/5/2019
Messed up. Overcharging for gas to take advantage of tourists and people. Should be illegal.

Useful 1 | Funny | Cool

**Kimberly K.**
Jacksonville, FL
0 friends
5 reviews

8/29/2019
DO NOT GET GAS HERE!! I wish I could give it no stars!! :( I reported this gas station to the State of Florida for gas gouging and they said that they can only monitor gas prices and fine people during a natural disaster but that they urged consumers to report this type of activity to online sites to patronize other gas stations in the area so that people will not use this station. It's absurd this owner is ripping people off by charging such high rates for gasoline. They should be shut down!!

Useful 1 | Funny | Cool

**Yipsy G.**
Hancock, Cape Coral, FL
28 friends
1 review

8/28/2019
Do not go to this gas station whenever I'm orlando. I would give this gas station a zero if I could! How could you charge people 6.99$ per gallon. Where does the gas come from a Gold mine? This is a way to screw with the public ! I have never seen anything like this in my life. I have lived in big cities before and never has gas been this overpriced

Useful | Funny | Cool

**Laura V.**
Hialeah, FL
1 friend
8 reviews
3 photos

8/26/2019
Shady business! We did not see the sign with the gas price and desperately needed gas. The price was not at the pump and we were distracted. It's $6.99 A GALLON! It also did not ask for our pin or zip code when paying with credit card. This gas price is probably illegal or they are using the station as a cover up for illegal activities. Who knows. Why else would they purposely put the highest price for gas and not have steady flow of customers?!

Useful 1 | Funny | Cool

**Ilisa N.**
Lutz, FL
71 friends
28 reviews
51 photos

8/25/2019
1 photo 1 check-in

I would give no stars except not an option to leave a review. We pass here every time we are in Orlando. We stopped to get a drink this time and my husband asked if that was in fact the price of gas. The very rude man/person behind the counter said yes it is if you want gas that's the price very rudely. So as he was paying for his drink he said no I am not getting gas the guy said than you don't need to worry about price you get can get somewhere else, to that Ted said I bet you do also like up the street. Honestly though isn't this price gauging isn't this illegal!!!

Useful 2     Funny    Cool

---

**Brian M.**
Albany, NY

0 friends
17 reviews
1 photo

★☆☆☆☆ 8/24/2019

6.99 a gallon!!!  We drove in to verify and that price is unfortunately correct.  Unless you are loaded and have deep pockets, many other options with reasonable prices are available nearby.  If there was a show for America's Got Talent with gas prices, this would win!

 Useful 1     Funny     Cool

---

**John S.**
Sanibel, FL

0 friends
1 review

★☆☆☆☆ 8/9/2019

6.99 a gallon! Shame on them!! Hope you can leave with your self's! This is stealing!

 Useful     Funny     Cool

---

**George H.**
West Milford, NJ

0 friends
4 reviews

★☆☆☆☆ 8/1/2019

Made mistake of not checking their prices, assuming they would be similar to everyone else, it was late, that is not case. Never paid that much in my life...

 Useful     Funny     Cool

---

**Doug C.**
Jacksonville, FL

13 friends
9 reviews
26 photos

★☆☆☆☆ 7/29/2019

If I could give this place -5 stars, I'd do it in a heartbeat. This place is as crooked as a dog's back leg! $6.99/gallon for regular??? WTF?? This place should be avoided at all costs - go down the road about a mile and you'll find a gas station with competitive pricing, not this gouging.

Obviously they are not making money from the gas sales, since my car was the only one at the pump.

Reporting this place not only to the Attorney General's office, but the Better Business Bureau, Shell Oil and the local television station.

Ripping off both locals and tourists...the place should be run out of town...

 Useful 3     Funny     Cool

---

**Alia A.**



**Orlando, FL**

👥 **9** friends

🏅 **55** reviews

📷 **21** photos

⭐ 7/28/2019

6.99 per gallon.. how is this place even open. What a rip off. That should be illegal to literally charge more than double the price of gas.

| 👍 Useful 2 | 😆 Funny | 😎 Cool |

---

Page 1 of 9   1 2 3 4 5 6 7 8 9   Next ›

69 other reviews that are not currently recommended

---

**You Might Also Consider** Sponsored ⓘ



**Universal Nissan**

📍 5.9 miles away from Vineland Shell

**Donna S. said** "My first experience with Universal Nissan. The sales staff and finance manager were very professional. This is a privately owned dealership and they work hard to extend the personal service that you do not see in many corporate…" **read more**

in Auto Repair, Auto Parts & Supplies, Car Dealers



**Universal Hyundai**

📍 5.9 miles away from Vineland Shell

**Lisa W. said** "My husband and I were a bit discouraged after visiting a few KIA dealerships and not getting the deal we wanted on a used Kia Optima (does anybody want to sell a car anymore?). We were about to just scratch the whole idea of getting…" **read more**

in Auto Parts & Supplies, Car Dealers, Auto Repair

---

**People Also Viewed**



**Speedway**

⭐⭐⭐ 15 reviews

Gas Stations

---

**Browse Nearby**

🍴 Restaurants

🍸 Nightlife

💼 Shopping

••• Show all

**Near Me**

Gas Stations Cost Guide

Cheapest Gas Near Me

**Other Gas Stations Nearby**

Find more Gas Stations near Vineland Shell

**People found Vineland Shell by searching for…**

Shell Gasoline Orlando

---

### About
About Yelp
Careers
Press
Investor Relations
Content Guidelines
Terms of Service
Privacy Policy
Ad Choices

### Discover
Yelp Project Cost Guides
Collections
Talk
Events
The Local Yelp
Yelp Blog
Support
Yelp Mobile
Developers
RSS

### Yelp for Business Owners
Claim your Business Page
Advertise on Yelp
Yelp Reservations
Yelp WiFi
Yelp Waitlist
Business Success Stories
Business Support
Yelp Blog for Business Owners

### Languages
English ▾

### Countries
United States ▾



Copyright © 2004–2019 Yelp Inc. Yelp, and related marks are registered trademarks of Yelp.

Exhibit G

DocuSign Envelope ID: 39F27F6D-30BB-4F19-80C9-997F3F37F075



MOTIVA ENTERPRISES LLC
FSM CONTRACTS
500 DALLAS ST, 6 OAC
HOUSTON, TX 77002

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

**January 31, 2018**

SOUTHEAST PETRO DISTRIBUTORS INC
402 HIGH POINT DR
COCOA, FL 32926-6600

Subject:        FAILURE TO MAINTAIN BRAND STANDARDS

Please refer to the Wholesale Marketer Agreement effective January 1, 2017 **("Agreement")** between SOUTHEAST PETRO DISTRIBUTORS INC **("Buyer")** and Motiva Enterprises LLC **("Company")** covering the sale of and purchase of Shell-branded products.

Company is aware of a high volume of over 400 customer complaints over a short period of time (past few months) that have been lodged against the site located at **8788 Vineland Ave, Orlando, FL 32821-6504 ("Buyer's Outlet")**. Under Section 7(a) Buyer agreed to uphold the Brand Standards of Company, including but not limited to promptly and courteously responding to customer complaints (including written responses when appropriate) and taking immediate action to resolve satisfactorily each customer complaint. Section 7(d) states that the operations at Buyer's Outlets must be conducted in a professional, business-like, ethical, and moral manner. In addition, Buyer has also agreed to under Section 9(a), that it has the obligation to use its reasonable efforts to develop and actively promote the sales of Products.

Company has found Buyer to be negligent in its responsibilities listed, due in part to the sheer volume of complaints that have been lodged against the above-mentioned site, as well as the content of the complaints that overwhelmingly allege price gouging and deceptive or unfair marketing practices. The customer complaints have been posted publicly on third party sites, as well as with Company's Customer Service Center.   Accordingly, Buyer has failed to uphold the Brand Standards of Company in resolving satisfactorily each customer complaint and in turn, such customer complaints have impacted promoting the sale and marketing of Products in accordance with the WMA. Such failure and public customer complaints have negatively impacted the Identifications when compared to the Orange County average of retail gasoline sales per site per month in that the monthly volume of Buyer's outlet has been well below the Orange County average. For those reasons, Company is revoking permission to use the Identifications at Buyer's outlet and must take all steps necessary to cease the marketing and selling of Products and otherwise using the Identifications at the Buyer's Outlet. **Failure to comply with this notice would result in the rightful termination of the WMA under Section 25.**

In accordance with §2802 and §2804 of the Petroleum Marketing Practices Act **("PMPA")**, Company gives Buyer 100 days from the date of this letter, **May 10, 2018**, to completely debrand Buyer's Outlet in accordance with the specifications listed in Exhibit A.

DocuSign Envelope ID: 39F27F6D-30BB-4F19-80C9-997F3F37F075

As a result of the early termination of Buyer's Outlet. Buyer is therefore obligated to reimburse Company **$29,585.23** which amount is based upon the Default formula in the Wholesale Marketer Facility Development Incentive Program Agreement relating to the Shell-branded retail outlet located at **8788** VINELAND AVE, ORLANDO, FL 32821-6504. In addition, it has come to Company's attention that Buyer's Outlet has been rebranded prior to the expiration of the Brand Commitment entitling Company to Rebrand Default Compensation. This letter confirms that Company and Buyer have agreed that Buyer will pay Company **$27,848** in settlement of Company's Rebrand Default Compensation claim. Company will draft Buyer's account for these amounts upon the date of debranding, **May 10, 2018.**

Please be reminded that in connection with this debranding Buyer must confirm that Buyer's Outlet has been properly debranded in accordance with the criteria set forth in the attached **Exhibit A** (Debranding Specifications).

Very truly yours,

Motiva Enterprises LLC

Thelma E. Johnson
FSM Contracts & Sales Support Manager
Fuels Sales & Marketing

cc:     Jerry LeBus
        Sean Howard

DocuSign Envelope ID: 39F27F6D-3UBB-4F19-8UC9-99/F3F3/FU/5

## EXHIBIT A

### DEBRANDING SPECIFICATIONS

1. Remove all sign faces including the Pecten, price sign faces and message panels from the free standing I. D. sign poles. Repaint sign poles a color scheme other than Shell RVI White #53 and Dark Gray #51 or Shell Warm Silver

2. Remove all canopy signage (Shell logotypes and Pectens), the RVI Lazy S fascia (including the red light bar) on RVI Levels 1 and 2 and the RVIe curved fascia on the RVIe Level 1 canopies, the red light bar on RVI Level 3A, the RVIe column mounted dispenser flag sign numbers and all decals including the canopy column decals, red decal on the canopy fascia, etc.

3. Paint or re-skin the canopy fascia a neutral color scheme other than Shell RVI Yellow #49 and White #53 and the canopy columns other than the combination of Shell RVI White #53 and Dark Gray #51.

4. Remove all building (Food Mart, Service Center and Car Wash) signage including portico (RVI Level 1), RVI color coded fascia or RVIe branding fascia and decals.

5. Remove all Shell Food Mart interior graphics and any other Shell related identification.

6. Paint the entire facility, all buildings, trash enclosure, perimeter fencing, bollards, etc. a neutral color scheme other than the combination of Shell RVI White #53 and Dark Gray #51.

7. Remove all Shell identification, graphics, valances, product banners, decals, etc. from the dispensers or completely remove and replace the dispensers.

# Exhibit H

**From:** Ryan Firth <ryan@southeastpetro.com>
**Date:** February 14, 2018 at 8:08:34 AM EST
**To:** "cicisfla@gmail.com" <cicisfla@gmail.com>
**Cc:** Summit Shah <Summit@southeastpetro.com>, Mariah Azevedo
<Mariah@southeastpetro.com>, Lysandra Owen <Lysandra@southeastpetro.com>
**Subject: Shell Debrand Notice**

Nabeel,

Shell has again issued noticed for you to debrand your facility due to the marketing practices and
growing number of complaints files. Unless otherwise withdrawn by Shell, site must debrand by May 10,
2018.

1



Southeast Petro

**Ryan Firth**

**Director of Business Deve**

402 High Point Dr. | Cocoa, FL :

Office 321.631.0245 Ext 148

Mobile 561.756.5203

Website | Map | Email

